**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------    x
                              :

In re:                              :

QUIRKY, INC., *et al.*[1]          :

        Debtors.         :

                              :

---------------------------------------------------------------    x

**Chapter 11**

**Case No. 15-12596 (___)**

**DECLARATION OF CHARLES KWALWASSER**
**IN SUPPORT OF DEBTORS' FIRST DAY PLEADINGS**

       I, Charles Kwalwasser, declare, pursuant to section 1746 of title 28 of the United States Code, that:

       1.     I am General Counsel, Chief Administrative Officer and Secretary of Quirky, Inc. ("Quirky"), one of the above-captioned debtors (the "Debtors", or the "Company"). I submit this Declaration in support of the Debtors' chapter 11 petitions and the first day pleadings described herein. I am familiar with the Debtors' day-to-day operations, businesses and financial affairs.

       2.     I have served as Quirky's General Counsel since joining the company in 2011. I previously served as Intellectual Property Counsel for Barclays Capital and Lehman Brothers, and worked in the Intellectual Property Group of Clifford Chance LLP.

       3.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (collectively, the "First Day Pleadings"). I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

4.      The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases.  Among other things, the First Day Pleadings are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity and value as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' businesses, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

5.      In my capacity as General Counsel of Quirky, I am familiar with the Debtors' day-to-day operations, financial affairs, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) my review of relevant documents; (iii) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (iv) my opinion based on my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6.      Parts I through III of this Declaration provide an overview of the Debtors' businesses, capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases.  Part IV summarizes the relief requested in each of the First Day Pleadings. Part V lists the schedules of information requested by Local Bankruptcy Rule 1007-2.

**THE DEBTORS' BUSINESS**

7.      Since its inception in 2009, Quirky's revolutionary online idea factory and marketplace has made invention accessible by bringing real people's product ideas to life.

From its headquarters in New York City -- and with contributions from its vibrant web-based community of inventors, collaborators and contributors -- Quirky identifies and cultivates products.  Last year, Quirky sold over 150 different products and a total of 4 million units, generating over $50 million in revenue from its retail and consulting businesses.

8.      Through Wink, Inc. ("Wink"), a wholly-owned subsidiary of Quirky that was incorporated in November 2013, the Company has developed a platform for wireless-enabled products that allows consumers to control a host of household appliances and services through their connected devices and the internet.   Through partnerships with General Electric, Honeywell, Nest, Phillips and others, over 60 Wink-enabled products are available in the marketplace with many more in development.  Wink enables homeowners to wirelessly connect lighting, power and security systems through a single app.  The Wink app allows users to customize the way products talk to each other. For example, a Kwikset SmartCode Deadbolt© can be programmed to tell a user's lights and air conditioning to turn on every time a home's front door is unlocked.   The Wink app also allows multiple users to control multiple appliances with a single swipe of their smart phone.   While Wink maintains its own management, distribution, and sales channels, it shares certain general administrative services with Quirky, its corporate parent.

9.      Historically, new ideas would be submitted to Quirky by means of its online platform by Quirky's inventor and collaborator community, which is comprised of over 1 million registered members.  Although a wide variety of product ideas were submitted to the Quirky platform, the most popular ideas centered on electronics, home and garden, kitchen and organization.  Those ideas deemed to have merit were then marked for review by Quirky staff and subjected to a more intensive evaluation by Quirky's engineers and designers.  The best ideas were then "pitched" to the Quirky community by a panel of Quirky staffers and designers during live weekly sessions broadcast on Quirky's website.  Historically, 8-15 products were

presented on a typical weekly basis, and the ideas that garnered the most support moved forward in the development process.

10.     Selected ideas were subjected to further design refinements by Quirky employees and researchers with further input from the Quirky community and then virtually "launched" on Quirky's website to gauge potential interest in a finished product.  After review and analysis of the feedback generated by this "soft" launch, Quirky decided if the product would finish the design and manufacturing process.  Products that generated sufficient positive feedback were then manufactured and sold to the public through big box retailers like Target and Home Depot and online through Quirky's website.  Revenues generated by the sale of these products were then shared with the inventor and the Quirky community at large.  Popular products generated through the Quirky process include the *Pivot Power* flexible surge protector, the *Cordies* cord organizer and the *Bandits* organizational tool, among others.   This process led to the manufacture and sale of 34 products in 2011, the first year the Company developed finished products for the marketplace.

11.     Quirky also works directly with large companies to develop new products through its "Powered by Quirky" initiative.  In exchange for service fees, Quirky provides third parties with access to its engineering and design staff, community of inventors and exclusivity to certain product ideas.  Through partnerships with General Electric, Quirky serves as a major driving force for the innovations behind new products.  In 2015, the Company began to wind-down its product development and distribution business and focused heavily on establishing new strategic partnerships through the Powered by Quirky initiative.  In order to bolster the Powered by Quirky infrastructure, on or about March 25, 2015 the Company acquired the assets of Undercurrent LLC, a leading boutique management consulting services provider.

12.     The Debtors currently employ approximately 90 employees (substantially all of whom are associated with the Wink business), none of whom are unionized.  The Debtors have enjoyed favorable relationships with their highly qualified and enthusiastic personnel.   The

Debtors believe that their labor relations are good.  Historically, all payroll and benefit expenses of each of the Debtors were borne by Quirky.

13.     As is further discussed below, the Debtors commenced these chapter 11 cases to (i) effectuate the sale of the assets associated with the operation of the Wink business to an affiliate or designee of Flextronics Sales and Marketing (A-P) Ltd. ("Flex") or any other bidder[s] submitting higher and better offers pursuant to a Court-approved bidding and auction process; (ii) preserve the Quirky invention engine and online community through a sale of the Quirky business through a postpetition process; and (iii) liquidate all of the Debtors' remaining assets and discontinue all business lines that cannot be sold for value.

## CAPITAL STRUCTURE[2]

I.    **Secured Debt**

14.     The Debtors and Comerica Bank ("Comerica") entered into a Loan and Security Agreement dated September 25, 2013, as amended from time to time, pursuant to which Comerica provided the Debtors with a $20 million revolving line of credit (the "Revolver"). Aggregate borrowings under the Revolver are limited to an amount determined by a formula based on various percentages of eligible inventory and accounts receivable, which bear interest at variable rates.  The maturity date of the Revolver is October 22, 2015.  As of the Petition Date, the outstanding balance under the Revolver is not less than $19,926,731.90 exclusive of accrued and unpaid interest, fees and expenses.

15.     Pursuant to that certain First Amended Loan and Security Agreement dated April 22, 2014, Comerica also provided the Debtors with a term loan in the face amount of $10 million (the "Term Loan").  The maturity date of the Term Loan is October 22, 2017.  As of the Petition

---

[2] The summary of the loan document and security agreement set forth herein is qualified in its entirety by the documents themselves.  To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

Date, the outstanding balance under the Term Loan is not less than $9,333,333.34 exclusive of accrued and unpaid interest, fees and expenses.

16.     The Revolver and the Term Loan are secured by first priority liens on substantially all of Quirky's assets.

## II.     **Unsecured Debt**

17.     *Subordinated Convertible Notes.*     On November 28, 2014, the Debtors authorized the issuance of $50 million of subordinated convertible notes due December 31, 2015 (the "Subordinated Convertible Notes"), unsecured debt instruments pursuant to which the holder shall have the right (at its option) to convert all or any portion of the unpaid principal and accrued and unpaid interest due thereunder into fully-paid and non-assessable shares of Series D Convertible Preferred Stock of Quirky at a conversion price equal to $6.022681 per share, subject to adjustment in certain events.

18.     As of the Petition Date, the Debtors have issued and sold nine Subordinated Convertible Notes to certain purchasers for the total principal amount of up to $36,800,000, as set forth in the table below:

| Noteholder | Principal Amount of Note |
| --- | --- |
| GE Ventures LLC | $10,000,000 |
| GE Ventures LLC | Up to $10,000,000 |
| RRE Ventures IV, L.P. | $300,000 |
| RRE Leaders Fund, L.P. | $2,700,000 |
| KPCB Holdings, Inc. | $2,000,000 |
| Norwest Venture Partners XI, LP | $3,000,000 |
| The Marks Family Trust | $500,000 |
| AH Parallel Fund III, L.P. for itself and as nominee for AH Parallel Fund III-A, L.P., AH Parallel Fund III-B, L.P., and AH Parallel Fund III-Q, L.P. | $3,000,000 |

| | |
|---|---|
| Undercurrent LLC | $5,300,000 |
| **Total** | **$36,800,000** |

19.     Pursuant to a Subordination Agreement dated April 30, 2015, the claims of the holders of the Subordinated Convertible Notes (other than Undercurrent, LLC) are subordinate to, among other things, any security interest, lien, and right to payment of Comerica.

20.     *Trade Debt.*  The Debtors also owe their trade vendors, landlords, service providers and other general unsecured creditors approximately $28 million as of September 1, 2015.

## III.      Equity Holders

21.     Quirky's preferred stock is privately held.  There are six classes of preferred stock: (i) Series A Convertible Preferred Stock; (ii) Series A-1 Convertible Preferred Stock; (iii) Series A-2 Convertible Preferred Stock; (iv) Series B Convertible Preferred Stock; (v) Series C Convertible Preferred Stock; and (vi) Series D Convertible Preferred Stock.  In total, among the six classes of preferred stock, approximately 48 million shares of preferred stock have been issued.  Quirky's common stock is also privately held.  Approximately 6.5 million shares of common stock have been issued.

22.     Wink and Undercurrent Acquisition, LLC are wholly-owned subsidiaries of Quirky.

### EVENTS LEADING TO THESE CHAPTER 11 CASES

23.     Several factors have severely impacted the profitability of the Debtors' product manufacturing and distribution business, ultimately prompting the current liquidity pressures that precipitated the Debtors' decision to commence these chapter 11 cases and dispose of their assets pursuant to a Court-approved sale process.

24.     Over the past six years, Quirky shepherded hundreds of new products to the marketplace.  While the Company's early efforts focused on manufacturing relatively simple items, Quirky quickly shifted focus towards a greater number of more complex offerings in both hardware and software.  By 2014, the number of products in manufactured and sold by Quirky

had increased from 34 to over 150.  The Company faced a number of operational challenges as the volume of more complicated products that Quirky brought to market increased and the product categories in which Quirky was involved became more diverse.   The Company expanded to accommodate the development of these new products by opening offices in San Francisco, CA and Schenectady, NY, increasing the overhead expenses and working capital needs of the enterprise.  At the same time, the Quirky platform generated a large number of products with an enthusiastic base of support from within the Quirky community.   In short, Quirky was unable to attain manufacturing and distribution scale, and sustained significant losses on many of these products.

25.     Over time, Quirky's struggle to effectively manage and scale the costs associated with its rapidly growing research and development, manufacturing and distribution functions manifested itself in increasing year-over-year operating losses and the incurrence of the secured and unsecured debt summarized above.    Quirky's difficulties coincided with considerable growth and development of the Wink business, which after initially serving as the app for connected products from the Quirky+GE partnership, quickly became a leader in the connected home products marketplace, expanding to partner with 15 leading brands and to support over 60 products.   Accordingly, beginning in late 2014, the Company commenced efforts to reduce costs by transitioning Quirky's business model from the manufacture of new products towards a model more focused on corporate partnerships and business-to-business consulting.  In order to bolster the Powered by Quirky capabilities, on or about March 25, 2015 the Company acquired the assets of Undercurrent LLC, a boutique management consulting services provider, in exchange for a cash payment of $1.5 million at closing, the issuance of $5.3 million of convertible unsecured notes, the issuance of warrants, the collection and delivery by Quirky of certain accounts receivable, and $8 million in aggregate deferred payments due in December 2015 and March 2016.

26.     In 2015, the Company sought to obtain additional debt or equity capital to bridge the Company's operations through this transitional phase in connection with an out-of-court restructuring.   The efforts to raise capital for Quirky were spearheaded by Ben Kaufman, Quirky's founder and Chief Executive Officer.   The Debtors viewed the Wink business as an attractive target for a stand-alone investment or acquisition.   Accordingly, on or about February 13, 2015, the Debtors retained Code Advisors LLC ("Code") to serve as Wink's investment banker.   The Company supplemented these restructuring efforts in May 2015 by retaining FTI Consulting, Inc. and Cooley LLP to advise the Debtors regarding strategic alternatives.

27.     As Mr. Kaufman sought new capital for Quirky and Code (with assistance from Mr. Kaufman and the Company's senior management) aggressively marketed the Wink business to prospective purchasers and investors, the Debtors continued to preserve liquidity and transition away from the manufacturing and design functions that had spurred Quirky's significant operating losses.   As part of that process, on June 2, 2015, Quirky effectuated a reduction in force of approximately 77 employees.

28.     Meanwhile, both Mr. Kaufman and Code expended significant effort trying to identify a financial partner to provide an equity infusion, debt investment or otherwise stabilize the financial situation of the Debtors.   Mr. Kaufman and Code contacted numerous parties, many of whom conducted due diligence on potential transactions.   Although several entities submitted non-binding expressions of interest, ultimately, no acceptable transaction for either Wink or Quirky materialized and the Debtors found themselves in a precarious financial condition that could no longer sustain operations in the ordinary course of business. Unfortunately, a transaction in the best interest of the Debtors, their creditors and shareholders was not available outside of chapter 11.

29.     Because of this reality, the Debtors implemented several initiatives.   First, on July 2, 2015, Quirky retained Centerview Partners LLC ("Centerview") to, in continuance of the efforts initially undertaken by Code and in consultation with Comerica, market Wink's assets for

9

sale through a chapter 11 proceeding pursuant to section 363 of the Bankruptcy Code.  To support that process, Quirky established a special committee of its board of directors to direct Centerview and manage the marketing effort.  Second, in order to stem the operating losses associated with the Quirky business and more efficiently allocate the Debtors' remaining cash toward the Wink business and the marketing of Wink's assets, the Debtors elected to temporarily discontinue Quirky's operations.  As a result, in late July and early August the Debtors conducted a second significant reduction in force, through which an additional 82 employees, including the vast majority of Quirky's remaining employees, were terminated. Ed Kremer, the Debtors' Chief Financial Officer, replaced Ben Kaufman as Chief Executive Officer and I was simultaneously elevated to Chief Administrative Officer.

30.    Third, the Debtors' management worked to ensure the uninterrupted flow of inventory needed to preserve the value of the Wink business.  Toward that end, the Debtors engaged with Flex, the primary provider of critical hardware for the Wink business, to support Wink's operations as the Debtors marketed their assets and explored strategic alternatives through the extension of unsecured credit.  The Debtors also consulted with Flex throughout their prepetition marketing process when a party that expressed serious interest in acquiring the Wink business identified the continuance of Wink's business relationship with Flex as a critical element of a potential transaction.  Flex agreed to support Wink's sale process and to work in good faith to timely enter into a new commercial arrangement with parties that express interest in acquiring Wink's assets, subject to Flex's reasonable business considerations.

31.    On July 22, 2015, Centerview began its outreach to potential bidders, and contacted 35 potential purchasers in total.  Of these parties, 13 executed non-disclosure agreements and conducted due diligence on a potential Contemporaneously with these discussions, Quirky and Flex consummated a transaction pursuant to which (i) Quirky's leases for its New York City and San Francisco headquarters were terminated, (ii) Flex entered agreements to lease the New York City and San Francisco offices from the respective landlords

at those locations; and (iii) Flex agreed to provide the Debtors with a rent-free short term sublease for the New York City headquarters.  Centerview's marketing process yielded the submission of three (3) non-binding expressions of interest.  The Company, through Centerview and its other advisors, worked with each of these parties to refine and enhance their acquisition proposal.  Ultimately, none of these expressions of interest resulted in the submission of a proposal that was acceptable to the Company.

32.     In the aftermath of this process, the Company approached Flex regarding their interest in submitting a proposal to serve as the stalking horse bidder for the assets of the Wink business.  The parties then engaged in substantive negotiations that culminated in the execution of a stalking horse asset purchase agreement for the sale of the assets associated with the Wink business and other assets to Flex, subject to higher and better offers, pursuant to a Court-approved process pursuant to section 363 of the Bankruptcy Code.

33.     As of the date hereof, the Debtors possess three categories of assets (i) assets associated with the continuation of the Wink business as a going concern (which are proposed to be acquired by Flex); (ii) the Quirky online community and the agreements between Quirky and third parties that constitute the Powered By Quirky Initiative; and (iii) miscellaneous inventory, machinery, furniture, fixtures, equipment, and intellectual property associated with Quirky's design and manufacturing business model.  The Debtors have commenced these cases to sell the Wink business as a going concern and to maximize the value of Quirky's assets through a sale process led by Hilco IP Services, LLC d/b/a Hilco Streambank, an expert in managing the sale of intellectual property assets.  It is expected that other, non-intellectual property assets of Quirky will be sold in sales arranged or managed by Ed Kremer, Quirky's Chief Executive Officer.

## SUMMARY OF FIRST DAY PLEADINGS

**I.    Emergency Motion of the Debtors for the Sale of Substantially All of Its Assets**

34.    In the weeks prior to the Petition Date, the Debtors conducted an extended marketing process in an effort to identify a going concern partner and/or equity investment in both Quirky and Wink.  While doing so, the Debtors' financial condition continued to deteriorate to the point that they can no longer operate in the ordinary course without immediate access to additional financing.    Unfortunately, the Debtors' assets cannot adequately collateralize additional financing, and in order to sustain further operations (including payment of payroll and inventory purchases), the Debtors are left with no choice but to immediately seek the Court's approval of the expedited sale of substantially all of their assets through the consummation of one or more transactions.

35.    Through *Debtors' Motion for Entry of (i) an Order (a) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets (b) Approving Procedures for Assumption and Assignment of Executory Contracts, (c) Approving the Form and Manner of Notice, and (d) Scheduling an Auction and a Sale Hearing, and (ii) an Order Authorizing and Approving the Sale of Certain Assets* (the "Sale Motion"), filed contemporaneously herewith, the Debtors are seeking to dispose of certain of their assets, including substantially all of the assets of the Wink business, to Flex subject to higher and better offers.  The Flex stalking horse asset purchase agreement (the "Stalking Horse APA") will be subject to higher or otherwise better bids at an auction to be held between the date of this filing and the hearing on the Sale Motion.  At such hearing, the Debtors will seek approval of the highest or otherwise best bid, on terms substantially similar to those contained in the Stalking Horse APA.

36.     As of the filing of this Motion, certain interested parties continue to conduct due diligence on a possible partial going concern acquisition of Quirky.   To facilitate that process, Flex has agreed to work in good faith to timely enter into a new commercial arrangement with parties that express interest in submitting a higher and better offer for the assets of the Wink business, subject to Flex's reasonable business considerations, including, without limitation, creditworthiness and whether the prospective buyer is a competitor of Flex.   In the event remaining interest materializes into a committed transaction prior to the hearing on the Sale Motion, the Debtors expect to subject that proposal to competitive bidding at an auction and to request the approval of that transaction (or any higher or better bid received at the auction).

## II.     Motion of the Debtors for Financing/ Use of Cash Collateral and Granting Adequate Protection

37.     It is essential that the Debtors obtain immediate post-petition authority to use cash collateral (the "Cash Collateral"), as that term is defined by section 363 of the Bankruptcy Code.   The Debtors are facing an immediate liquidity crisis.   After consulting with their professional advisors, the Debtors concluded that the best course to maximize value for their estates is to conduct an expedited sale process.   As set forth above, the Debtors made a lengthy and far-reaching effort to obtain additional secured or unsecured financing or an equity investment to address their liquidity concerns.   Ultimately, the Debtors were unable to identify an investor or lender willing to provide them with new liquidity.   Moreover, Comerica declined the Debtors' request to provide them with a postpetition financing facility or to consent to the Debtors' granting of new liens on Wink's assets or to the granting of a priming lien to a third party lender in connection with a DIP facility.   Based on this experience, the Debtors determined that actively seeking DIP financing from a third party lender would be futile.

38.     Accordingly, and in order to allow the Debtors the opportunity to pursue a value maximizing sale, the Debtors negotiated with Comerica and received their consent to use Cash Collateral in accordance with a budget that the Debtors believe will be sufficient to pay their

administrative expenses that become due and payable before such a sale can be consummated on the timeline assumed in such budget.

39.     Without the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, provide financial information, pay employees, payroll taxes, inventory suppliers and other vendors, overhead, lease expenses, and other expenses necessary for the operation of the Debtors' business in the ordinary course and to maintain the value of their assets.   Accordingly, without immediate access to Cash Collateral, the Debtors could suffer substantial and irreparable harm.

40.     By contrast, once use of Cash Collateral is approved, the Debtors will be able to continue their business operations during the interim period between the Petition Date and the consummation of a going concern sale or liquidation of the Debtors' business, which would allow it to maximize the value of its assets for the benefit of all of its stakeholders.   The Debtors' need for access to Cash Collateral, therefore, is urgent.   In addition, because the Debtors lack sufficient unencumbered funds to meet certain imminent expenses necessary for a smooth transition to chapter 11, it is essential that they obtain interim approval of the use of Cash Collateral.

III.     **Motions to be Heard at First Day Hearing**

41.     In addition, the Debtors intend to seek relief from the Court as soon as possible after the Petition Date through each of the motions described below:

| **TITLE** | **PURPOSE OF MOTION** |
| --- | --- |
| Motion to Authorize Joint Administration of the Debtors' Chapter 11 Cases. | Authorization to jointly administer the Debtors' chapter 11 cases on one docket. |

| TITLE | PURPOSE OF MOTION |
|---|---|
| Motion for an Order Authorizing the Debtors to (i) Continue to Use Existing Cash Management System, (ii) Maintain Existing Bank Accounts and Business Forms, and (iii) Waive Requirements of Section 345(b) of the Bankruptcy Code. | Authorization to use the Debtors' existing bank accounts and cash management system is requested. |
| Motion to Extend Time to File the Debtors' (i) Schedules of Assets and Liabilities, (ii) Schedules of Current Income and Expenditures, (iii) Schedules of Executory Contracts and Unexpired leases, and (iv) Statements of Financial Affairs. | A 30-day extension of the time required to file schedules and statements of financial affairs is requested. |
| Motion for Interim and Final Orders Authorizing (i) Payment of Wages, Compensation and Employee Benefits and (ii) Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations. | Authorization to pay prepetition wage claims and continue existing employee benefit programs is requested. |
| Motion for (i) Waiver of Requirement to File List of Creditors and (ii) Authority to Establish Procedures to Notify Creditors of the Commencement of the Debtors' Chapter 11 Cases. | Waiver of the requirement to file a list of creditors, and to establish procedures by which to notice parties of the commencement of this case, is requested. |
| Motion for Entry of Interim and Final Orders (i) Authorizing Payment of Prepetition Sales and Use Taxes and (ii) Allowing Financial Institutions to Cash and process Related Checks and Transfers. | Authorization to pay accrued but unpaid prepetition sales and use taxes is requested. |
| Motion of an Order Implementing Certain Notice and Case Management Procedures. | Authorization to establish certain notice and case management procedures is requested. |

| **TITLE** | **PURPOSE OF MOTION** |
|---|---|
| Application of the Debtors for and Order Authorizing Retention and Appointment of Rust Consulting/ Omni Bankruptcy as Claims and Noticing Agent for the Clerk of the Bankruptcy Court Under 28 U.S.C. § 156(c) Nunc Pro Tunc to the Petition Date. | Authorization to retain Omni Management Group, LLC as claims and noticing agent is requested. |
| Motion for Entry of Interim and Final Orders Authorizing (i) the Debtors to Pay Prepetition Claims of Certain Critical Vendors and Service Providers Related to the Wink Business and (ii) Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issues and Electronic Payment Requests Relating to the Foregoing. | Authorization to pay the prepetition claims of certain critical vendors is requested. |
| Motion for Entry of Interim and Final Orders Authorizing (i) the Debtors to Pay Prepetition Claims of Certain Customs, Shipper, Warehousemen and Common Carriers and (ii) Banks and Other Financial Institutions to receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests relating to the Foregoing. | Authorization to pay the prepetition claims of customs brokers, warehousemen and shippers is requested. |
| Motion for Authorization to Honor Certain Prepetition Customer Programs. | Authorization for Wink to continue to honor its prepetition customer programs is requested. |
| Motion P (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment | Approval of adequate assurance of payment to utilities, and approval of procedures to determine the amount of that adequate assurance, is requested. |

IV.    **Motions To Be Filed But Not Heard at First Day Hearing**

42.    In addition, the Debtors intend to seek relief from the Court at a hearing

approximately 25 days after the Petition Date through each of the motions described below, all

of which shall be filed shortly after the Petition Date:

| **TITLE** | **PURPOSE OF MOTION** |
| --- | --- |
| Application Authorizing Employment and Retention of Cooley LLP as Attorneys for Debtors, *Nunc Pro Tunc* to the Petition Date. | Authorization to retain Cooley as attorneys for the Debtors, effective as of the Petition Date, is requested. |
| Application Authorizing Employment and Retention of Klestadt Winters Jureller Southard & Stevens, LLP as Conflicts Counsel for Debtors, *Nunc Pro Tunc* to the Petition Date. | Authorization to retain conflicts counsel for the Debtors, effective as of the Petition Date, is requested. |
| Application for Entry of an Order Authorizing Retention and Employment of FTI Consulting, Inc. as Financial Advisors to the Debtors, *Nunc Pro Tunc* to the Petition Date. | Authorization to retain FTI as Financial Advisors to the Debtors, effective as of the Petition Date, is requested. |
| Application for Entry of an Order Authorizing Retention and Employment of Centerview Partners, LLC as Investment Bankers to the Debtors, *Nunc Pro Tunc* to the Petition Date. | Authorization to retain Centerview as investment banker to the Debtors, effective as of the Petition Date, is requested. |

| **TITLE** | **PURPOSE OF MOTION** |
|---|---|
| Application for Entry of an Order Authorizing Retention and Employment of Hilco IP Services LLC d/b/a Hilco Streambank as Intellectual Property Disposition Consultant to Quirky, Inc., *Nunc Pro Tunc* to the Petition Date. | Authorization to retain Hilco Streambank as intellectual property disposition consultant to Quirky, effective as of the Petition Date, is requested. |
| Motion Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals. | Authorization to establish procedures providing for interim monthly compensation and reimbursement of retained professionals is requested. |

### INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

43.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

44.     In accordance with Local Bankruptcy Rule 1007-2(a)(3), and to the best of my knowledge, information, and belief, no prepetition committee has been formed in these chapter 11 cases.

45.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), **Schedule 1** hereto is a list of the names, addresses, and, where available, telephone and facsimile numbers of the creditors holding the 30 largest unsecured claims (excluding insiders, unless otherwise noted) against the Debtors. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on **Schedule 1** regarding, among other things, the actual validity of any such claims.

46.     In accordance with Local Bankruptcy Rule 1007-2(a)(5), **Schedule 2** is a list of the names and addresses of the creditors holding the five largest secured claims against the Debtors, as well as the names and addresses for the holders of record of such secured claims. Such list includes the amount of the claim, an estimate of the value of the collateral, and

whether the claim or lien is disputed, subject, however, to the reservations of rights stated on **Schedule 2**.

47.    In accordance with Local Bankruptcy Rule 1007-2(a)(6), **Schedule  3** hereto provides a summary of the Debtors' assets and liabilities.

48.    In accordance with Local Bankruptcy Rule 1007-2(a)(8), **Schedule 4** hereto is a list of the Debtors' property not in the Debtors' possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

49.    In accordance with Local Bankruptcy Rule 1007-2(a)(9), **Schedule 5** hereto is a list of the premises owned, leased, or held under other arrangement, from which the Debtors operate their business.

50.    In accordance with Local Bankruptcy Rule 1007-2(a)(10), **Schedule 6** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the value of any assets held by the Debtors outside the territorial limits of the United States.

51.    In accordance with Local Bankruptcy Rule 1007-2(a)(11), **Schedule 7** hereto is a list of litigation commenced against the Debtors.

52.    In accordance with Local Bankruptcy Rule 1007-2(a)(12), **Schedule 8** hereto contains the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.  The Debtors intend to continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

53.    In accordance with Local Bankruptcy Rule 1007-2(b)(1), **Schedule 9** hereto is the estimated amount of the payroll to employees of the Debtors (exclusive of officers, directors and stockholders) for the 30-day period following the commencement of the Debtors' chapter 11 cases.

54.     In accordance with Local Bankruptcy Rule 1007-2(b)(2)(A), **Schedule 10** hereto contains the amounts to be paid to the Debtors' officers, directors, and stockholders for services for the 30-day period following the commencement of the Debtors' chapter 11 cases.

55.     In accordance with Local Bankruptcy Rule 1007-2(b)(3), **Schedule 11** hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of the Debtors' chapter 11 cases.

56.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

[<em>Remainder of page intentionally left blank.</em>]

57.    Accordingly, I respectfully request that the Court grant all of relief requested in the First Day Pleadings and such other and further relief as may be just and appropriate.

Dated: September 22, 2015

Quirky, Inc., et al.

By:  */s/ Charles Kwalwasser*
     Charles Kwalwasser
     General Counsel, Chief Administrative Officer
     and Secretary of Quirky, Inc.

**SCHEDULE 1**

Form B4 (Official Form 4) -  (12/07)

**Quirky, Inc.,** *et al.*
_____       _____
Debtors                                                                                    Case No. (If known)

### Form 4.   CONSOLIDATED LIST OF CREDITORS HOLDING 30 LARGEST UNSECURED CLAIMS

### UNITED STATES BANKRUPTCY COURT

### SOUTHERN DISTRICT OF NEW YORK

Following is a list of the debtor's creditors holding the 30 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims. If a minor child is one of the creditors holding the 30 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112 and Fed. R. Bankr. P. 1007(m).

| | Name of creditor and complete mailing address, including zip code. | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|---|
| 1 | Flex Sales & Marketing North Asia Financial Park, Jalan Merdeka Unit 7 D, Main Tower Office, 87000, W.P.Labuan Mep: PCBA_Wuzhong_746 Malaysia | Flex Sales & Marketing North Asia Financial Park, Jalan Merdeka Unit 7 D, Main Tower Office, 87000, W.P.Labuan Mep: PCBA_Wuzhong_746 Malaysia | Trade debt | | | | $18,690,653.72 |
| 2 | Undercurrent LLC Attn: Jonathan H. Steeler, Esq. Ryley, Carlock & Applewhite 1700 Lincoln St., Suite 3500 Denver, CO 80203 | Undercurrent LLC Attn: Jonathan H. Steeler, Esq. Ryley, Carlock & Applewhite 1700 Lincoln St., Suite 3500 Denver, CO 80203 | Convertible note, deferred payments | | | | $14,097,619.68 |
| 3 | UPS P.O. Box 7247-0244 Philadelphia, PA 19170 | UPS P.O. Box 7247-0244 Philadelphia, PA 19170 | Trade debt | | | | $1,316,884.82 |
| 4 | AdRoll Inc 972 Mission Street, 3rd Floor San Francisco, CA 94103 | AdRoll Inc 972 Mission Street, 3rd Floor San Francisco, CA 94103 | Trade debt | | | | $882,713.81 |
| 5 | Eastfield Lighting (Hong Kong) Co., Ltd. US Room 05-15, 13A/F. South Tower, World Finance Centre Harbour City, 17 Canton Road Tsim Sha Tsui, Hong Kong | Eastfield Lighting (Hong Kong) Co., Ltd. US Room 05-15, 13A/F. South Tower, World Finance Centre Harbour City, 17 Canton Road Tsim Sha Tsui, Hong Kong | Trade debt | | | | $634,878.62 |
| 6 | R/GA Branding 350 West 39th Street New York, NY 10018 | R/GA Branding 350 West 39th Street New York, NY 10018 | Trade debt | | | | $506,750.00 |

Form B4 (Official Form 4) - (12/07)

Quirky, Inc., *et al.*
_____          _____
**Debtors**                                                                                    **Case No. (If known)**

## Form 4.  CONSOLIDATED LIST OF CREDITORS HOLDING 30 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| Name of creditor and complete mailing address, including zip code. | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| 7    Yellowhammer Media Group Inc. 111 West 28th Street Suite 2B New York, NY 10001 | Yellowhammer Media Group Inc. 111 West 28th Street Suite 2B New York, NY 10001 | Trade debt | | | | $476,187.23 |
| 8    Wistron NeWeb Corporation 21F No.88 Sec 1 Xintai 5th Rd. New Taipei City, Xizhi Dist. 22181 Taiwan | Wistron NeWeb Corporation 21F No.88 Sec 1 Xintai 5th Rd. New Taipei City, Xizhi Dist. 22181 Taiwan | Trade debt | | | | $399,327.12 |
| 9    DEL Industrial Ltd. 5/F, ChaiWan Industrial Centre 20 Lee Chung street Hong Kong | DEL Industrial Ltd. 5/F, ChaiWan Industrial Centre 20 Lee Chung street Hong Kong | Trade debt | | | | $313,297.62 |
| 10    Benjamin Kaufman 251 West 19th Street Apartment 8D New York, NY 10011 | Benjamin Kaufman 251 West 19th Street Apartment 8D New York, NY 10011 | Severance claim, community claim | | | | $296,311.56 |
| 11    Sercomm Corporation 8F, No. 3-1, YuanQu St. (Nankang Software Park) Taipei, 115 R.O.C. Taiwan | Sercomm Corporation 8F, No. 3-1, YuanQu St. (Nankang Software Park) Taipei, 115 R.O.C. Taiwan | Trade debt | | | | $210,125.71 |
| 12    OHL 15604 Collections Center Drive Chicago, IL 60693 | OHL 15604 Collections Center Drive Chicago, IL 60693 | Trade debt | | | | $206,671.00 |
| 13    Garthen Leslie garthen@aol.com Email: garthen@aol.com | Garthen Leslie garthen@aol.com Email: garthen@aol.com | Community claim | | | | $191,378.84 |
| 14    Doreen Lorenzo 1208 Verdant Way Austin, TX 78746 | Doreen Lorenzo 1208 Verdant Way Austin, TX 78746 | Severance claim | | | | $190,384.59 |

Form B4 (Official Form 4) -  (12/07)

Quirky, Inc., *et al.*
_____          _____
Debtors                                                                                                    Case No. (If known)

## Form 4.  CONSOLIDATED LIST OF CREDITORS HOLDING 30 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| Name of creditor and complete mailing address, including zip code. | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| 16  Chinaming Limited<br>Qinggan Industrial Area,No.30<br>Xinghua Road, Dachong Town, Zhongshan City<br>Guangdong Province, China<br>China | Chinaming Limited<br>Qinggan Industrial Area,No.30<br>Xinghua Road, Dachong Town, Zhongshan City<br>Guangdong Province, China<br>China | Trade debt | | | | $166,447.01 |
| 17  NetSuite, Inc.<br>15612 Collections Center Drive<br>Chicago, IL 60693 | NetSuite, Inc.<br>15612 Collections Center Drive<br>Chicago, IL 60693 | Trade debt | | | | $133,813.68 |
| 18  Double D International<br>915#, Shenzhen University-Town Park, Lishan Road,<br>Nanshan District<br>Shenzhen, Guangdong Province<br>Hong Kong | Double D International<br>915#, Shenzhen University-Town Park, Lishan Road,<br>Nanshan District<br>Shenzhen, Guangdong Province<br>Hong Kong | Trade debt | | | | $131,527.07 |
| 18  Okaywife Daily Necessities Co.<br>FederalIndustrial City<br>No. 363 Yu Shan Xi Road<br>Shiqiao, Panyu, Guangzhou<br>China | Okaywife Daily Necessities Co.<br>FederalIndustrial City<br>No. 363 Yu Shan Xi Road<br>Shiqiao, Panyu, Guangzhou<br>China | Trade debt | | | | $121,162.05 |
| 19  PriceWaterhouseCoopers<br>300 Madison Ave<br>#24<br>New York, NY 10017 | PriceWaterhouseCoopers<br>300 Madison Ave<br>#24<br>New York, NY 10017 | Trade debt | | | | $120,000.00 |
| 20  ZenDesk<br>989 Market St.<br>Suite 300<br>San Francisco, CA 94103 | ZenDesk<br>989 Market St.<br>Suite 300<br>San Francisco, CA 94103 | Trade debt | | | | $119,262.00 |
| 21  AT&T<br>PO BOX 6463<br>Carol Stream, IL 60197-6463 | AT&T<br>PO BOX 6463<br>Carol Stream, IL 60197-6463 | Trade debt | | | | $118,905.85 |

Form B4 (Official Form 4) -  (12/07)

Quirky, Inc., *et al.*
_____    _____
Debtors                                                                      Case No. (If known)

## Form 4.  CONSOLIDATED LIST OF CREDITORS HOLDING 30 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| Name of creditor and complete mailing address, including zip code. | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| 22  German Link<br>Attn: Cary Zhang<br>608, 6/FL., Fook Hong Industrial Building<br>19, Sheung Yuet Rd.<br>Kowloon Bay<br>Hong Kong | German Link<br>Attn: Cary Zhang<br>608, 6/FL., Fook Hong Industrial Building<br>19, Sheung Yuet Rd.<br>Kowloon Bay<br>Hong Kong | Trade debt | | | | $107,103.61 |
| 23  Cowan Liebowitz & Latman<br>Attn: Steven D. Underwood, Esq.<br>1133 Avenue of the Americas<br>New York, NY 10036-6799 | Cowan Liebowitz & Latman<br>Attn: Steven D. Underwood, Esq.<br>1133 Avenue of the Americas<br>New York, NY 10036-6799 | Trade debt | | | | $99,780.80 |
| 24  SailThru<br>160 Varick St<br>12th Floor<br>New York, NY 10013 | SailThru<br>160 Varick St<br>12th Floor<br>New York, NY 10013 | Trade debt | | | | $98,245.50 |
| 25  LJM Consultants<br>PO Box 262<br>West Islip, NY 11795 | LJM Consultants<br>PO Box 262<br>West Islip, NY 11795 | Trade debt | | | | $83,337.95 |
| 26  Nesco Resource<br>15 British American Blvd<br>Latham, NY 12110 | Nesco Resource<br>15 British American Blvd<br>Latham, NY 12110 | Trade debt | | | | $80,000.00 |
| 27  Guang Dong Xinbao Electrical Appliances Holdings Co., Ltd<br>South Zhenghe Road, Leliu Town<br>Shunde District, Foshan City<br>Guangdong Province<br>China | Guang Dong Xinbao Electrical Appliances Holdings Co., Ltd<br>South Zhenghe Road, Leliu Town<br>Shunde District, Foshan City<br>Guangdong Province<br>China | Trade debt | | | | $76,950.00 |
| 28  Stratasys Inc<br>7665 Commerce Way<br>Eden Prairie, MN 55344 | Stratasys Inc<br>7665 Commerce Way<br>Eden Prairie, MN 55344 | Trade debt | | | | $74,862.91 |
| 29  Silverchair Partners<br>590 Madison Avenue<br>18th Floor<br>New York, NY 10022 | Silverchair Partners<br>590 Madison Avenue<br>18th Floor<br>New York, NY 10022 | Trade debt | | | | $70,189.66 |

Form B4 (Official Form 4) - (12/07)

**Quirky, Inc.,** *et al.*
_____    _____
**Debtors**                                                                                      **Case No. (If known)**

### Form 4.  CONSOLIDATED LIST OF CREDITORS HOLDING 30 LARGEST UNSECURED CLAIMS
#### (Continuation Sheet)

| Name of creditor and complete mailing address, including zip code. | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|---|
| 30   Fusco Personnel, Inc.<br>4 Executive Park Dr. Suite B<br>Albany, NY 12203 | Fusco Personnel, Inc.<br>4 Executive Park Dr. Suite B<br>Albany, NY 12203 | Trade debt | | | | $68,658.67 |

## DECLARATION UNDER PENALTY OF PERJURY
## REGARDING CONSOLIDATED LIST OF CREDITORS

      Pursuant to 28 U.S.C. § 1746, I, Charles Kwalwasser, the undersigned General Counsel, Chief Administrative Officer, and Secretary declare under penalty of perjury that I have reviewed the Consolidated List of Creditors Holding 30 Largest Unsecured Claims and it is true and correct to the best of my information and belief.

Dated: September 22, 2015          By:  */s/ Charles Kwalwasser*
                                   Charles Kwalwasser
                                   General Counsel, Chief Administrative Officer and Secretary

**SCHEDULE 2**

## LIST OF CREDITORS
## HOLDING 5 LARGEST SECURED CLAIMS[1]

The following is a list of creditors holding the 5 largest secured claims against the Debtors. The list has been prepared in accordance with Local Bankruptcy Rule 1007-2(a)(5). The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

| Name of Creditor | Mailing Address | Description of Collateral Securing the Claim | Estimate of the Book Value of the Collateral | Amount of Claim |
|---|---|---|---|---|
| Comerica Bank, N.A. | 250 Lytton Avenue Palo Alto, CA 94301 | 1st lien on substantially all of Quirky, Inc.'s assets | $31.69 million | $29,260,065.90 plus interest |

---

[1]    This list reflects the latest information available to the Debtors as of the Petition Date. The estimate value of collateral securing the claims is the value on the Debtors' balance sheet as of September 1, 2015 and does not represent the liquidation value of the collateral.

**SCHEDULE 3**

**DEBTORS' CONSOLIDATED BALANCE SHEET**

**Quirky, Inc.**
**August 2015 Unaudited Balance Sheet**

**Balance Sheet ($ in millions)**

|  | August 2015 |
|---|---|
| Cash and Cash Equivalents | $ 7,186,452 |
| Accounts Receivable, Net | $ 4,534,388 |
| Inventory, Net | $ 7,061,758 |
| Prepaid Expenses | $ 1,166,770 |
| Other Current Assets | $ 246,836 |
| Current Assets | $ 20,196,203 |
|  |  |
| Operational Fixed Assets | $ 13,119,406 |
| Accumulated Depreciation | $ (6,195,218) |
| Intangible Assets | $ 4,020,597 |
| Accumulated Amortization | $ (1,635,939) |
| Goodwill | $ 22,383,410 |
| Other Assets | $ 2,019,238 |
| Total Assets | $ 53,907,698 |
|  |  |
| Accounts Payable | $ 22,261,851 |
| Community Payable | $ 2,364,363 |
| Sales Tax Payable | $ 34,411 |
| Royalty Payable | $ 1,312,505 |
| Accrued Expenses | $ 2,739,771 |
| Deferred Revenue | $ 4,500,751 |
| Debt | $ 28,926,732 |
| Note Payable | $ 8,000,000 |
| Convertible Note | $ 36,800,000 |
| Warrant Obligation | $ 8,055,737 |
| Long Term Liabilities | $ 21,832,707 |
| Total Liabilities | $ 136,828,826 |
|  |  |
| Preferred Stock | $ 45,218 |
| Common Stock | $ 100,801 |
| APIC - Preferred Stock | $ 154,810,368 |
| APIC - Common Stock | $ 5,591,628 |
| Contributed Capital | $ 305,887 |
| Retained Earnings | $ (243,775,030) |
| Total Equity | $ (82,921,128) |
|  |  |
| Total Liabilties and Equity | $ 53,907,698 |

**SCHEDULE 4**

## DEBTORS' PROPERTY NOT IN DEBTORS' POSSESSION[1]

| Type of Property | Value of Property | Person or Entity in Possession | Address and Telephone Number |
|---|---|---|---|
| Cash deposit | $14,051.05 | CSC Leasing Company | 6806 Paragon Place, Suite 170, Richmond, VA 23230<br><br>(804) 673-1000 |
| Cash deposit | $3,245.00 | Avalon Bay Communities, Inc. | 282 11th Avenue New York, NY 10001<br><br>(212) 564-2813 |
| Cash deposit | $3,295.00 | Avalon Bay Communities, Inc. | 282 11th Avenue New York, NY 10001<br><br>(212) 564-2813 |

---

[1]　　This list has been prepared based upon the consolidated books and records of the Debtors and reflects amounts as of September 20, 2015.  In addition to the properties listed above, in the ordinary course of business, property of the Debtors is likely to be in the possession of various other persons including, without limitation, maintenance providers, shippers, common carriers and materialmen. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of persons in possession of the Debtors' property would be impractical, if not impossible.

**SCHEDULE 5**

**PREMISES OWNED, LEASED, OR
HELD UNDER OTHER ARRANGEMENT
FROM WHICH THE DEBTORS OPERATE THEIR BUSINESSES**

**Leased Real Property**

| Lessor | Location | City | State | Zip |
|--------|----------|------|-------|-----|
| Flex | 606 West 28th Street, 6th Floor | New York | NY | 10012 |
| Development at Center City, LLC | 433 State Street | Schenectady | NY | 12305 |

**<u>SCHEDULE 6</u>**

## LOCATION OF DEBTORS' ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets and the location of its books and records.

| Location of Debtors' Substantial Assets |
| --- |
| 606 West 28th Street, Seventh Floor, New York, NY 10012 |

| Location of Debtors' Books and Records |
| --- |
| 606 West 28th Street, Seventh Floor, New York, NY 10012 |

**<u>SCHEDULE 7</u>**

**SIGNIFICANT LITIGATION COMMENCED
AGAINST THE DEBTORS PRIOR TO THE PETITION DATE**

| Title of Action | Court | Nature of Action | Status |
|---|---|---|---|
| Antonio Acebo v. Quirky, Inc. | Arbitration | Alleged royalty payments owing | Pending |
| Fusco Personnel v. Quirky, Inc. | Supreme Court, State of New York, Albany Division | Collection of unpaid invoices | Pending |
| Busy Bee Cleaning Service Corp. v. Quirky, Inc. and Susan Lovaglio | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |
| H.K. Glory Colourboxes & Paper Limited v. Quirky, Inc. | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |
| The Stable Group LLC v. Quirky, Inc. | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |

**<u>SCHEDULE 8</u>**

**DEBTORS' EXISTING SENIOR MANAGEMENT**

| Name/Position | Summary of Responsibilities and Experience |
|---|---|
| Ed Kremer, Chief Executive Officer, Quirky, Inc. | Day-to-day management of company. Management of cash flows, budgeting and financial reporting.  Until August 2, 2015, served as Chief Financial Officer of Quirky Prior experience includes positions at consumer product companies including Oakley, Oliver Peoples and Luxottica in a series senior leadership roles. Most recently he served as Vice President of Finance at Beats by Dr. Dre |
| Charles Kwalwasser, Secretary, Chief Administrative Officer  and General Counsel of Quirky, Inc. | Day-to-day management of the legal affairs of the company.  Charlie previously served as Intellectual Property Counsel for Barclays Capital and previously Lehman Brothers, Prior to Lehman Brothers, Charlie worked in the Intellectual Property Group at the New York office of Clifford Chance. |
| Nathan Smith, President, Wink, Inc. | Day-to-day management of Wink platform. Prior experience includes work at Google and Jumpstart Auto Group; experience building applications with Objective C, Java, and Ruby; former Head of Technology for Quirky. |

**<u>SCHEDULE 9</u>**

**ESTIMATED AMOUNT OF WEEKLY PAYROLL TO
EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS, AND
SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| Week Ending | Estimated Gross Payroll |
|:-----------:|:-----------------------:|
| 9/26  | $196,596 |
| 10/2  | $196,596 |
| 10/9  | $196,596 |
| 10/16 | $196,596 |

## **SCHEDULE 10**

**ESTIMATED AMOUNT OF WEEKLY PAYROLL
TO OFFICERS, DIRECTORS, AND SHAREHOLDERS
FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| Week Ending | Payments to Officers, Directors and Stockholders |
|:---:|:---:|
| 9/26 | $25,940 |
| 10/2 | $25,940 |
| 10/9 | $25,940 |
| 10/16 | $25,940 |

## **SCHEDULE 11**

**DEBTORS' ESTIMATED CASH DISBURSEMENTS AND**
**RECEIPTS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| | |
|---|---|
| Cash Receipts | $906,393 |
| Cash Disbursements | ($3,458,566.00) |
| Net Cash Gain (Loss) | ($2,552,173.00) |
| Unpaid Obligations | $1,130,988.00 |
| Unpaid Receivables | $280,000.00 |