**Hearing Date and Time: October 23, 2015 at 9:00 a.m. (ET)**
**Response Deadline: October 16, 2015 at 4:00 p.m. (ET)**

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Tel.: 212-479-6000
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit

Proposed Counsel for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                              :
In re:                                          Chapter 11
                                                              :
QUIRKY, INC., *et al.*,[1]                      Case No. 15-12596 (MG)
                                                              :
        Debtors.,                               (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**NOTICE OF HEARING REGARDING DEBTORS' APPLICATION FOR ORDER UNDER
BANKRUPTCY CODE SECTIONS 327(a) AND 328 AND BANKRUPTCY RULES 2014 AND
2016 AUTHORIZING EMPLOYMENT AND RETENTION OF CENTERVIEW PARTNERS LLC
TO SERVE AS INVESTMENT BANKER TO THE DEBTORS AND DEBTORS IN
POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE**

    **PLEASE TAKE NOTICE** that on **October 23, 2015 at 9:00 a.m.** (ET), or as soon

thereafter as counsel may be heard, a hearing on the Debtors' *Application for Order Under*

*Bankruptcy Code Sections 327(a) and 328 and Bankruptcy Rules 2014 and 2016 Authorizing*

*Employment and Retention of Centerview Partners LLC to Serve as Investment Banker to the*

*Debtors and Debtors In Possession* Nunc Pro Tunc *to the Petition Date* (the "Application") will

be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

the United States Bankruptcy Court for the Southern District of New York (the "Court"), One Bowling Green, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that any responses to the Application: (i) must be in writing; (ii) shall conform to the Federal Rules of Bankruptcy Procedure, the Local Rules and *Interim Case Management Order* [Docket No. 44]; (iii) set forth the name of the responding party, the basis for the response and the specific grounds thereof; and (iv) be filed with the Court electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Court's case filing system and, by all other parties in interest, on a 3.5 inch floppy disk, CD-ROMs, and 100 MB Zip Disks in either PDF or WordPerfect format. Further, pursuant to Local Bankruptcy Rule 9070-1 and these Interim Case Management Procedures, at least one hard copy, marked "***Chambers Copy***", be delivered directly to the chambers of the Honorable Martin Glenn, and shall be served upon: (a) the Debtors, 606 West 28th Street, 7th Floor, New York, NY 10001, Attn: Charles Kwalwasser; (b) counsel to the Debtors, Cooley, LLP, 1114 Avenue of the Americas, New York, NY, 10036, Attn: Jeffrey L. Cohen; (c) Centerview Partners LLC, 31 West 52nd Street, New York, NY 10019, Attn: John Bosacco; (d) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014, Attn: Paul Schwartzberg; (e) entities listed on the Consolidated List of Creditors Holding 30 Largest Unsecured Claims; and (f) any persons who have filed a request for notice in the above captioned case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, so as to be filed and received by no later than **October 16, 2015 at 4:00 p.m.** (ET) (the "Response Deadline").

[*Remainder of page intentionally left blank.*]

**PLEASE TAKE FURTHER NOTICE** that, if no responses are timely filed and served with respect to the Application, the Debtors may, on or after the Response Deadline, submit to the Court an order substantially in the form of the proposed order annexed to the Application, which order may be entered with no further notice or opportunity to be heard.

Dated:   September 29, 2015
      NEW YORK, NEW YORK

COOLEY LLP

*/s/  Jeffrey L. Cohen*
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: jcohen@cooley.com
      mklein@cooley.com
      rkalnit@cooley.com

Proposed Counsel for the Debtors and Debtors in Possession

Hearing Date: October 23, 2015 at 9:00 a.m. (Prevailing Eastern Time)
Objection Deadline: October 16, 2015 at 4:00 p.m. (Prevailing Eastern Time)

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit

*Proposed Counsel for Debtors
and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                             :

In re:                                  :   Chapter 11
                                     :

QUIRKY, INC., *et al.*[1]            :
                                     :   Case No. 15-12596 (MG)
               Debtors.        :
                                     :   (Jointly Administered)
                                     :

-------------------------------------------------------------- x

**DEBTORS' APPLICATION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 327(a)
AND 328 AND BANKRUPTCY RULES 2014 AND 2016 AUTHORIZING EMPLOYMENT AND
RETENTION OF CENTERVIEW PARTNERS LLC TO SERVE AS INVESTMENT BANKER
TO THE DEBTORS AND DEBTORS IN POSSESSION *NUNC PRO TUNC*
TO THE PETITION DATE**

Quirky, Inc. ("Quirky"), on behalf of itself and its affiliated debtors and debtors in

possession (collectively, the "Debtors") hereby applies (the "Application") for entry of an order

under sections 327(a), 328 and 1107 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules for the United States

Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing the

employment and retention of Centerview Partners LLC ("Centerview"), effective as of the

Petition Date (as defined herein), as the Debtors' investment banker in accordance with the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification
number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692).
The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

terms and conditions set forth in the engagement letter (the "Engagement Letter"), a copy of which is attached hereto as **Exhibit A**.[2] In support of the Application, the Debtors rely upon and incorporate by reference the *Declaration of John Bosacco in Support of Debtors' Application for Order Under 11 U.S.C. §§ 327(a), 328 and 1107 and Bankruptcy Rules 2014 and 2016 Authorizing Employment and Retention of Centerview Partners LLC as Investment Banker for Debtors and Debtors in Possession* (the "Bosacco Declaration"), attached hereto as **Exhibit B**. In further support of the Application, the Debtors respectfully represent:

## BACKGROUND

1.      On September 22, 2015, (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under the Bankruptcy Code.   The Debtors are authorized to operate its businesses and manage their properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

## THE DEBTORS' BUSINESSES

I.      **General**

2.      On September 22, 2015 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.   The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   On September 25, 2015, this Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases [Docket No. 32].   No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

---

[2]      The Engagement Letter supersedes a prior engagement letter between the Debtors and Centerview.  As of September 18, 2015, the parties executed the amended letter to ensure that, among other things, the responsibilities of and services to be provided by Centerview were clearly delineated and would not overlap or cause any duplication of effort with any of the Debtors' other professionals, namely FTI Consulting and Hilco Streambank.

II.    **The Debtors' Business**

3.      Since its inception in 2009, Quirky's revolutionary online idea factory and marketplace has made invention accessible by bringing real people's product ideas to life. From its headquarters in New York City -- and with contributions from its vibrant web-based community of inventors, collaborators and contributors -- Quirky identifies and cultivates products.  Last year, Quirky sold over 150 different products and a total of 4 million units, generating over $50 million in revenue from its retail and consulting businesses.

4.      Quirky also works directly with large companies to develop new products through its "Powered by Quirky" initiative.  In exchange for service fees, Quirky provides third parties with access to its engineering and design staff, community of inventors and exclusivity to certain product ideas.  Through partnerships with General Electric, Quirky serves as a major driving force for the innovations behind new products.  In 2015, the Company began to wind-down its product development and distribution business and focused heavily on establishing new strategic partnerships through the Powered by Quirky initiative.  In order to bolster the Powered by Quirky infrastructure, on or about March 25, 2015 the Company acquired the assets of Undercurrent LLC, a leading boutique management consulting services provider.

5.      Through Wink, Inc. ("Wink"), a wholly-owned subsidiary of Quirky that was incorporated in November 2013, the Company has developed a platform for wireless-enabled products that allows consumers to control a host of household appliances and services through their connected devices and the internet.   Through partnerships with General Electric, Honeywell, Nest, Phillips and others, over 60 Wink-enabled products are available in the marketplace with many more in development.  Wink enables homeowners to wirelessly connect lighting, power and security systems through a single app.  The Wink app allows users to customize the way products talk to each other. For example, a Kwikset SmartCode Deadbolt© can be programmed to tell a user's lights and air conditioning to turn on every time a home's front door is unlocked.   The Wink app also allows multiple users to control multiple appliances

3

with a single swipe of their smart phone. While Wink maintains its own management, distribution, and sales channels, it shares certain general administrative services with Quirky, its corporate parent.

6.     Over the past six years, Quirky shepherded hundreds of new products to the marketplace. While the Company's early efforts focused on manufacturing relatively simple items, Quirky quickly shifted focus towards a greater number of more complex offerings in both hardware and software. By 2014, the number of products in manufactured and sold by Quirky had increased from 34 to over 150. The Company faced a number of operational challenges as the volume of more complicated products that Quirky brought to market increased and the product categories in which Quirky was involved became more diverse. The Company expanded to accommodate the development of these new products by opening offices in San Francisco, CA and Schenectady, NY, increasing the overhead expenses and working capital needs of the enterprise. At the same time, the Quirky platform generated a large number of products with an enthusiastic base of support from within the Quirky community. In short, Quirky was unable to attain manufacturing and distribution scale, and sustained significant losses on many of these products.

7.     These expenses could not be sustained by the revenue generated by the sale of products and the strategic partnerships entered into by Quirky and Wink. Accordingly, beginning in late 2014, the Debtors commenced efforts to reduce costs by transitioning away from the manufacture of new products and towards a model more focused on product design process and process management services. These initiatives required more time and capital than had been initially projected, resulting in a liquidity crisis in mid-2015. Efforts to obtain additional debt or equity capital to bridge the Debtors' operations through this transitional phase were unsuccessful.

8.     Accordingly, beginning in July 2015, the Debtors began to market Wink's assets for sale through a chapter 11 proceeding pursuant to section 363 of the Bankruptcy Code. In

addition, and in order to stem the operating losses associated with the Quirky business and more efficiently allocate the Debtors' remaining cash toward the Wink business and the marketing of Wink's assets, the Debtors elected to temporarily discontinue Quirky's operations.

9.     As of the date hereof, the Debtors possess three categories of assets (i) assets associated with the continuation of the Wink business as a going concern (which are proposed to be acquired by Flextronics International USA Inc.); (ii) the Quirky online community and the agreements between Quirky and third parties that constitute the Powered By Quirky Initiative; and (iii) miscellaneous inventory, machinery, furniture, fixtures, equipment, and intellectual property associated with Quirky's design and manufacturing business model.  The Debtors have commenced these cases to sell the Wink business as a going concern and to maximize the value of Quirky's assets for the benefit of creditors.

## JURISDICTION

10.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 327 (a), 328 and 1107(b) of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016.

## RELIEF REQUESTED

11.     By this Application, the Debtors seek an order authorizing the employment and retention of Centerview as the Debtors' investment banker with respect to the sale of the "Wink assets" effective as of the Petition Date in accordance with the provisions of this Application, the Bosacco Declaration, and the Engagement Letter.  A description of the "Wink assets" is set forth more fully in the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets Related to the Wink Business, (B) Approving Procedures for Assumption and Assignment of Executory Contracts, (C) Approving the Form and Manner of Notice, and (D) Scheduling an Auction and a Sale Hearing, and (II) an*

*Order Authorizing and Approving the Sale of Certain of the Debtors' Assets Related to the Wink Business* [D.I. 17].

### QUALIFICATIONS OF CENTERVIEW

12.    Established in 2006, Centerview is a full-service independent investment bank providing financial advisory services, including mergers and acquisitions and restructuring advice, across a broad range of industries, including the technology industry.   Centerview serves a diverse set of clients around the world from its offices in New York, Los Angeles, San Francisco and London, has expertise in designing and managing complex restructuring processes among a wide range of stakeholders, and a demonstrated track record of designing, negotiating and implementing amendments, exchange offers, financings, distressed merger and acquisitions transactions and out-of-court and in-court restructurings.   Centerview and its principals have advised debtors, lenders, committees and acquirers in many complex financial reorganizations.   Centerview's professionals have been involved in transactions representing over $150 billion in restructured debt.

13.    The Debtors originally retained Code Advisors on or about February 13, 2015 as their investment banker to conduct a sale process for the Wink Business Assets or otherwise seek a capital infusion, whether through debt or equity.   The primary focus of that marketing effort was the sale of the Wink Business Assets as opposed to other assets due to the Debtors' perceived value of these assets relative to other assets and the potential for a sale at a value that would exceed the existing indebtedness.   However, the efforts by Code Advisors were unsuccessful, and it ultimately became apparent to the Debtors that they would need to explore restructuring alternatives in the context of a possible bankruptcy filing.   To that end, the Debtors interviewed several investment bankers with experience in distressed asset sales and, in particular, sales pursuant to section 363 of the Bankruptcy Code.   The Debtors selected Centerview based on, among other things, the Debtors' need to retain an investment banking firm to provide advice with respect to the Debtors' restructuring activities, its extensive

experience and excellent reputation in conducting complex asset sales pursuant to section 363 of the Bankruptcy Code as well as their competitive pricing. Accordingly, on July 2, 2015, the Debtors retained Centerview to lead their sale and marketing efforts.

14.     Centerview's professionals, including while employed at other firms, have provided financial advisory, investment banking and other services in connection with the in-court restructuring of numerous companies, including Residential Capital, LLC, et al., Case No. 12-12020 (MG) (Bankr. S.D.N.Y.); Acterna Corp., Case No. 03-12837 (BRL) (Bankr. S.D.N.Y.); Amtrol Holdings, Inc., Case No. 06-11446 (KG) (Bankr. D. Del.); Birch Telecom, Case No. 05-12237 (Bankr. D. Del.); Bruno's Inc., Case Nos. 98-212 (SLR) through 98-223 (SLR) (Bankr. N.D. Ala.); Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y.); Charter Commc'ns, Inc., Case No. 09-11435 (JMP) (Bankr. S.D.N.Y.); Citation, Case No. 06-15108 (Bankr. N.D. Ala.); CTC, Case No. 02-12875 (Bankr. D. Del.); Dana Corp., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y.); Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del.); Fairpoint Commc'n Inc., Case No. 09-16335 (BRL) (Bankr. S.D.N.Y.); General Growth Properties, Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y.); GW Limited 51, Inc., f/k/a GWLS Holdings, Inc., et al., Case No. 08-12430 (PJW) (Bankr. D. Del.); Interstate Bakeries Corp., Case No. 04-45814 (JWV) (Bankr. W.D. Mo.); Lear Corp., Case No. 09-14326 (ALG) (Bankr. S.D.N.Y.); Magna Entm't Corp., Case No. 09-10720 (MFW) (Bankr. D. Del.); MagnaChip Semiconductor Finance Co., et al., Case No. 09-12008 (PJW) (Bankr. D. Del.); McLeodUSA Inc., Case No. 05-63230 (JHS) (Bankr. D. Del.); Mirant Corp., Case No. 03-46590 (DML) (Bankr. N.D. Tex.); Pacific Crossing, Case No. 02-12088 (Bankr. D. Del.); Patriot Coal, Case No. 15-32450 (Bankr. E.D. Va.); Pegasus Satellite Television, Inc., Case No. 04-20878 (JBH) (Bankr. D. Me.); Polaroid, Case No. 08-46617 (Bankr. D. Minn.); PSI Net Inc., 01-13213 (REG) (Bankr. S.D.N.Y.); The Reader's Digest Ass'n, Inc., Case No. 09-23529 (RDD) (Bankr. S.D.N.Y.); Simmons Bedding Co., Case No. 09-14037 (MFW) (Bankr. D. Del.); and Stallion Oilfield Services Ltd., Case No. 09-13562 (BLS) (Bankr. D. Del.). Centerview's professionals have also provided such services

in the out-of-court restructurings of numerous companies, including Autocam Corporation; Broder Bros Co.; DS Waters of America, Inc.; Exide Technologies; Gate Gourmet, Inc.; Isola Group Ltd.; Keystone Automotive Operations, Inc.; Mashantucket Pequot Gaming Enterprise, Inc. / Foxwoods Inc.; OSI Restaurant Partners, LLC; PlayPower; Stolt-Nielsen Limited; Targus Group International, Inc.; and Vonage Holdings Corporation.

15.     Centerview's professionals, including while employed at other firms, have provided financial advisory, investment banking and other services in connection with the following selected technology transactions: advisor to FIS on its acquisition of SunGard from a private equity consortium; advisor to the Special Committee of the Board of Directors of Solera on its acquisition by Vista Equity Partners; advisor to Cisco on its acquisition of OpenDNS; advisor to DTS on its acquisition of iBiquity; advisor to Panasonic on its acquisition of ITC Global; advisor to MICROS on its acquisition by Oracle; advisor to Cognizant on its acquisition of TriZetto; advisor to Convergys on the acquisition of Stream Global Services; and advisor to JDS Uniphase on the spin-off of its Communication and Commercial Optical Product segment into Lumentum Holdings.

16.     In providing professional services to the Debtors in the period prior to the Petition Date, Centerview has become familiar with the Debtors and their business including the Debtors' financial affairs, capital structure, operations and related matters.  Having worked with the Debtors' management and their other advisors, Centerview has developed relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases.  Accordingly, Centerview is both well qualified and uniquely able to represent the Debtors in these chapter 11 cases in an efficient and timely manner.

17.     The experienced professionals at an investment bank such as Centerview fulfill a critical need that complements the services offered by the Debtors' other restructuring professionals.  The Debtors believe they require the services of a capable and experienced

investment banking firm such as Centerview and that Centerview is crucial to the Debtors' success in these cases.

## SERVICES TO BE RENDERED[3]

18.     Centerview has been retained to conduct the marketing and sale process with respect to Wink and its related assets.  In replacing Code Advisors, it was retained by the Debtors for this sole and exclusive purpose.

19.     The terms and conditions of Centerview's engagement are governed by the Engagement Letter, which reflects the substantial efforts that have been and will continue to be required of Centerview in this engagement.  Pursuant to the terms of the Engagement Letter, Centerview has and will continue to advise the Debtors in a variety of matters, including, as reasonably requested:

a.     Investment Banking and Sale Services:

i.     Familiarize itself with the business, operations, properties, financial condition and prospects of the Debtors;

ii.     Review the Debtors' financial condition and outlook;

iii.     Assist in the development of presentations to the Debtors' Board of Directors, various creditors and other parties;

iv.     Analyze the financial implications of bids;

v.     Participate in negotiations among the Debtors, and related creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by the Engagement Letter;

vi.     Participate in hearings before the bankruptcy court with respect to the matters upon which Centerview has provided advice, including, as relevant, coordinating with the Debtors' counsel with respect to testimony in connection therewith;

---

[3] This summary is solely for the convenience of the Court and parties in interest.  To the extent that this summary and the terms of the Engagement Letter are inconsistent, the terms of the Engagement Letter shall control.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them as in the Engagement Letter.

vii.   Provide advice and assistance to the Debtors in connection with a Sale,[4] identifying potential acquirers and, at the Debtors' request, contacting such potential acquirers;

viii.   Assist the Debtors and/or participate in negotiations with potential acquirers; and

ix.   Perform such other services as may be specifically agreed upon in writing by the Debtors and Centerview, subject to Bankruptcy Court approval.

## **PROFESSIONAL COMPENSATION**

20.    Centerview's decision to continue with its engagement to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment and to be compensated for its services and reimbursed for the expenses it incurs in accordance with its customary billing practices.

21.    Centerview intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "Fee Structure").  Further, because the Debtors are seeking to retain Centerview under section 328(a) of the Bankruptcy Code, the Debtors believe that Centerview's compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code and should not constitute a "bonus" under applicable law.  Notwithstanding anything herein to the contrary, the United States Trustee for the Southern District of New York shall retain all rights to respond or object to Centerview's interim and final applications for compensation and reimbursement of expenses on all grounds including, but not limited to, reasonableness, pursuant to section 330 of the Bankruptcy Code, and in the event the U.S. Trustee objects, the

---

[4] As used in this Application and Engagement Letter, the term "Sale" shall mean any transaction or series of related transactions involving the acquisition, merger, consolidation, or any other business combination pursuant to which a majority of the business, equity or assets of the Debtors are, directly or indirectly, sold, purchased or combined with another entity or company pursuant to § 363 of the Bankruptcy Code or Plan.

Court retains the right to review such interim and final applications pursuant to section 330 of the Bankruptcy Code.

22.    In summary, the Fee Structure provides for the following compensation to Centerview:

a.    A monthly financial advisory fee of $50,000 (the "Monthly Advisory Fee"), due on each monthly anniversary of execution of the Engagement Letter during the term of the engagement. The Monthly Advisory Fee shall be credited against any Transaction Fee (as defined below) earned by Centerview in connection with the engagement.

b.    If at any time during the term of the engagement or within the twenty-four full months following the termination of the engagement (including the term of the engagement, the "Fee Period"), (1) the Debtors consummate any Restructuring or Sale of the Core Assets or (2) the Debtors enter into an agreement in principle, definitive agreement or Plan to effect a Restructuring or Sale of Core Assets, and at any time (including following the expiration of the Fee Period), any Restructuring or Sale of the Core Assets is consummated, Centerview shall be entitled to receive a transaction fee (a "Transaction Fee"), contingent upon the consummation of (i) a Sale of the Wink Assets and payable at the closing thereof equal to the greater of (A) $1,000,000 and (B) 2% of Aggregate Consideration (as defined below), or (ii) a Restructuring of the Wink Assets and payable at the closing thereof equal to $1,000,000. For the avoidance of doubt, in the event of both a Sale and a Restructuring, Centerview shall not be entitled to two Transaction Fees.

c.    In addition to the fees payable by the Debtors to Centerview, the Company shall, whether or not any Restructuring and/or Sale shall be proposed or consummated, reimburse Centerview on a periodic basis for its travel and other reasonable out-of-pocket expenses incurred in connection with, or arising out of Centerview's activities under or contemplated by the engagement; *provided, however*, that the Debtors shall not be required to reimburse Centerview for (i) any fees, disbursements and other charges of outside counsel retained by Centerview in connection with the engagement, and (ii) any individual expense that exceeds $5,000 which was incurred without the prior written consent of the Debtors. The Debtors shall also reimburse Centerview, at such times as Centerview shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in, or contemplated by, the engagement. Such reimbursements shall be made promptly upon submission by Centerview of statements for such expenses.

d.    The Debtors and Centerview have entered into a separate letter agreement (the "Indemnification Agreement"), providing for indemnification by the Debtors of Centerview and certain related persons.

> As stated in the Engagement Letter, the Indemnification Agreement shall survive any termination or completion of Centerview's engagement.

23.     The Fee Structure is consistent with and typical of compensation arrangements entered into by Centerview and its restructuring professionals and other comparable firms in connection with the rendering of similar services under similar circumstances.  Centerview and the Debtors believe that the foregoing compensation arrangements are both reasonable and market-based and consistent with Centerview's normal and customary billing practices for comparably sized and complex restructuring cases, both in- and out-of-court.

24.     In determining the level of compensation to be paid to Centerview the Debtors compared Centerview's proposed fees with the range of investment banking fees in other chapter 11 cases.  The Debtors found Centerview's proposed fees to be within the range of other comparable transactions and, in addition, Centerview's proposed fees were the most competitive of the investment bankers interviewed by the Debtors.

25.     Centerview's strategic and financial expertise as well as its capital markets knowledge, financing skills, expertise in technology transactions, restructuring capabilities and mergers and acquisitions expertise, all of which have been and will continue to be required by the Debtors during the term of Centerview's engagement, were all important factors in determining the Fee Structure.  The Debtors believe that the ultimate benefit of Centerview's services hereunder cannot be measured by reference to the number of hours expended by Centerview's professionals in the performance of such services.  Indeed, the Debtors and Centerview agreed upon the Fee Structure in anticipation that a substantial commitment of professional time and effort would be required of Centerview and its professionals prior to and in connection with these chapter 11 cases and in light of the fact that such commitment would foreclose other opportunities for Centerview, and the actual time and commitment required of Centerview and its professionals to perform its services under the Engagement Letter would

vary substantially from week to week and month to month, creating "peak load" issues for Centerview.

26.     The Debtors request that notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, orders of this Court, or any guidelines regarding submission and approval of fee applications, in light of the services to be provided by Centerview and the structure of Centerview's compensation pursuant to the Engagement Letter, Centerview and its professionals should be excused from maintaining time records as set forth in Local Rule 2016-1 and the United States Trustee Fee Guidelines in connection with the services to be rendered pursuant to the Engagement Letter.  Notwithstanding the foregoing, Centerview intends to file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred.  Such applications will include time records setting forth, in a summary format, a description of the services rendered by each professional, and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.  Because Centerview does not ordinarily maintain contemporaneous time records in one-tenth hour (.1) increments or provide or conform to a schedule of hourly rates for its professionals, Centerview intends to file time records in one half (.5) hour increments.  Centerview will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the services discussed above. Centerview's applications for compensation and expenses will be paid by the Debtors, pursuant to the terms of the Engagement Letter upon approval by this Court.

## **INDEMNIFICATION AND CONTRIBUTION PROVISIONS**

27.     The Debtors have agreed to indemnify, to make certain contributions to, and to reimburse Centerview in accordance with the provisions set forth in the Indemnification Agreement.  The Indemnification Agreement provide, among other things, that the Debtors will indemnify Centerview and other Indemnified Persons (as defined therein), except to the extent that any loss, claim, damage, demand, liability (joint or several) or action or proceeding are

13

finally judicially determined to have resulted from such Indemnified Person's willful misconduct or gross negligence.

28.     As set forth in more detail below, the indemnification, contribution and reimbursement provisions reflected in the Indemnification Agreement are customary and reasonable provisions included in engagement letters for investment bankers such as Centerview for proceedings both out of court and in chapter 11.

29.     The terms of the Indemnification Agreement were fully negotiated between the Debtors and Centerview at arm's length and the Debtors respectfully submit that the Indemnification Agreement are reasonable and in the best interests of the Debtors, their estates, and creditors.   Accordingly, as part of this Application, the Debtors request that this Court approve the Indemnification Agreement, as modified as set forth more fully in the proposed order annexed hereto, which conforms with the Blackstone Protocol, at the request of the Office of the United States Trustee.

## NO DUPLICATION OF SERVICES

30.     The Debtors intend for Centerview's services to complement, and not duplicate, the services to be rendered by any other professional retained in these cases.   Centerview understands that the Debtors have retained and may retain additional professionals during the term of the engagement, Centerview has worked and will continue to work cooperatively, as requested by the Debtors, with other professionals retained by the Debtors to integrate any respective work conducted by the professionals on behalf of the Debtors.   In particular, the Debtors have retained FTI Consulting, Inc. ("FTI") as financial advisor and Hilco Streambank LLC as investment banker with respect to certain assets not being marketed by Centerview (i.e., the "Quirky assets").   Centerview, FTI and Streambank will work diligently to avoid duplication of effort.

## CENTERVIEW'S DISINTERESTEDNESS

31.     To the best of the Debtors' knowledge and except to the extent disclosed herein and in the Bosacco Declaration, Centerview (i) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, (ii) does not hold or represent an interest adverse to the Debtors' estates and (iii) has no connection to the Debtors, their creditors or their related parties.

32.     Prior to the Petition Date, the Debtors paid $150,000 in Monthly Advisory Fees for the months of July, August and September and $2,051.15 as reimbursement for Centerview's expenses, all pursuant to the terms of the Engagement Letter.  Centerview has received no other compensation from the Debtors.  As of the Petition Date, Centerview did not hold a prepetition claim against the Debtors for fees or expenses related to services rendered in connection with the engagement.

33.     Centerview will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of Centerview's retention are discovered or arise, Centerview will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014.

## BASIS FOR RELIEF

34.     The Debtors seek authority to retain and employ Centerview as their investment banker under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out their duties under this title." 11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's

employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

35.    In addition, the Debtors seek approval of the Engagement Letter (including, without limitation, the Fee Structure and the Indemnification Agreement) pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327…on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis…" 11 U.S.C. § 328(a).    Section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on more flexible terms that reflect the nature of their services and market conditions.    As the United States Court of Appeals for the Fifth Circuit recognized in Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.), 123 F.3d 861 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

Id. at 862 (citations omitted).

36.    Furthermore, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 328(a) of the Bankruptcy Code, which now provides as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee

16

basis.

11 U.S.C. § 328(a) (amendment underlined). This change makes clear that the Debtors are able to retain a professional on a fixed or percentage fee basis, such as the Fee Structure, with bankruptcy court approval.

37.    The Engagement Letter appropriately reflects (i) the nature and scope of services to be provided by Centerview, (ii) Centerview's substantial experience with respect to investment banking services, and (iii) the fee structures typically utilized by Centerview and other leading investment bankers that do not bill their clients on an hourly basis.

38.    Similar fixed and contingency fee arrangements have been approved and implemented by courts in other chapter 11 cases in this district. See, e.g., In re Blockbuster, Inc., Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Sept. 23, 2010); In re Penton Business Media Holdings, Inc., Case No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010); In re FairPoint Commc'ns, Inc., Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan 11, 2010); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 2, 2006); In re Tower Auto., Inc., Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Jun. 15, 2005); In re Spiegel, Case No. 03-11540 (CB) (Bankr. S.D.N.Y. Aug. 7, 2003); In re NextWave Pers. Commc'ns, Inc., Case No. 98-21529 (ASH) (Bankr. S.D.N.Y. Oct. 1, 2001); In re Casual Male Corp., Case No. 01-41404 (REG) (Bankr. S.D.N.Y. Jul. 20, 2001).  Accordingly, the Debtors believe that Centerview's retention on the terms and conditions proposed herein is appropriate.

39.    In the light of the foregoing, and given the numerous issues that Centerview may be required to address in performance of its services hereunder, Centerview's commitment to the variable level of time and effort necessary to address all such issues as they arise and the market rate charged for comparable services both in and out of chapter 11, the Debtors believe that the terms and conditions of the Engagement Letter are fair and reasonable under the standards set forth in Bankruptcy Code section 328(a). In particular, the Debtors believe the Fee Structure creates a proper balance between monthly fees and contingency fees based the

overall success of these chapter 11 cases. Moreover, Centerview's substantial experience with respect to investment banking services, coupled with the nature and scope of work already performed by Centerview before the commencement of these chapter 11 proceedings, further suggest the reasonableness of the Fee Structure.

40.    Denial of the relief requested herein will deprive the Debtors of the assistance of uniquely qualified investment banking advisors and would cause unjust disadvantage to the Debtors and all parties in interest. Indeed, the Debtors would be forced to engage new investment bankers who lack a thorough understanding of the Debtors' business and the initiatives that have been implemented in the months leading up to the Petition Date. It would require a commitment of significant resources for a newly retained investment banking advisor to get up to speed given the steep learning curve involved. Additionally, given the Debtors liquidity profile, engaging new investment bankers would require incremental time which would effectively the amount of time the Debtors have to re-market their assets.

## NOTICE

41.    No trustee or examiner has been appointed in these chapter 11 cases.  Notice of this Application has been given to:  (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to Comerica; (iii) such other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b).  The Debtors submit that no other or further notice need be given.

42.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

18

**WHEREFORE,** the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to employ and retain Centerview as investment banker, effective as of the Petition Date, and (ii) granting such other and further relief as is just and proper.

Dated: September 29, 2015
New York, NY

Respectfully submitted,

Quirky, Inc.

By: /s/ Charlie Kwalwasser _____
Name:  Charlie Kwalwasser
Title:    General Counsel, Chief
Administrative Officer, Secretary

**<u>EXHIBIT A</u>**

**<u>ENGAGEMENT LETTER</u>**

EXECUTION COPY

As of September 18, 2015

Quirky, Inc.
606 West 28th Street
New York, NY 10001 Attention: Ed Kremer, CEO

Dear Mr. Kremer:

This letter (the "Agreement") amends and restates the previous letter agreement dated July 2, 2015 (the "Prior Agreement") and confirms the terms under which Quirky, Inc. and its subsidiaries (collectively, the "Company") have engaged Centerview Partners LLC ("Centerview") as its investment banker with respect to a possible Restructuring and/or Sale (each as defined below) of the assets and/or equity (the "Wink Assets") of Wink, Inc. ("Wink") and with respect to such other financial matters as to which the Company and Centerview may agree in writing during the term of this engagement. For purposes hereof, the term "Wink" also includes any entity that the Company may form or invest in to consummate a Restructuring and/or Sale, and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of the Wink, Inc., whether pursuant to a Plan (as defined below) or otherwise. If appropriate in connection with performing its services for the Company hereunder, Centerview may utilize the services of one or more of its affiliates, in which case references herein to Centerview shall include, as applicable, such affiliates. The terms of this Agreement shall apply to all services provided by Centerview to the Company in connection with the matters contemplated by herein, including those provided prior to the date of this Agreement.

As used herein, the term "Restructuring" shall mean any recapitalization or restructuring of the Wink Assets (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement, refinancing, purchase or repurchase and/or a material modification or amendment to the terms, conditions or covenants thereof) of Wink's preferred equity and/or debt securities and/or bank or other credit facilities and/or other indebtedness, obligations or liabilities (including, without limitation, partnership interests, lease obligations, trade credit facilities and/or contract, tort and contingent obligations), including pursuant to a repurchase or an exchange transaction, pursuant to a Plan (as defined below).

For purposes of this Agreement, the term "Sale" shall mean any transaction or series of related transactions involving an acquisition, merger, consolidation, or any other business combination pursuant to which the Wink Assets are, directly or indirectly, sold, purchased or combined with another entity or company pursuant to §363 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code") or a Plan (as defined below).

For purposes of this Agreement, the term "Out-of-Court Sale" shall mean any transaction or series of related transactions involving an acquisition, merger, consolidation, or any other business combination pursuant to which the Wink Assets are, directly or indirectly, sold, purchased or combined with another independent, non-insider entity or company outside of the Bankruptcy Code. For purposes of clarity, in the event any such transaction or series of transactions are entered into with a shareholder or any entity or company that constitutes an "insider" of the Company (as defined in §101(31) of the Bankruptcy Code), such transaction or series of transactions shall not constitute an "Out of Court Sale" for purposes of this Agreement.

1.

1.    Centerview, as investment banker to the Company, will perform the following sale and investment banking services to the extent requested by the Company:

    i.    familiarize ourselves with the business, operations, properties, financial condition and prospects of the Company;

    ii.    review the Company's financial condition and outlook;

    iii.    assist in the development of presentations to the Company's Board of Directors, various creditors and other parties;

    iv.    analyze the financial implications of bids;

    v.    participate in negotiations among the Company, and related creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by this Agreement;

    vi.    participate in hearings before the bankruptcy court with respect to the matters upon which Centerview has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith;

    vii.    provide advice and assistance to the Company in connection with a Sale, identifying potential acquirers and, at the Company's request, contacting such potential acquirers;

    viii.    assist the Company and/or participate in negotiations with potential acquirers; and

    ix.    perform such other services as may be specifically agreed upon in writing by the Company and Centerview, subject to Bankruptcy Court approval in the event that the Company becomes a debtor under the Bankruptcy Code.

*provided, however*, that Centerview shall use its reasonable best efforts to ensure that none of the services rendered are duplicative of the services provided to the Company by FTI Consulting, Inc. or Hilco Streambank. For the avoidance of doubt, all services listed above are to be rendered solely in connection with and in support of investment banking services provided by Centerview in furtherance of a disposition of assets and/or equity of Wink.

In rendering its services to the Company hereunder, Centerview is not assuming any responsibility for the Company's underlying business decision to pursue any business strategy or to effect any Restructuring and/or Sale. The Company agrees that Centerview shall not have any obligation or responsibility to provide accounting, audit, "crisis management," or business consultant services for the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or to provide any fairness or valuation opinions. The Company acknowledges that Centerview is not providing any advice on tax, legal, regulatory or accounting matters, and the Company agrees that it will seek and rely on the advice of its own professional advisors for

such matters, and will make an independent decision with respect to the matters that are the subject of this engagement based on such advice.

In order to coordinate effectively the Company's and Centerview's activities to effect a Restructuring and/or Sale, the Company will promptly inform Centerview of any discussions, negotiations or inquiries regarding a possible Restructuring and/or Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this Agreement).

The Company shall make available to Centerview all information in its possession concerning the business, assets, operations, financial condition and prospects of the Company that Centerview reasonably requests in connection with the services to be performed for the Company hereunder, and shall provide Centerview with reasonable access to the Company's officers, directors, employees, independent accountants, and counsel, and other advisors, agents and other representatives of the Company as Centerview deems appropriate. To the best of the Company's knowledge, all information furnished by or on its behalf to Centerview pertaining to the Company, when delivered, will be accurate and complete in all material respects.   In addition, the Company agrees that it will promptly notify Centerview of any material event or change in the business affairs, condition (financial or otherwise) of the Company that occurs during the term of our engagement hereunder, or if it learns of any material inaccuracy or misstatement in, or material omission from, any information theretofore delivered to Centerview. The Company understands and agrees that, in performing our services hereunder, Centerview (a) will be using and relying on publicly available information and on materials, data and other information furnished to Centerview by the Company and other parties, (b) is entitled to assume and rely upon the accuracy and completeness of such publicly available information and the other information so furnished without having independently verified the same, and (c) does not assume any responsibility for the accuracy or completeness of such information. Centerview will not conduct an independent evaluation or appraisal of the assets or liabilities (including any contingent, derivative or off -balance sheet assets or liabilities) of the Company, or advise or opine on any solvency or viability issues, nor will it make an inspection of the properties or assets of the Company. With respect to any forecasts or projections that may be furnished to Centerview or discussed with the Company, Centerview will assume that they have been reasonably prepared on bases reflecting the best then currently available estimates and judgments of the management of the Company as to the matters covered thereby. In connection with the services described above, the Company authorizes Centerview to transmit any memorandum prepared by the Company describing the Wink Assets in connection with a Sale to potential parties to a Sale. The Company will be solely responsible for the contents of this memorandum. We will use all nonpublic Information concerning the Company solely for the performance of our services hereunder and will treat it confidentially for as long as it remains nonpublic. Except as otherwise required by applicable law, regulation or judicial or regulatory process, or requested by any regulatory body or securities exchange, we will not disclose material nonpublic information about the Company to a third party who is not subject to a confidentiality obligation to the Company without the Company's consent.

2.      As compensation for our services, the Company agrees to pay Centerview in cash, by wire transfer of immediately available funds when due, the following fees:

a.    A monthly financial advisory fee of $50,000 (the "Monthly Advisory Fee"), the first of which was paid in connection with execution of the Prior Agreement, and thereafter on each monthly anniversary thereof during the term of this engagement. The Monthly Advisory Fees shall be credited against any Transaction Fee or Out of Court Fee (both as defined below) earned by Centerview in connection with this engagement.

b.    If at any time during the term of this engagement or within the twenty-four full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (1) the Company consummates any Restructuring or Sale of the Wink Assets or (2) the Company enters into an agreement in principle, definitive agreement or Plan to effect a Restructuring or Sale of the Wink Assets, and at any time (including following the expiration of the Fee Period), any Restructuring or Sale of the Wink Assets is consummated, Centerview shall be entitled to receive a transaction fee (a "Transaction Fee"), contingent upon the consummation of (i) a Sale of the Wink Assets and payable at the closing thereof equal to the greater of (A) $1,000,000 and (B) 2% of Aggregate Consideration (as defined below), or (ii) a Restructuring of the Wink Assets and payable at the closing thereof equal to $1,000,000. For the avoidance of doubt, in the event of both a Sale and a Restructuring, Centerview shall not be entitled to two Transaction Fees.

c.    If during the Fee Period, the Company consummates an Out-of-Court Sale with respect to the Wink Assets or the Company enters into an agreement in principle or definitive agreement to effect an Out-of-Court Sale with respect to the Wink Assets (including following the expiration of the Fee Period), Centerview shall be entitled to receive a fee (an "Out-of-Court Fee"), contingent upon the consummation of such Out-of-Court Sale and payable at the closing thereof equal to $250,000, but only to the extent Centerview is not, and does not become, due a Transaction Fee. Under no circumstances shall Centerview be entitled to payment of an Out-of-Court Fee and a Transaction Fee.

For purposes of this Agreement, the term "Aggregate Consideration" shall mean the total amount of cash and the fair market value (on the date of payment and as determined by Centerview and the Company in good faith) of all securities and other property primarily related to the Wink Assets paid or payable, directly or indirectly, by the acquiring party (the "Acquiror") to the acquired party or the seller of the acquired business (in either case, the "Acquired"), or to the Acquired's contract parties, claim holders, security holders and employees, or by the Acquired to the Acquired's contract parties, claim holders, security holders and employees, in connection with a Sale or a transaction related thereto (including, without limitation, amounts paid by the Acquiror (i) pursuant to covenants not to compete, employment contracts, employee benefit plans or other similar arrangements and (ii) to holders of any warrants, stock purchase rights, convertible securities or similar rights of the Acquired and to holders of any options or stock appreciation rights issued by the Acquired, whether or not vested). Aggregate Consideration shall also include the value of any liabilities assumed by the purchaser of the Wink Assets (including obligations relating to any capitalized leases and the principal amount of any indebtedness for borrowed money) (x) existing on the Acquired's balance sheet at the time of a

121490570 v3

Sale or repaid or retired in anticipation of a Sale (if such Sale takes the form of a merger or sale or exchange of stock) or (y) assumed directly or indirectly by the Acquiror in connection with a Sale (if such Sale takes the form of a sale or exchange of assets). Aggregate Consideration shall also include (i) the net value (on the closing date of the Sale and as determined by Centerview in good faith), if positive, of any current assets not sold to the Acquiror. If a Sale takes the form of a recapitalization of Wink (including, without limitation, through an extraordinary dividend or other distribution, a spin-off, split-off or similar transaction), Aggregate Consideration shall also include the fair market value (on the closing date of the Sale and as determined by Centerview and the Company in good faith) of (i) the equity securities of Wink retained by Wink's security holders and/or creditors following the consummation of such transaction and (ii) any cash, securities (including securities of subsidiaries) or other consideration received by Wink's security holders and/or creditors in exchange for or in respect of securities of and/or claims against the Company in connection with such transaction (all such cash, securities and/or claims against other consideration received by such security holders and/or creditors being deemed to have been paid to such security holders and/or creditors in such transaction). If a Sale takes the form of a joint venture, partnership or other entity, Aggregate Consideration shall mean the fair market value (equity plus debt) of the joint venture, partnership or similar entity on the date of formation of such entity. In the event that any part of the consideration in connection with any Sale will be payable (whether in one payment or a series of two or more payments) at any time following the consummation thereof, the term Aggregate Consideration shall include the present value of such future payment or payments, as determined by Centerview in good faith, except that amounts (if any) held in escrow shall be deemed to have been paid at closing. As used in this Agreement, the terms "payment," "paid" or "payable" shall be deemed to include, as applicable, the issuance or delivery of securities or other property other than cash.

The Company acknowledges and agrees that Centerview's restructuring expertise as well as its capital markets/financing knowledge and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of Centerview's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of Centerview's services hereunder could not be measured merely by reference to the number of hours to be expended by Centerview's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Centerview and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for Centerview and that the actual time and commitment required by Centerview and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given numerous issues which Centerview may be required to address in the performance of its services hereunder, Centerview's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Centerview's services for engagements of this nature in an out-of-court context, each party hereto agrees that the fee and expense arrangements hereunder are reasonable under all applicable legal standards.

The Company and Centerview acknowledge and agree that more than one fee may become payable to Centerview under subparagraph 2(b) hereof in connection with any single transaction or a series of transactions. It is understood and agreed that if more than one fee becomes so

payable to Centerview in connection with a series of independent transactions, each such fee shall be paid to Centerview.

3.  In addition to the fees payable by the Company to Centerview hereunder, the Company shall, whether or not any Restructuring and/or Sale shall be proposed or consummated, reimburse Centerview on a periodic basis for its travel and other reasonable out-of-pocket expenses incurred in connection with, or arising out of Centerview's activities under or contemplated by this engagement; provided, however, that the Company shall not be required to reimburse Centerview for (i) any fees, disbursements and other charges of outside counsel retained by Centerview in connection with this engagement and (ii) any individual expense that exceeds $5,000 which was incurred without the prior written consent of the Company. The Company shall also reimburse Centerview, at such times as Centerview shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in, or contemplated by, this engagement. Such reimbursements shall be made promptly upon submission by Centerview of statements for such expenses. It is understood and agreed that nothing contained herein shall be deemed to limit in any manner the indemnification, expense reimbursement and other obligations of the Company contained in the Indemnification Agreement attached hereto as Annex A.

4.  The Company and Centerview have entered into a separate letter agreement, dated the date hereof and attached hereto as Annex A (the "Indemnification Agreement"), providing for indemnification by the Company of Centerview and certain related persons. Such Indemnification Agreement is an integral part of this Agreement and the terms thereof are incorporated by reference herein. As stated therein, the Indemnification Agreement shall survive any termination or completion of Centerview's engagement hereunder.

5.  The Company agrees that neither Centerview nor any of its affiliates, their respective members, directors, officers, employees and controlling persons, and each of their respective successors and assigns (collectively, the "Centerview Persons" and each individually, a "Centerview Person") shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company for or in connection with this engagement or any transactions or conduct in connection herewith, except to the extent that any losses, claims, damages or liabilities incurred by the Company are finally judicially determined to have resulted directly from the willful misconduct or gross negligence of such Centerview Person.

6.  This Agreement and Centerview's engagement hereunder may be terminated by either the Company or Centerview at any time upon 30 days' prior written notice thereof to the other party; provided, however, that (A) termination of Centerview's engagement hereunder shall not affect the Company's continuing obligations under the Indemnification Agreement, and its continuing obligations and agreements under paragraphs 5 and 7 hereof, (B) notwithstanding any such termination, Centerview shall be entitled to the full fees in the amounts and at the times provided for in paragraph 2 hereof and (C) termination of Centerview's engagement hereunder shall not affect the

121490570 v3

Company's obligation to reimburse the expenses accrued prior to such termination to the extent provided in paragraph 3 hereof.

7.    Centerview has been retained under this Agreement as an independent contractor with duties owed solely to the Company, and the Company acknowledges that Centerview is not acting as an agent of the Company or in a fiduciary capacity, whether pursuant to contract or otherwise, with respect to the Company or its stockholders, employees, creditors or any other third party. The advice (oral or written) rendered by Centerview pursuant to this Agreement is intended solely for the benefit and use of the Board of Directors of the Company (in their capacity as directors and not in any individual capacity) in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to Centerview be made by the Company, without the prior written consent of Centerview. Centerview is not assuming any duties or obligations other than those expressly set forth in this Agreement.

8.    The Company agrees that, Centerview shall have the right to place advertisements in financial and other newspapers and journals and in marketing materials at its own expense describing its services to the Company hereunder.

9.    In the event that the Company becomes a debtor under the Bankruptcy Code, the Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327(a) and 328(a) of the Bankruptcy Code of this Agreement and Centerview's retention by the Company under the terms of this Agreement, and subject to the standard of review provided for in Section 328(a) of the Bankruptcy Code, and not subject to any other standard of review under section 330 of the Bankruptcy Code or any other standard of review, and shall use its best efforts to obtain Bankruptcy Court authorization thereof. The Company shall supply Centerview and its counsel with a draft of such application and any proposed order authorizing Centerview's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of the filing of such application or the submission of such order, as the case may be, to enable Centerview and its counsel to review and comment thereon. Centerview shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless and until Centerview's retention under the terms of this Agreement is approved under Section 327(a) and 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Centerview in all respects. Centerview acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this paragraph 9, payment of Centerview's fees and expenses shall be subject to (i) jurisdiction and approval of the Bankruptcy Court under Section 327(a) and 328(a) of the Bankruptcy Code and any order approving Centerview's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interest and final fee applications. Centerview shall have no obligation to keep time records except as it does so in its normal practice and will have no obligation to

121490570 v3

provide services under this Agreement if it will be required to vary its normal time-keeping practices. In the event that the Company becomes a debtor under the Bankruptcy Code and Centerview's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Centerview hereunder as promptly as practicable in accordance with the terms hereof. In so agreeing to seek Centerview's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Centerview's experience and expertise, its knowledge of the industry in which the Company operates and the capital markets and its other capabilities will inure to the benefit of the Company, that the value to the Company of Centerview's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees payable to Centerview hereunder are reasonable regardless of the number of hours to be expended by Centerview's professionals in performance of the services to be provided hereunder. Prior to commencing a chapter 11 case, the Company shall pay all undisputed amounts theretofore due and payable to Centerview in cash.

The Company agrees that Centerview's post-petition compensation as set forth herein and payments made pursuant to the expense reimbursements and indemnification provisions of this Agreement (including, without limitation, Annex A hereto) shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court. The Company also agrees to assist Centerview in preparing, filing and serving all required fee statements, interim fee applications, and final fee application, The Company agrees to support Centerview's fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by Centerview therein are consistent with this Agreement.

10.   This Agreement shall be deemed made in New York. This Agreement and all controversies arising from or relating to performance hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in such State, without giving effect to such State's rules concerning conflicts of laws that might provide for any other choice of law. Each of the Company and Centerview agree that any action or proceeding based hereon, or arising out of Centerview's engagement hereunder, shall be brought and maintained in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York. The Company and Centerview each hereby irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any such action or proceeding as set forth above. Each of the Company and Centerview hereby irrevocably waive, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that any such action or proceeding has been brought in an inconvenient forum and agree not to plead or claim the same. THE COMPANY (FOR ITSELF, ANYONE CLAIMING THROUGH IT OR IN ITS NAME, AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF

ITS EQUITY HOLDERS) AND CENTERVIEW EACH HEREBY IRREVOCABLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.    This Agreement may be executed in counterparts, each of which together shall be considered a single document. This Agreement may not be assigned by either party (except by Centerview to an affiliate) without the prior written consent of the other. This Agreement shall be binding upon Centerview and the Company and their respective successors and permitted assigns (including, in the case of the Company, any successor to all or a portion of the assets and/or the businesses of the Company under a Plan). This Agreement is not intended to confer any rights upon any shareholder, creditor, owner or partner of the Company, or any other person or entity not a party hereto, other than the Indemnified Persons referenced in the Indemnification Agreement attached hereto as Annex A and the Centerview Persons referenced in paragraph 5 hereof. This Agreement and the Indemnification Agreement constitute the entire agreement of the parties with respect to the subject matter hereof, and may not be amended or otherwise modified or its provisions waived except by a writing executed by Centerview and the Company.

12.    Centerview is engaged directly and through its affiliates and related parties in a number of investment banking, financial advisory and merchant banking activities. The Company acknowledges and agrees that in performing its services for the Company hereunder, Centerview shall have no duty to disclose to the Company, or to use for the benefit of the Company, any proprietary or non public information obtained by Centerview or its affiliates or related parties in the course of providing services to any other entity or person, engaging in any transaction (including as principal) or otherwise conducting its business.

We are pleased to accept this engagement and look forward to working with the Company. Please confirm that the foregoing is in accordance with our mutual understanding by signing and returning to Centerview this letter and the Indemnification Agreement attached hereto as Annex A, which shall thereupon constitute binding agreements between Centerview and the Company.

Very truly yours,

**CENTERVIEW PARTNERS LLC**

By:

Name:    John C. Bosacco
Title:    Partner

9.

Accepted and Agreed to:

QUIRKY, INC.

By: _____

Name: _____

Title: _____

10.

EXECUTION COPY

## INDEMNIFICATION AGREEMENT

Annex A

As of September 18, 2015

Centerview Partners LLC
31 West 52nd Street
New York, NY 10019

Ladies and Gentlemen:

In connection with the engagement (the "Engagement") of Centerview Partners LLC ("Centerview") by the undersigned (the "Company") to render sale and investment banking services to the Company pursuant to a letter agreement dated the date hereof (the "Engagement Agreement"), which agreement amends and restates the previous letter agreement dated July ___2___, 2015, the Company hereby agrees as follows:

1.  Except as provided in paragraph 3 hereof, the Company agrees to indemnify and hold harmless Centerview and each of its affiliates, their respective members, directors, officers, employees and controlling persons, and each of their respective successors and assigns (collectively, the "Indemnified Persons" and each individually, an "Indemnified Person") from and against any and all losses, claims, damages, demands and liabilities, joint or several, or actions or proceedings in respect thereof, brought by or against any person (collectively, "Losses"), which are related to or arise out of the Engagement or any matter or transaction contemplated thereby.

2.  The Company agrees to reimburse each Indemnified Person promptly upon request for all costs and expenses (including fees, disbursements and other charges of legal counsel), as they are incurred in connection with investigating, preparing for, pursuing, defending against or providing evidence in, any pending or threatened action, claim, suit, investigation or other proceeding brought by or against any person in any jurisdiction related to or arising out of the Engagement or any matter or transaction contemplated thereby (whether or not Centerview or any other Indemnified Person is a named party or witness, and whether or not any liability to any person results therefrom), including in connection with enforcing the terms hereof.

3.  Notwithstanding the foregoing, the Company shall have no obligation to indemnify and hold harmless any Indemnified Person under this letter agreement in respect of any Losses to the extent that such Losses are finally judicially determined to have resulted directly from the willful misconduct or gross negligence of such Indemnified Person.

4.  The Company agrees that it will not, without Centerview's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, claim, suit, investigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Centerview or any other Indemnified Person is an actual or potential party thereto) unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from all liability arising out of such action, claim, suit, investigation or proceeding and does not impose any monetary or financial obligation on any

121490570 v3

Indemnified Person or contain any admission of culpability or liability on the part of any Indemnified Person. No Indemnified Person seeking indemnification, reimbursement or contribution under this letter agreement will, without the Company's prior written consent (which consent shall not be unreasonably withheld or delayed), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

5.   If the foregoing indemnification provided for herein is determined to be unavailable to an Indemnified Person for any reason or is insufficient to hold it harmless in respect of any Losses referred to herein, then, in lieu of indemnifying such Indemnified Person hereunder, the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses (and expenses related thereto) (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and to Centerview, on the other hand, with respect to the Engagement or (ii) if the allocation provided by clause (i) of this paragraph is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of each of the Company, together with its officers, directors, employees and other advisors, on the one hand, and Centerview, on the other hand, and any other relevant and equitable considerations; provided, however, that in no event shall the aggregate contribution of the Indemnified Persons to the amounts so paid or payable exceed the aggregate amount of all fees actually received by Centerview from the Company in connection with the Engagement (excluding any amounts received by Centerview as reimbursement of expenses pursuant to the Engagement Agreement). For purposes of this letter agreement, the relative benefit to the Company and Centerview of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company in the transaction or transactions that are the subject of the Engagement, whether or not such transaction is proposed or completed, bears to (b) the fees paid or to be paid to Centerview under the Engagement Agreement.

6.   This letter agreement shall be deemed made in New York. This letter agreement and all controversies arising from or relating to performance hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in such State, without giving effect to such State's rules concerning conflicts of laws that might provide for any other choice of law. Each of the Company and Centerview agree that any action or proceeding based on, arising out of or resulting from any matter referred to in this letter agreement, shall be brought and maintained exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York. The Company and Centerview each hereby irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any such action or proceeding as set forth above, and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceeding. Each of the Company and Centerview hereby irrevocably waive, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to

12.

above and any claim that any such action or proceeding has been brought in an inconvenient forum, and agree not to plead or claim the same. ANY RIGHTS OF TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THIS LETTER AGREEMENT OR THE ENGAGEMENT ARE HEREBY WAIVED.

7.    The indemnity, contribution, reimbursement and other obligations of the Company hereunder shall be in addition to any liability that the Company may have, at common law or otherwise, and shall be binding on its successors and permitted assigns. The obligations of the Company hereunder cannot be assigned without the prior written consent of Centerview.

8.    Prior to or at the time a public announcement is made concerning the Company entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify Centerview in writing thereof and, if requested by Centerview, shall use commercially reasonable efforts to arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein.

9.    The terms of this letter agreement shall apply to all services provided by Centerview to the Company in connection with the matters contemplated by the Engagement, including those provided prior to the date of this letter agreement. The provisions of this letter agreement shall apply to any subsequent amendment to or modification of the Engagement Agreement, and shall survive the termination or completion of the Engagement. For the avoidance of doubt, the term "Engagement" shall include any services provided by Centerview to the Company prior to the execution of an Engagement Agreement with the Company, whether or not such services are described in such Engagement Agreement.

Very truly yours,

QUIRKY, INC.

By: _____
     Name: Charles Kwtwxxee
     Title: CAO

Accepted:

CENTERVIEW PARTNERS LLC

By: _____
     Name: John C. Besacco
     Title: Partner

13.

121490570 v3

## **EXHIBIT B**

## **BOSACCO DECLARATION**

COOLEY LLP

1114 Avenue of the Americas

New York, New York 10036

Telephone: (212) 479-6000

Facsimile: (212) 479-6275

Jeffrey L. Cohen

Michael A. Klein

Richelle Kalnit

*Proposed Counsel for Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                            :

In re:                          :    Chapter 11

                            :

QUIRKY, INC., *et al.*[1]          :

                            :    Case No. 15-12596 (MG)

          Debtors.       :

                            :    (Jointly Administered)

-------------------------------------------------------------- x

### DECLARATION OF JOHN BOSACCO IN SUPPORT OF DEBTORS' APPLICATION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 327(a) 328 AND 1107 AND BANKRUPTCY RULES 2014 AND 2016 AUTHORIZING EMPLOYMENT AND RETENTION OF CENTERVIEW PARTNERS LLC TO SERVE AS INVESTMENT BANKER TO THE DEBTORS AND DEBTORS IN POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), John Bosacco declares:

1.      I am a Partner in the Debt Advisory & Restructuring Group of Centerview Partners LLC ("Centerview"), which has its principal office at 31 West 52nd Street, 22nd Floor, New York, NY 10019. I am authorized to execute this declaration on behalf of Centerview. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

2.      This Declaration is being submitted in connection with the proposed employment and retention of Centerview as investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") to perform services as set forth in the *Application for an Order Authorizing Employment and Retention of Centerview Partners LLC to Serve as Investment Banker to the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* (the "Application").  I submit this Declaration in compliance with sections 327, 328 and 1107(a) of the Bankruptcy Code and to provide the disclosure required under Rules 2014(a) and 2016 of the Bankruptcy Rules and Rules 2014-1 and 2016-1 of the Local Rules.

3.      Established in 2006, Centerview is a full-service independent investment bank providing financial advisory services, including mergers and acquisitions and restructuring advice, across a broad range of industries, including the technology industry.  Centerview serves a diverse set of clients around the world from its offices in New York, Los Angeles, San Francisco and London, has expertise in designing and managing complex restructuring processes among a wide range of stakeholders, and a demonstrated track record of designing, negotiating and implementing amendments, exchange offers, financings, distressed merger and acquisitions transactions and out-of-court and in-court restructurings.  Centerview and its principals have advised debtors, lenders, committees and acquirers in many complex financial reorganizations. Centerview's professionals have been involved in transactions representing over $150 billion in restructured debt.

4.      In connection with its proposed retention by the Debtors in these cases, Centerview undertook to determine whether Centerview had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors. Specifically, Centerview obtained from the Debtors and/or their representatives the names of individuals and entities that may be parties in interest in these chapter 11 cases (the "Potential Parties in Interest"), which parties are listed on **Schedule 1** annexed hereto.

5.      To the best of my knowledge, information and belief, Centerview has not represented any Potential Parties-in-Interest in connection with matters relating to the Debtors,

2

their estates, assets, or businesses and will not represent other entities which are creditors of, or have other relationship to, the Debtors in matters relating to these Chapter 11 Cases except as set forth herein.

6.      As part of this inquiry, Centerview entered the names of Potential Parties-in-Interest into its computer database of existing and prior clients and other relevant databases relating to Centerview's clients.  To the extent that I have been able to ascertain that Centerview has been retained within the last two years to represent any of the Potential Parties in Interest in matters unrelated to these chapter 11 cases, such parties are referenced on **Schedule 2** attached hereto. In addition to those entities identified on **Schedule 2**, Centerview is currently engaged to represent one of the Potential Parties in Interest on a confidential basis on matters unrelated to the chapter 11 cases. Centerview's representation of each entity referenced on Schedule 2 is only in connection with matters that are unrelated to the Debtors or these chapter 11 cases.

7.      As part of its diverse practice, Centerview appears in numerous cases, proceedings and transactions involving many different attorneys, accountants, investment bankers and financial consultants, some of whom may represent Potential Parties-in-Interest in these Chapter 11 Cases.  Further, Centerview has in the past, and may in the future, be represented by attorneys and law firms, some of whom may be involved in these proceedings.  In addition, Centerview has been in the past, and likely will be in the future, engaged in matters unrelated to the Debtors or these Chapter 11 Cases in which it works with or against or has mutual clients with other professionals involved in these Chapter 11 Cases.  In particular, Centerview may also represent, or may have represented in the past, committees or groups of lenders, creditors or equity owners in matters unrelated to the Debtors or these Chapter 11 Cases, some of which are included on the Potential Parties-In-Interest list. Furthermore, Centerview has vendor relationships with certain of the entities listed as Potential-Parties-Interest unrelated to the Debtors or these Chapter 11 Cases. Based on our current knowledge of the entities listed as Potential Parties-in-Interest in these Chapter 11 Cases, and to the best of my knowledge, none of these business relations constitute interests adverse to the Debtors.

3

8.      Other than as referenced herein, I am unaware of any client relationships that Centerview has had with the Potential Parties-in-Interest herein.    If Centerview's proposed retention by the Debtors is approved by this Court, Centerview will not accept any engagement or perform any service for any entity or person other than the Debtors in these Chapter 11 Cases. Given the size of the Firm and the breadth of Centerview's client base, it is possible that Centerview may now or in the future be retained by one or more of the Potential Parties-in-Interest in matters unrelated to the Debtors or these Chapter 11 Cases without my knowledge.   In addition, the Debtors may have customers, creditors, competitors, and other parties with whom they maintain business relationships that are not listed as Potential Parties-in-Interest and with whom Centerview may now or in the future maintain commercial or other professional relationships.   To the extent that Centerview discovers any, or enters into any new, material commercial or other professional relationship with Potential Parties-in-Interest, it will supplement this disclosure to the Court promptly. Centerview is a global investment banking and advisory firm.   Centerview has several legal and separate affiliates and related parties (the "Corporate Group Entities") that engage in a variety of investment activities.   However, none of the Corporate Group Entities is being retained in connection with this engagement and none of the professionals of Centerview has discussed or will discuss the Debtors' cases with any professional of the Corporate Group Entities.   Thus, there has not been and will not be any flow of information between Centerview and any Corporate Group Entity with respect to any matter pertaining to the Debtors or these Chapter 11 Cases.   Centerview can make no representation as to the disinterestedness of the Corporate Group Entities in respect of the Debtors or the chapter 11 cases.

9.      To the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, Centerview has no agreement with any other entity to share with such entity any compensation received by Centerview in connection with these Chapter 11 Cases.   No promises have been received by Centerview as to compensation for Centerview in connection with these Chapter 11 Cases other than in accordance with the Engagement Letter.

10.    Prior to the Petition Date, the Debtors paid $150,000 in Monthly Advisory Fees for the months of July, August and September and $2,051.15 as reimbursement for Centerview's expenses, all pursuant to the terms of the Engagement Letter.  Centerview has received no other compensation from the Debtors.  As of the Petition Date, Centerview did not hold a prepetition claim against the Debtors for fees or expenses related to services rendered in connection with the engagement.

11.    Accordingly, other than as disclosed herein, and insofar as I have been able to determine after reasonable inquiry, Centerview has no relationship with the Debtors of which I am aware.  Based upon the foregoing, I believe that Centerview is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that Centerview and its professionals:

  a.    are not creditors, equity security holders or insiders of the Debtors;
  b.    were not, within two years before the Petition Date, a director, officer or employee of the Debtors; and
  c.    do not have an interest materially adverse to the Debtors, their respective estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason.

12.    Centerview will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of Centerview's retention are discovered or arise, Centerview will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 29th day of September, 2015.

**CENTERVIEW PARTNERS LLC**


By: /s/John Bosacco
Name: John Bosacco
Title: Partner

## **SCHEDULE 1**

## **Interested Parties Searched**

**Debtors and Affiliates**

Quirky, Inc.
Wink, Inc.
Undercurrent LLC

**Current Directors and Officers**

James D. Robinson IV
Pat Patnode
Josh Goldman
Scott Weiss
Ed Kremer
Charles Kwalwasser
Nathan Smith

**Former Directors and Officers**

Ben Kaufman
Michael Marks
Elizabeth Comstock
Carl Bass

**Vendors**

1WorldSync
24 Seven Inc.
250 West Parking Corp - Imperial Parking
Abbye Churchill
Abiezer  Benitez
Able Fire Prevention Corp
Acclaro Inc
Accountemps
Acme Exterminating Corp
Action Environmental Services
Adam Yale
Adir Tech LLC
AdRoll Inc
AERO CONCEPT LIMITED
Ahsan Ullah
Airbnb, Inc
Airgas USA
AirWatch LLC
AJ Melino & Associates
Alexander Goebel
All American Elevator Company
All Makes Heating and Air Conditioning
Altium
American Arbitration Association
American Discount Security
AmpLive, Inc
AnyPerk, Inc.
Apple Storage
Arrow Electronics
Ashley Cunningham
AT&T

Atlantic Forwarding China Ltd.
Audio Design NYC
Autodesk, Inc.
Avery Dennison
Bazaarvoice, Inc.
Beacon Intellectual Property Services
Beautiful Enterprise Co., Ltd.
Bebop Technologies Inc.
Bernd Schnell
Big Ass Fans
Blaine Townsend
Blue Chip Building Maintenance, Inc.
Blue Limo
Bond Creative Search
Boomi, Inc.
Bortstein Legal Group
Bounce Exchange Inc
Box, Inc.
Brad Irvine
Bradford Graphics
Brian Orter Lighting Design
Brian Rossmajer
Bruce Sharpe
Bryan Baker
Bugcrowd Inc
Busy Bee Cleaning Service Corp
C.H. Robinson Company, Inc.
CA Sales Tax (Board of Equalization)
CADD Edge
Calculated Technology, LLC
California Model & Design
Caplugs (Shanghai) Plastic Products Co., Ltd.
Carbonic Service Inc.
Carolina Innovations, LLC
CCA Designing and Manufacturing Ltd.
Cheung Tai Plastic Factory Ltd
China Dragon Technology Limited
Chinaming Limited
Cision US Inc
Cloud Sherpas , Inc.
Coeur Noir Inc.
COKeM International LTD
ComGroup Holding LLC dba Alphaserve Technologies
Command Mechanical Corp
Commerce Hub
Comp.romiser LLC
Computer Packages Inc
Concur Technologies
Consumer Testing Laboratories
Contivio.com
Con-Way Freight
Corey  Woito
CORPORATE ESSENTIALS, LLC
Costa Brown Architecture
Covance - The Development Services Company
Cowan Liebowitz & Latman

CSC Leasing Co
Culture Amp Inc
Da Vinci Vertalingen
Dan Blessing-Graham
Dan Burke
Dan Goldman
Danny Luk
Dariusz Friedel
David  Plummer
Deacons
DEL Industrial Ltd.
Derek Kuntz
DHL
Dianne Zygaj
Digital Color Concepts Inc
Donald  Russo
Donald  S Bosley
Double D International
Douglas P Burke
Dun & Bradstreet Inc
Dyanna Prinz
Dynalink CommunicationsInc
Dynamex Operations East
East Color
Eastern Managed Print Network
Eastfield Lighting (Hong Kong) Co., Ltd. US
EASTON AIR-SEA FREIGHT CO.,LTD
Easylink Services International Corporation
El Dorado Molds
Elite Optoelectronics Co. LTD
Engineering 350
Erez Yaron
Eric Yealland
Estes Express Lines
Evan Jensen
Expensify
Exubrancy
eZCom Software
Fastmetrics
Federal Express
Fine Line
Flat Rate Storage
Flex Sales & Marketing North Asia (L)Ltd
Flextronics
Florida Department of Revenue
Fragomen, Del Rey, Bernsen & Loewy, LLP
Francis Leblanc
Freeman Lewis LLP
Fruda LLC
Ganas LLC
German Link
Gilbert Displays Inc
Google Inc
Gottlieb, Rackman & Reisman, P.C
Grain Group
Grainger

Group Intellect Technology Limited
Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLD
GUANG DONG XINBAO ELECTRICAL APPLIANCES
HOLDINGS CO., LTD
Gunderson Dettmer Stough LLP
H&S Power Wash and Window Cleaning Co.,
Hampton Management Co LLC (wink)
Hawk Ridge Systems
Henry Lo
HireRight, Inc.
HK JING QUAN HUA DEVELOPMENT LIMITED
Hoc Global Solutions
HOLLWICH KUSHNER ARCHITECTURE D.P.C
Home Ventilating Institute
HuiYu Plastic Factory
Human
ILogic Technology Limited
Innovative Sales Solutions
Innovatrio Design
Insite Security Inc.
Intermedia.net, Inc
International CES
International Home and Housewares
Intertek Testing Services
J. Callahan Consulting, Inc
Jake  Zien
JAS Recruitment
Jeffrey L Curry
Jennifer Jones
Jenny Best
JKEP Ltd - Jessie Punia
Joe Turner
Josh Green
Josh Stukey
Junc Order Handbag (Hong Kong) Company Ltd.
JYASF Inc
Kelly McNair
Kevin Woodrow
Kings Electric Co., Ltd.
Kristen J Bates and Associates
Kwikset
Kyle Jordan
Kyriba
Las Vegas/L.A. Express, Inc
Legacy Effects, LLC
Leviton Manufacturing Co. Inc
Lindenmeyr Munroe
LinkedIn
Lisa Puccia
LJM Consultants
Logistics Plus
Looker Data Services, Inc.
Lost Tribes Beverages
Lutron
Luxion Inc.
M & M Sanitation Corp

Mark Khouri
Mathieu Tremblay
McMaster-Carr
Merry Electronics co., LTD
Michael Gongol
Michael Nixon
Michael Page International, Inc.
Microbiz Security Company
Midtown Video
MIG Technology Inc.
Milkshake Studio, LLC
Miller Thomson LLP
Mollie A West
Mouser Electronics (US)
Namely Inc
National Grid
Natural Waters
Nature Box Inc
Nelson J.I.T.
Neo Innovation, Inc.
Nesco Resource
NetNames USA, Inc.
NetSuite, Inc.
New Penn
New York State Sales Tax
Ogletree Deakins
OHL
Okaywife Daily Necessities Co.
Oksung  Kim
Oleg  Saltykov
OMD USA LLC
Optimal Design Co.
Oren S Levy
Ovation In Store/SRM
Paradigm Janitorial Service
Parking 31 Management LLC
Partners & Spade
Pepcom, Inc.
Philippe Berube
PIRRI BUILDERS LLC
Planetary Corporation
Plant Specialists LLC
Precision Glass & Aluminum Inc
Premium Retail Services
PriceWaterhouseCoopers
Private Palate LLC
ProtoFinish
R/GA Branding
Rachio
RAND PRODUCTS MFG. CO., INC.
Randy Stanley
Ready to Roll Transportation Inc
Reidy Contracting Group
Reliance Technical Service Ltd
RevelOps Ireland Limited t/a Logentries
RippleIT

Rise Devices LLC
Robert Del Casale
Robert Jones
Rosini Engineering, PC
Ryan Mano
SailThru
Sercomm Corporation
Shalita Monique Robinson
ShenZhen XiuShun Label-Printing Co., Ltd
SHI International Corp
Shijin Industrial
Signifyd Inc
Silverchair Partners
Smart Choice Communications
Smartsheet.com, Inc.
Snaptron Inc
Sobel & Feller LLP
Solium Capital
Spector Group
SPS Commerce Inc
Stable Group LLC
Staples
Stephen Gould Corporation
Steve Scopa
Steven Praeter
Stratasys Inc
Sumo Logic, Inc
SUNRISE ELECTRONICS INC
Sunshine Best Cleaning Corp
Superior Office Systems
Superwell International Electronic Co.,LTD
Swing Labels LLC
Tak Lee Company
Take The Interview
Tax Agency CA
Taylor Hodson Staffing Inc.
Techni-Tool, Inc.
Tekserve
Telefield Limited
Tesla Motors, Inc.
TEST VENDOR
The Clarient Group, LLC
The Gazette
The Participation Agency
Thinking Phone Networks, Inc.
Thoro Packaging
Time Shred Services, Inc.
Time Warner Cable of Schenectady
TimePayment Corp
Toppan Win Label Co., LTD
Towerstream Corporation
Townstage Productions Wink
Tri-Cor
TriMark ERF, Inc.
Triple Crown Consulting
TÜV SÜD Hong Kong

Uber Technologies, Inc.
UL AG Chicago
UL LLC (US)
UL Verification Services, Inc.
UL VS Hong Kong Limited
Uline
UPS
Urban Airship, Inc.
Verizon
Voion Printing Group Co. Ltd
Wah Ming International Ltd. - Come Sure
WB Mason
Wells Wood Turning
William A Jessup
Wistron NeWeb Corporation
Wolfe Security
World Wide Security
Xiushun Label Printing Co.
Yebo Incorporated
Yellowhammer Media Group Inc.
Yick Sang Metal And Plastic Mould Texturing Limited
Doreen Lorenzo
Kate Vallon
Christopher L. Smith
Office Team
Chad Wi
Denyveaus Sells

**Parties to Litigation**

Fusco Personnel, Inc.
Antonio Acebo
The Stable Group

**Landlords**

Waterfront NY Realty Corp.
Development at Center City, LLC
AvalonBay Communities, Inc.

**Prepetition Secured Lender**

Comerica Bank

**Banks**

Comerica Bank
J.P. Morgan

**Professionals**

FTI Consulting
Centerview Partners
Hilco Streambank
Rust Omni
Klestadt Winters Jureller Southard & Stevens

**U.S. Trustee's Office – Region 2 (Manhattan)**

Linda A. Riffkin
Victor Abriano
Susan Arbeit
Catletha Brooks
Amanda Cassara
Maria Catapano
Danny A. Choy
Myrna R. Fields
Susan Golden
Nadkarni Joseph
Anna M. Martinez
Brian S. Masumoto
Ercilia A. Mendoza
Mary V. Moroney
Richard C. Morrissey
Serene Nakano
Cheuk M. Ng
Ilusion Rodriguez
Andrea B. Schwartz
Paul K. Schwartzberg
Sylvester Sharp
Andy Velez-Rivera
Greg M. Zipes

**Bankruptcy Judges (S.D.N.Y.)**

Cecelia G. Morris
Stuart M. Bernstein
Shelley C. Chapman
Robert D. Drain
James L. Garrity
Robert E. Gerber
Martin Glenn
Robert E. Grossman
Sean H. Lane
Michael E. Wiles

**District Court Judges (S.D.N.Y.)**

Loretta A. Preska
Robbie Abrams
Deborah A. Batts
Richard M. Berman
Vincent L. Briccetti
Vernon S. Broderick
Naomi Reice Buchwald
Valerie E. Caproni
Andrew L. Carter Jr.
Kevin P. Castel
Miriam Goldman Cedarbaum
Denise L. Cote
Paul A. Crotty

George B. Daniels
Kevin T. Duffy
Paul A. Engelmayer
Katherine Polk Failla
Katherine B. Forrest
Jesse M. Furman
Paul G. Gardephe
Thomas P. Griesa
Charles S. Haight
Alvin K. Hellerstein
Lewis A. Kaplan
Kenneth M. Karas
John F. Keenan
John G. Koeltl
Victor Marrero
Colleen McMahon
Alison J. Nathan
J. Paul Oetken
Robert P. Patterson
William H. Pauley III
Jed S. Rakoff
Edgardo Ramos
Nelson S. Roman
Leonard B. Sand
Shira A. Scheindlin
Lorna G. Schofield
Cathy Seibel
Louis L. Stanton
Sidney H. Stein
Richard J. Sullivan
Laura Taylor Swain
Robert W. Sweet
Analisa Torres
Kimba M. Wood
Gregory H. Woods

**Credit Card Company**

American Express

**Insurance/Employee Wages, Benefits Administrators**

ADP Inc.
Federal Insurance Company (Chubb)
Great Northern Insurance Company (Chubb)
Markel & Great American Insurance Company
Allianz Global Corporate & Specialty
American Alternative Insurance Corporation
Indian Harbor Insurance Co.
Starr Surplus Lines Insurance Co.
US Specialty Co. (HCC)
Illinois National Ins. Co. (AIG)
Integro Insurance Brokers

**Equity Holders Holding 10% or More of Equity Interests**

Norwest Venture Partners XI, L.P.
RRE Ventures IV, LP
GE Ventures LLC
Andreessen Horowitz Fund III, L.P.
KPCB Holdings, Inc.
Mitchell Lowe
JWN Holdings Limited

**Parties to Significant Contracts**

Mattel, Inc.
GE Ventures LLC
General Electric Company
GE Trademark Licensing, Inc.
Harman International Industries, Inc.
Robert Bosch Tool Corporation
Andersen Corporation/Andersen Windows, Inc.
The Chamberlain Group Inc.
Emerson Electric (through its White Rodgers Division)
Honeywell International Inc.
Jasco Products Company LLC
King of Fans, Inc.
Cree, Inc.
OSRAM SYLVANIA Inc.
Fibar USA, LLC
Presley Holdings LLC f/k/a Undercurrent LLC

**Community Members Owed More than $5,000**

Garthen Leslie
Angelo Cacchione
Gary Vaynerchuk
robert sweeney
James Robinson
Ben Kaufman
Peter Provart
Ania Piwko
Kim Williams-Smith
James Clevenger
Brad Beesley
Emad Yahia
Luke Decker
Samuel Greenlee
jeff natland
Alex de Beer
Catherine Burnett
Nicolas Vossen
Peter Galio
SW Park
Micah Goodman
Javier Rapoport
Katchina Blanca
Brian Schamp
Patrick Robbe

Mel Brunner
Alejandro Malo Tamayo
TeamLab
Aron Han
Mitch Lowe
Denyveaus Sells
Luis Cuadra
John Hanchulak
Patrick Steffen
John Bohlin
Graycloud Rios

## SCHEDULE 2

## Centerview Disclosures

**General Electric Company**
**Emerson Electric**
**Time Warner Cable**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                            :
In re:                                :    Chapter 11
                                              :
QUIRKY, INC., *et al.*[1]          :
                                              :    Case No. 15-12596 (MG)
             Debtors.           :
                                              :    (Jointly Administered)
                                              :
-------------------------------------------------------------- x

**ORDER UNDER 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR. P. 2014(a) AND 2016, AND LBR S.D.N.Y. 2014-1 AND 2016-1 AUTHORIZING EMPLOYMENT AND RETENTION OF CENTERVIEW PARTNERS LLC TO SERVE AS INVESTMENT BANKER TO THE DEBTORS AND DEBTORS IN POSSESSION, *NUNC PRO TUNC* TO THE PETITION DATE**

Upon the application (the "<u>Application</u>")[2] of the Debtors for entry of an order (the "<u>Order</u>") under sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 authorizing the employment and retention of Centerview as investment banker to the Debtors *nunc pro tunc* to the Petition Date; and the Court having reviewed the Application and the Bosacco Declaration; and upon consideration of the First Day Declaration; and due and sufficient notice of the Application having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and upon the record of the hearing held by the Court on the Application; and the Court being satisfied with the representations made in the Application and the Bosacco Declaration that Centerview neither holds nor represents an interest adverse to the estates, that is a "disinterested person" as that term is defined under section 101(14) of the Bankruptcy Code, and that it appearing that the terms of Centerview's compensation, as set forth in the Engagement Letter (defined below), are reasonable for purposes of 11 U.S.C. § 328(a); and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them as in the Application.

**ORDERED THAT:**

1.       The Application is GRANTED as set forth herein.

2.       Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, the Debtors, as debtors and debtors in possession, are authorized to employ and retain Centerview as their investment banker for the Debtors *nunc pro tunc* to the Petition Date, pursuant to the terms of the Engagement Letter (the "Engagement Letter") and to pay, reimburse and indemnify Centerview on the terms specified in the Engagement Letter and as set forth in this Order.  The services to be provided by Centerview pursuant to the Engagement Letter are not duplicative of services to be performed by any other professionals retained by the Debtors, and Centerview will undertake every effort to avoid any duplication of services.

3.       All of Centerview's compensation set forth in the Engagement Letter is approved pursuant to section 328(a) of the Bankruptcy Code, and Centerview shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of the Engagement Letter, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, Local Rules, and any other applicable orders of this Court.

4.       Centerview will file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, any applicable Bankruptcy Rules, Local Rules, any order of this Court and any procedures as may be fixed by order of this Court.

5.       Notwithstanding the prior paragraph, all fees payable to Centerview pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard review set forth in section 330 of the Bankruptcy Code.

6.       Centerview and its professionals shall be excused from keeping time records for services rendered in one-tenth of an hour increments, and instead shall only be required to maintain time records in half hour increments.

7.       Notwithstanding anything to the contrary herein, the U.S. Trustee retains all rights to object to Centerview's interim and final fee applications (including expense reimbursements) on all grounds including but not limited to the reasonableness standard provided for in section 330 of the Bankruptcy Code.

8.       The Debtors shall indemnify and hold harmless Centerview pursuant to the Indemnification Agreement attached as Annex A to the Engagement Letter and, during the pendency of these chapter 11 cases, subject to the following conditions:

a)       all requests for payment of indemnity, contribution, or otherwise pursuant to the Indemnification Agreement shall be made by means of a final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Indemnification Agreement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other order of this Court and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought; *provided however*, that in no event shall an Indemnified Person (as defined in the Indemnification Agreement) be indemnified or receive contribution to the extent that nay claim arose or expense has resulted for any such losses finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct of any Indemnified Person.

b)       in no event shall any Indemnified Person be indemnified or receive contribution or other payment under the Indemnification Agreement if the Debtors or a representative of the Debtors' estate asserts a claim for, and a court determines

by a final order that such claims primarily arose out of, such person's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct of any Indemnified Person; and

c)    in the event an Indemnified Person seeks reimbursement of attorneys' fees from the Debtors pursuant to the Indemnification Agreement, the invoices and supporting time records from such attorneys shall be attached to Centerview's own interim and final fee application, and such invoices and time records shall be subject to the U.S. Trustee guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3(C) of the Bankruptcy Code.

9.    In the event of a conflict among the Application, the Bosacco Declaration, the Engagement Letter, the Indemnification Agreement, and the express terms of this Order, this Order shall govern.

10.    The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by contents of the Application.

11.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

12.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


Dated: October ___, 2015
     New York, New York                  ————————————————————
                                   HONORABLE MARTIN GLENN
                                   UNITED STATES BANKRUPTCY JUDGE