COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Tel.: 212-479-6000
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit

Counsel for Debtors and
Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | X : | |
| In re: | : | Chapter 11 |
| QUIRKY, INC., *et al.*,[1] | : | Case No. 15-12596 (MG) |
| Debtors. | : | (Jointly Administered) |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : X | |

<u>NOTICE OF SELECTION OF STALKING HORSE BIDDER FOR QUIRKY ASSETS</u>

   **PLEASE TAKE NOTICE** that on October 27, 2015, the Court entered the *Order*

*(i) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain*

*Assets Related to the Business of Quirky, Inc., (ii) Approving Procedures for Assumption and*

*Assignment of Executory Contracts, (iii) Approving the Form and Manner of Notice, and*

*(iv) Scheduling an Auction and a Sale Hearing* [Docket No. 136] (the "<u>Quirky Bidding</u>

<u>Procedures Order</u>")[2] setting forth certain procedures for the sale of certain of the Debtors'

assets (the "<u>Quirky Bidding Procedures</u>").

   **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Quirky Bidding

Procedures Order, to the extent a stalking horse bidder (the "<u>Stalking Horse Bidder</u>") is selected

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Quirky Bidding Procedures Order.

by the Debtors with respect to the sale of an of Quirky Assets, it must be done so by November 2, 2015.

**PLEASE TAKE FURTHER NOTICE** that the Debtors selected Q Holdings LLC as Stalking Horse Bidder for the Acquired Assets, as defined in the agreement between the Debtors and the Stalking Horse Bidder (the "Stalking Horse Agreement").  A copy of the Stalking Horse Agreement, fully executed on November 2, 2015, is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that, as set forth in the Quirky Bidding Procedures, parties wishing to bid on individual products included in the Acquired Assets may do so using a form bill of sale, attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** the deadline to bid on the Quirky Assets, including individual products, is **November 13, 2015 at 12:00 p.m.** (prevailing Eastern Time).

Dated:    November 3, 2015
          New York, New York

COOLEY LLP

*/s/ Jeffrey L. Cohen*
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: jcohen@cooley.com
        mklein@cooley.com
        rkalnit@cooley.com

Counsel for the Debtors and
Debtors-in-Possession

## **EXHIBIT A**

**Stalking Horse Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**dated as of**

**November 2, 2015**

**by and among**

**Q HOLDINGS LLC**

**and**

**QUIRKY, INC.**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of November 2, 2015 by and among Q Holdings LLC, a Delaware limited liability company (the "**Purchaser**"), and Quirky, Inc., a Delaware corporation having a place of business at 606 West 28th Street, New York, New York 10001 ("**Seller**").

## RECITALS

WHEREAS, Seller has developed (i) the assets primarily relating to the Quirky.com online community platform (including, the Quirky trademarks and domain name quirky.com for an online community as well as the Quirky trademark registrations in other categories, the software and source code and third party software licenses, to the extent assignable, necessary to operate the community platform and innovation work flow, and the database of community members including the data fields necessary to track idea submission and contributions) and (ii) product specific patents, trademarks, designs, prototypes and related intangibles for all Quirky-owned products developed through the Quirky.com online community platform (collectively, the "**Acquired Assets**");

WHEREAS, on September 22, 2015 (the "**Filing Date**"), Seller filed a voluntary petition under chapter 11 of title 11 of the United States Code, Section 101, et seq. (the "**Bankruptcy Code**"), case number 15-12596 (MG) (the "**Bankruptcy Case**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (as defined below), and this Agreement and the transactions contemplated herein are subject to the approval of the Bankruptcy Court; and

WHEREAS, Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller substantially all of the assets primarily related to the Acquired Assets as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows:

## AGREEMENT

1.    Definitions

    **1.1**    "Actions" has the meaning set forth in Section 3.3 hereof.

    **1.2**    "Acquired Assets" has the meaning set forth in the recitals.

    **1.3**    "Affiliate" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person.

**1.4**    "Agreement" means this Asset Purchase Agreement among the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be delivered to Purchaser following the date hereof and amended from time to time.

**1.5**    "Ancillary Agreements" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated by this Agreement.

**1.6**    "Apportioned Obligations" has the meaning set forth in Section 5.5 hereof.

**1.7**    "Auction" means the auction of the Purchased Assets.

**1.8**    "Auction Date" means November 17, 2015, or such other date as the Bankruptcy Court may order for the Auction.

**1.9**    "Bankruptcy Case" has the meaning given to it in the recitals hereto.

**1.10**    "Bankruptcy Code" has the meaning given to it in the recitals hereto.

**1.11**    "Bankruptcy Court" has the meaning given to it in the recitals hereto.

**1.12**    "Bidding Procedures Order" means the order approving the bidding procedures at the Auction for the Purchased Assets.

**1.13**    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

**1.14**    "Closing" means the closing of the transactions contemplated by this Agreement.

**1.15**    "Closing Date" means the date on which the conditions set forth in Article 6 are satisfied or waived, or such other date as the parties may mutually agree upon which the Closing takes place.

**1.16**    "Code" means the Internal Revenue Code of 1986, as amended.

**1.17**    "Competing Transaction" means any transaction (or series of related transactions), whether direct or indirect, concerning a sale, financing, recapitalization, liquidation or other disposition of all of the Acquired Assets, the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement.

**1.18**    "Consent" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement or any Ancillary Agreement, the performance by a Person of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby.

**1.19**    "Copyrights" has the meaning set forth in Section 2.1(a)(i) hereof.

**1.20**    "Copyright Rights" has the meaning set forth in Section 2.1(a)(i) hereof.

123291322 v4

**1.21**   "Deposit" has the meaning set forth in Section 2.5 hereof.

**1.22**   "Disclosure Schedule" means each, and collectively all, as the context may require, of the disclosure schedules attached to this Agreement as <u>Exhibit A</u>, and includes but is not limited to each of the disclosure schedules expressly referred to in Article 3 of this Agreement.

**1.23**   "Documentation" has the meaning set forth in Section 2.1(a)(v) hereof.

**1.24**   "Domain Names" has the meaning set forth in Section 2.1(a)(vii) hereof.

**1.25**   "Excluded Assets" has the meaning set forth in section 2.2 hereof.

**1.26**   "Expense Reimbursement" means the reimbursement of Purchaser's reasonable out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement, in an aggregate amount not to exceed $50,000.

**1.27**   "Filing Date" has the meaning given to it in the recitals hereto.

**1.28**   "Final Order" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended as to which no appeals or motions for reconsideration are pending and any and all appeal periods with respect to such order, judgment or other decree have expired.

**1.29**   "GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

**1.30**   "Governmental Entity" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

**1.31**   "Intellectual Property Rights" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual obligation, or other means, throughout the world, including the right to distribute, exhibit, broadcast, and market by all means now known or hereafter devised (including over the Internet, World Wide Web, or other computer network), arising from or in respect of (i) the IP Assets and (ii) rights of privacy, publicity and biography, moral rights, and all other similar rights and collateral, ancillary and subsidiary rights of every kind and nature primarily related to the Acquired Assets, together with the goodwill associated therewith, all remedies against infringements thereof and rights to protect any interest therein.

**1.32**   "Interests" means (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, interests and claims (as that term is defined in the Bankruptcy Code), (ii) claims in respect of Taxes, and (iii) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code.

123291322 v4

**1.33**    "IP Assets" means all of the Seller's right, title and interest in and to the following: (i) Copyright Rights; (ii) Software; (iii) Trademark Rights; (iv) Patent Rights; (v) Documentation; (vi) Trade Secrets; (vii) Domain Names; and (viii) Web Sites.

**1.34**    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by the Chief Executive Officer and Chief Administrative Officer of the Seller; provided that such officer shall be deemed to have actual knowledge of any fact or matter such officer would reasonably be expected to have knowledge of in performing his or her duties and responsibilities, in such capacity, for the Seller.

**1.35**    "Material Adverse Effect" means a material adverse effect (financial or otherwise) on (a) the Acquired Assets, the Purchased Assets or on the results of operations or condition of the Acquired Assets or the Purchased Assets, taken as a whole, or the ability of Purchaser to succeed to and exercise rights or interests of Seller that are necessary to operate the Acquired Assets, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated by this Agreement other than effects directly arising as a result of (i) the performance of this Agreement or (ii) events, changes or developments relating to the financial, banking or capital-markets or the economy in general or industry-wide developments affecting Persons in businesses similar to the Acquired Assets.

**1.36**    "Nondisclosure Rights" has the meaning set forth in Section 2.1(b) hereof.

**1.37**    "Patents" has the meaning set forth in Section 2.1(a)(iv) hereof.

**1.38**    "Patent Rights" has the meaning set forth in Section 2.1(a)(iv) hereof.

**1.39**    "Permits" means all licenses, certificates of authority, permits, orders, consents, franchises, approvals, registrations, clearances, variances, exemptions, authorizations, qualifications and filings required to be obtained under applicable law or to be filed with any Governmental Entities.

**1.40**    "Person" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

**1.41**    "Post-Closing Tax Period" shall mean (i) any Tax period beginning any time after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

**1.42**    "Pre-Closing Tax Period" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

**1.43**    "Purchased Assets" has the meaning set forth in Section 2.1 hereof.

**1.44**    "Purchase Price" has the meaning set forth in Section 2.5 hereof.

**1.45**    "Purchaser" has the meaning given to it in the recitals hereto.

**1.46**    "Sale Approval Order" has the meaning set forth in Section 5.4(b) hereof.

123291322 v4

**1.47**    "Sale Hearing" means the hearing to approve the sale of the Purchased Assets.

**1.48**    "Seller" has the meaning given to it in the recitals hereto.

**1.49**    "Software" has the meaning set forth in Section 2.1(a)(ii) hereof.

**1.50**    "Stalking Horse Order" has the meaning set forth in Section 6.1(g) hereof.

**1.51**    "Subsidiary" means, with respect to any Person, any other Person (i) of which the first Person owns directly or indirectly fifty percent (50%) or more of the equity interest in the other Person; (ii) of which the first Person or any other Subsidiary of the first Person is a general partner or (iii) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries.

**1.52**    "Tangible Personal Property" has the meaning set forth in Section 2.1(c) hereof.

**1.53**    "Taxes" (or "Tax" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto.

**1.54**    "Third-party Technology" means (a) any "open source software" or under a similar licensing or distribution model and (b) any software and/or technology licensed by Seller from any Person primarily related to the Acquired Assets, as listed on Section 3.5 of the Disclosure Schedule.

**1.55**    "Trademarks" has the meaning set forth in Section 2.1(a)(iii) hereof.

**1.56**    "Trademark Rights" has the meaning set forth in Section 2.1(a)(iii) hereof.

**1.57**    "Trade Secrets" means any information which (i) is used in a business, (ii) is not generally known to the public or to Persons who can obtain economic value from its disclosure, and (iii) is subject to reasonable efforts to maintain its secrecy or confidentiality; the term may include but is not limited to inventions, processes, know-how, formulas, computer software, and mask works which are not patented and are not protected by registration (e.g., under copyright, patent, or mask work laws); lists of customers, suppliers, and employees, and data related thereto; business plans and analyses; and financial data.

**1.58**    "Trade Secret Rights" has the meaning set forth in Section 2.1(a)(vi) hereof.

**1.59**    "Web Sites" has the meaning set forth in Section 2.1(a)(viii) hereof.

123291322 v4

2.    <u>Purchase and Sale of Assets</u>

**2.1**    <u>Purchase and Sale of Assets</u>.    Subject to the terms and conditions of this Agreement together with any Bankruptcy Court approval that may be required, including the payment by Purchaser of the Purchase Price, at the Closing, (x) Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of any and all Interests, good, valid and marketable title and interest in and to all of the assets, properties and rights of Seller, other than the Excluded Assets, primarily related to the Acquired Assets (such assets, properties and rights are hereinafter collectively referred to as the "Purchased Assets"), including, but not limited to, the following assets, properties and rights:

**(a)**    IP Assets of Seller primarily related to the Acquired Assets, including, without limitation:

**(i)**    all right, title and interest, including all moral rights, in and to published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information), copyrights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof ("Copyrights") owned or licensed by the Seller primarily related to the Acquired Assets, including but not limited to those set forth on Schedule 2.1(a)(i) (collectively, the "Copyright Rights");

**(ii)**    all right, title and interest in and to any and all proprietary computer software owned or licensed by Seller (including software programs, objects, modules, routines, algorithms and any other software, source or object code) primarily related to the Acquired Assets, including but not limited to those set forth on Schedule 2.1(a)(ii), and all related Intellectual Property Rights (collectively, the "Software");

**(iii)**    all right, title and interest in and to any and all trademarks, service marks, certification marks, collective marks, trade names (including without limitation the trade name "Quirky"), business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by common law, and all applications, registrations, and renewals for any of the foregoing ("Trademarks") primarily related to the Acquired Assets, together with the goodwill associated with and symbolized by each of the foregoing held or used by Seller and all goodwill associated with the foregoing items set forth in this subsection 2.1(a)(iii) (collectively, the "Trademark Rights");

**(iv)**    all right, title and interest in and to any and all patent applications and patents which are owned or licensed by Seller (the "Patents") primarily related to the Acquired Assets, including but not limited to those set forth on Schedule 2.1(a)(iv), all patent applications claiming the benefit of the filing date of any such patent or patent application, all continuations, divisionals, renewals, substitutes, extensions, conversions, continuations-in-part, reissues, provisionals, reexaminations or other equivalents thereof, and all patents issuing in respect of any of the foregoing, and all related patent prosecution files (collectively, the "Patent Rights");

**(v)**    all right, title and interest in and to any and all documentation (whether in tangible or intangible format, and whether or not complete), files, and original documents owned or controlled by Seller and which, in each case, directly or indirectly relate to the other Purchased Assets (collectively, the "Documentation"), including, but not limited to,

-6-

(i) business plans developed by Seller and (ii) those relating to Seller's IP Assets, including without limitation all applications and patents included in the Patent Rights and Patents, all applications and trademarks included in the Trademark Rights, and all applications for copyright registration and copyright registrations included in the Copyright Rights;

**(vi)**    all Trade Secrets, confidential and proprietary information, and know-how, including methods, processes, business plans, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists primarily related to the Acquired Assets (collectively, the "Trade Secret Rights")

**(vii)**    all right, title and interest in and to domain name registrations, IP addresses, network addresses and the like held or used by Seller, and the applications therefor primarily related to the Acquired Assets, including but not limited to those domain names set forth listed on Schedule 2.1(a)(vii) (the "Domain Names"), and including further all Intellectual Property Rights in and to such Domain Names;

**(viii)**    all right, title and interest in and to the web sites set forth on Schedule 2.1(a)(viii), including all designs for such web sites, all underlying code for such web sites, and all contents of such web sites and other similar materials (the "Web Sites"), in any and all media now known or hereafter developed, and including further all Intellectual Property Rights in and to such Web Sites and all proprietary aspects of such Web Sites.

**(b)**    Except as specifically excluded under Section 2.2, all claims, causes of action, rights of recovery and rights of set-off owned by Seller and primarily related to the Acquired Assets, including, but not limited to, any and all enforcement rights to pursue damages, injunctive relief and other remedies, whether currently pending, filed, or otherwise, relating to the Intellectual Property Rights of Seller, or with respect to confidentiality, noncompetition and/or nondisclosure obligations of any current or former employee, shareholder, director or officer whether arising under contract or by operation of law ("Nondisclosure Rights"), and all rights to profits and damages due or accrued, arising out of or in connection with, any and all past, present or future infringement, misappropriation or other violation of the Intellectual Property Rights or Nondisclosure Rights of Seller, including all rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of the Intellectual Property Rights or Nondisclosure Rights, in the Purchaser's own name or in the name of the Seller, and all rights of Seller to collect royalties under the Intellectual Property Rights;

**(c)**    All materials, prototypes, tools, supplies and all physical embodiments of the Intellectual Property Rights, and improvements to the foregoing, including, but not limited to, the tangible assets identified on Schedule 2.1(c) (collectively, "Tangible Personal Property") owned by Seller and primarily related to and used solely by the Acquired Assets; provided that Seller, and any successor to Seller, including any trustee appointed in the Bankruptcy Case, shall be provided with reasonable access, subject to Purchaser's policies as to safety, security and confidentiality, to any information on any such computer system relating to the Acquired Assets, Seller's regulatory compliance or any matters as to which Seller is required by law to respond in an administrative or judicial proceeding, in existence as of the Closing Date for a period of six (6) months thereafter, provided further that in connection with any such administrative or judicial proceeding Purchaser shall be given the opportunity to limit disclosure of Purchaser's confidential information and Seller will cooperate with Purchaser in seeking nondisclosure of, or appropriate protective orders regarding, such information;

-7-

Except as set forth herein, the assets, properties and rights to be conveyed, sold, transferred, assigned and delivered to Purchaser pursuant to this Section 2.1 shall be transferred "as is, where is".

**2.2** <u>Excluded Assets</u>. Notwithstanding anything to the contrary herein, Seller shall not cause to be sold, assigned, transferred, conveyed or delivered to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Seller in, any of the following assets (the "Excluded Assets"):

(a)    all rights of Seller under this Agreement and the Ancillary Agreements;

(b)    all cash on hand or in banks and cash equivalents of Seller;

(c)    all interests in and to the capital stock of Seller and all corporate records, including without limitation, the organizational documents of Seller, accounting documents, tax returns, audit materials, legal records, board and member minutes and related correspondence, stock transfer books, blank stock certificates and other documents, qualification to conduct business as a foreign corporation and any Permits held by Seller that are not transferrable as a matter of law; <u>provided</u> that Purchaser shall be granted reasonable access to, and the right to make copies of, any such documents of Seller;

(d)    all human resources material including without limitation employment and compensation records and benefits information, <u>provided</u> that Purchaser shall be granted reasonable access to, and the right to make copies of, any such materials of Seller, for a period of twelve (12) months after the Closing Date;

(e)    all executory contracts and unexpired leases, <u>provided</u> that no executory contract shall be rejected by the Seller if such rejection would adversely affect the Nondisclosure Rights;

(f)    all bankruptcy avoidance claims of Seller, including without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code;

(g)    all claims, causes of action, rights of recovery and rights of set-off that the Seller may hold against any current or former director, officer or employee of Seller for breach of fiduciary duty or claims of a similar nature, <u>provided</u> that any such causes of action, whenever arising, that may be asserted against any Person (and any officer, director, shareholder or member of any Person) who is now or hereafter becomes a member, manager, officer or employee of or independent contractor to the Purchaser is hereby waived and released in its entirety, irrevocably, and shall not be asserted by the Seller or any Person claiming by, through or in the right of the Seller;

(h)    all other claims, causes of action, rights of recovery and rights of set-off that Seller may hold, including any and all enforcement rights to pursue damages, whether currently pending, filed, or otherwise, <u>provided</u> that the relief requested is solely monetary damages and that the pursuit of such claims, causes of action, rights of recovery and rights of set-off would not reasonably be expected to impact the Acquired Assets;

(i)    all tooling primarily related to the Acquired Assets and not in the possession of Seller;

-8-

**(j)**    all inventory of Seller; and

**(k)**    all intellectual property of the Company not otherwise specifically identified as Acquired Assets herein.

**2.3**    <u>No Liabilities</u>. Seller and Purchaser hereby expressly acknowledge and agree that Purchaser is not assuming any liabilities or obligations of Seller (i) in connection with this Agreement and the transactions contemplated hereby or (ii) in connection with Seller's current or past employees, agents, consultants, service providers or advisors.

**2.4**    <u>Closing</u>. Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, at 10:00 a.m. on November 30, 2015, or at such other place and time as the parties agree in writing, unless this Agreement is before such other time terminated in accordance with the terms hereof.

**2.5**    <u>Consideration</u>.    The aggregate consideration to be paid and delivered by Purchaser and accepted by Seller for the Purchased Assets (the "Purchase Price") shall be a cash amount equal to $2,300,000, payable by Purchaser at Closing by (i) release to Seller of the Deposit and (ii) wire transfer of immediately available funds to such accounts as Seller shall designate in writing in the amount of the Purchase Price less the Deposit.

As of the date hereof, Cooley LLP shall have received a deposit from or on behalf of Purchaser in the amount of $230,000 (the "Deposit"), which shall be held by Cooley LLP separate from its other funds until released to Seller at the Closing or otherwise disposed of as provided hereunder.

**2.6**    <u>Delivery</u>.    Subject to entry of the Sale Approval Order and such Sale Approval Order becoming a Final Order, at the Closing:

**(a)**    Purchaser shall release to Seller the Deposit and deliver to Seller the Purchase Price less the Deposit;

**(b)**    Seller shall deliver to Purchaser the Purchased Assets;

**(c)**    Seller and Purchaser shall execute and deliver the Patent Assignment in the form attached as <u>Exhibit B</u> hereto;

**(d)**    Seller and Purchaser shall execute and deliver the Trademark and Copyright Assignment in the form attached as <u>Exhibit C</u> hereto;

**(e)**    Seller shall execute and deliver to Purchaser the Bill of Sale, Assignment and Assumption Agreement in the form attached as <u>Exhibit D</u> hereto;

**(f)**    Seller shall deliver to Purchaser an executed Power of Attorney in the form attached as <u>Exhibit E</u> hereto;

**(g)**    Seller and Purchaser shall execute and deliver the Intellectual Property Assignment in the form attached as <u>Exhibit F</u> hereto;

(h)    Seller shall deliver to Purchaser an executed domain name transfer form attached as <u>Exhibit G</u> hereto;

(i)    Seller shall deliver to Purchaser such other and further documents as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein and to vest in Purchaser all right, title and interest in, to and under the Purchased Assets;

(j)    Seller shall deliver to Purchaser any and all trademark, patent and copyright prosecution files included in the Purchased Assets (without limitation of Seller's obligations under other provisions of this Agreement to deliver the Purchased Assets to Purchaser);

(k)    Seller shall deliver a copy of the Sale Approval Order; and

(l)    Seller shall deliver a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Case evidencing that the Sale Approval Order is a Final Order unless the requirement that the Sale Approval Order has become a Final Order has been waived by the Purchaser.

2.7    <u>Possession</u>.  Subject to entry of the Sale Approval Order, the right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date.  Seller shall transfer and deliver to Purchaser on the Closing Date such usernames, passwords, account numbers, authorization codes, encryption keys, and other similar items with respect to the Purchased Assets as Purchaser shall require to obtain control of the Purchased Assets, and shall also make available to Purchaser at Seller's then existing locations all documents, Documentation, software and hardware that are required to be transferred to Purchaser by this Agreement.

2.8    <u>Transfer Taxes</u>.  <u>Provided</u> that the Sale Approval Order includes a finding that the sale of the Purchased Assets is in contemplation of a plan to be confirmed under Section 1129 of the Bankruptcy Code, in accordance with section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be free and clear of any and all transfer tax, stamp tax or similar taxes.  Such instruments, orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

> "Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the Southern District of New York in contemplation of a chapter 11 plan of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(a)."

If such transfer, stamp or similar taxes are ultimately payable, notwithstanding section 1146(a) of the Bankruptcy Code or for any other reason, Purchaser shall pay any and all such transfer, stamp or similar taxes, which may be payable by reason of the transaction contemplated in this Agreement and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such taxes.

-10-

3.      Representations and Warranties of Seller

Subject to entry of the Sale Approval Order and except as set forth in the Disclosure Schedule (it being understood and hereby agreed that (i) the disclosures set forth in the Disclosure Schedule shall be organized under separate section and subsection references that correspond to the sections and subsections of this Article 3 to which such disclosure relates and (ii) the disclosure set forth in a particular section or subsection of the Disclosure Schedule shall qualify (A) the representations and warranties set forth in the corresponding section or subsections of this Article 3 and (B) such other representations and warranties set forth in this Article 3 if, and to the extent that, upon a reading of the disclosure, it is reasonably apparent that such disclosure is applicable to such other representations and warranties), Seller hereby represents and warrants to Purchaser as follows:

**3.1**     Authority, Etc.  Seller is a corporation duly organized and in good standing under the laws of the State of Delaware. Seller has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Seller.  This Agreement has been, and upon execution and delivery thereof each of the Ancillary Agreements will be, duly executed and delivered by Seller and constitutes, and such Ancillary Agreements will constitute, the valid and legally binding obligations of Seller enforceable against Seller in accordance with their respective terms and conditions.

**3.2**     Title.  Seller has good and marketable title to all of the Purchased Assets to be sold by Seller.  Upon the Closing, Seller will convey and transfer to Purchaser all of the Purchased Assets, and Purchaser shall receive good and marketable title to all of the Purchased Assets free and clear of any Interests, pursuant to sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

**3.3**     Brokers.  Other than amounts owed to Hilco IP Services, LLC d/b/a Hilco Streambank for services rendered in connection with this Agreement and the transactions contemplated by this Agreement, Seller has no liability or obligation to pay any broker, finder or investment banker, any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement or the transactions contemplated by this Agreement.

**3.4**     Litigation.  Except as set forth in Section 3.4 of the Disclosure Schedule, other than the Bankruptcy Case, there is no claim, action, suit, proceeding, opposition, challenge, cancellation proceeding or investigation (collectively, "Actions") pending or, to the Knowledge of Seller, currently threatened against Seller or primarily related to the Acquired Assets, any Nondisclosure Rights or the practice of any of the IP Assets, that questions the validity of this Agreement, any Ancillary Agreement, any of the IP Assets or any Nondisclosure Rights, or the right of Seller to enter into this Agreement or any Ancillary Agreement to which it is a party, or would prohibit Seller from entering into this Agreement or any Ancillary Agreement to which it is a party, or to consummate the transactions contemplated hereby or thereby, or that, to the Knowledge of Seller, could result, either individually or in the aggregate, in any Material Adverse Effect.  Other than the Bankruptcy Case, there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Acquired Assets, the Purchased Assets, the

-11-

Nondisclosure Rights or the practice of the IP Assets.  Section 3.4 of the Disclosure Schedule sets forth a description of all Actions to which Seller is a party or the Purchased Assets, the Nondisclosure Rights or the practice of the IP Assets or the Acquired Assets is subject.

**3.5**     Intellectual Property.     Except as otherwise disclosed in Section 3.5 of the Disclosure Schedule, Seller owns and possesses all right, title and interest in and to all material IP Assets, there are no licenses or other grants of rights from Seller to any Person with respect to such IP Assets, and all IP Assets shall be conveyed and transferred to Purchaser at the Closing free and clear of all Interests.  Without limiting the foregoing:

**(a)**     Schedules 2.1(a)(i), 2.1(a)(ii), 2.1(a)(iii) 2.1(a)(iv), 2.1(a)(vi) and 2.1(a)(viii) set forth a true and complete list of (i) all Copyrights, Software, Trademarks, Patents, Domain Names and Web Sites required to operate Acquired Assets, all of which are wholly owned by and registered to Seller; and (ii) other than as set forth on Schedule 3.5 of the Disclosure Schedule, there are no Copyrights, Software, Trademarks, Patents, Domain Names and Web Sites used in connection with the Acquired Assets that Seller has licensed or otherwise permitted to be used by other Persons.

**(b)**     Except as set forth on Schedule 3.5 of the Disclosure Schedule:

**(i)**     Based on the Knowledge of Seller, Seller owns all IP Assets and has valid rights in and to, including rights to use, publish, and perform, as applicable, all material Intellectual Property Rights included in the Purchased Assets as such IP Assets were used in the Acquired Assets as of the cessation of business by Seller.  No Person other than Seller has any ownership interest in, or a right to receive a royalty or similar payment with respect to, any of the IP Assets.

**(ii)**     Based on the Knowledge of Seller, the IP Assets are not the subject of any ownership, validity, use, or enforceability challenge or claim received by Seller in writing or, to the Knowledge of Seller, any outstanding Final Order restricting the use by Seller or adversely affecting any of the rights of Seller thereto.

**(iii)**     Seller has not entered into any agreement, excluding normal course commercial agreements, to indemnify any other Person against any charge of infringement with respect to any of Seller's Intellectual Property Rights. Seller has not entered into any agreement which granted any third party the right to bring infringement actions or otherwise to enforce rights with respect to IP Assets or pursuant to which Seller has agreed not to sue or otherwise enforce any legal rights with respect to any of Seller's Intellectual Property Rights.

**(iv)**     To the Knowledge of Seller, no Person is violating any IP Assets.

**(v)**     To the Knowledge of Seller, neither Seller nor the Acquired Assets is violating any intellectual property rights of any other Person and (B) there are no Actions pending or, to the Knowledge of Seller, threatened concerning any claim that Seller or the Acquired Assets has infringed, diluted, misappropriated, or otherwise violated any intellectual property rights of any other Person.

**(c)**     Seller has used commercially reasonable efforts to protect the confidentiality of any Trade Secrets and other confidential and proprietary information included in the IP Assets.

-12-

**3.6**   Tangible Personal Property.   The Tangible Personal Property of Seller or Purchaser included in the Purchased Assets is free from material defects, subject to normal wear and tear and continued repair and replacement in accordance with past practice.  All such Tangible Personal Property has been maintained, repaired and replaced in accordance with manufacturer's recommendations and industry best practices, and, to the Knowledge of Seller, any such Tangible Personal Property that is susceptible to the same contains no virus, malware, timebomb or similar defect.  Seller has not received notice that any of the Tangible Personal Property included in the Purchased Assets is in violation of any existing law or order of any Governmental Authority.  No Permit, approval or Consent of any Person is needed so that the interest of Seller in the Tangible Property transferred to Purchaser hereunder shall continue to be in full force and effect and enforceable by Purchaser following the Closing.

**3.7**   Good Faith.   This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Seller's Knowledge, in good faith, and neither Seller nor Purchaser engaged in any collusion with respect to setting or fixing the Purchase Price, and to the Knowledge of Seller, there are no facts to support a finding that Purchaser negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

4.   Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller as follows:

**4.1**   Authority.   Purchaser is a limited liability company organized and in good standing under the laws of the State of Delaware.  Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements to which it is to be a party and to carry out the obligations hereunder and thereunder, without the need for any further approval of its officers and directors.  All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the Ancillary Agreements to which it is to be a party has been taken.  Upon its execution and delivery by Purchaser, this Agreement and each Ancillary Agreement to which it is to be a party will be the valid and legally binding obligations of the Purchaser in accordance with their respective terms.

**4.2**   Compliance with Other Instruments.   The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is to be a party, and the consummation of the transactions contemplated hereby and thereby will not result in any violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, a default under any provision of any instrument, judgment, order, writ, decree or contract to which it is a party.

**4.3**   Brokers.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements to which it is to be a party or the transactions contemplated by this Agreement and such Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.  All fees associated with brokers shall otherwise be made through section 327, 330, and 331 of the  Bankruptcy Code.

**4.4**   Litigation.   There is no action, suit, proceeding or investigation pending or, to Purchaser's knowledge, currently threatened in writing against Purchaser that questions the validity of this Agreement or any Ancillary Agreement to which it is to be a party, or the right of

-13-

Purchaser to enter into such agreements, or to consummate the transactions contemplated hereby or thereby.

**4.5**    Financial Assurance.  The Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable payment of the Purchase Price and any other amounts to be paid by it hereunder.

**4.6**    Good Faith.  This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Purchaser's knowledge, in good faith, and neither Seller nor Purchaser engaged in any collusion with respect to setting or fixing the Purchase Price, and to the knowledge of Purchaser, there are no facts to support a finding that Seller negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

5.    Covenants

**5.1**    Seller Records.   Prior to the Closing Date, and without limiting the other provisions of this Agreement, Seller shall afford Purchaser, its attorneys, accountants and representatives, free and full access to the Acquired Assets and any assets, contracts, facilities, books, records and employees related thereto, at any time and from time to time upon reasonable notice and request, and shall provide to Purchaser and its representatives such additional financial and operating data as Purchaser shall from time to time reasonably request.

**5.2**    Filings and Authorizations.   Each of Seller and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Entities and non-governmental Persons necessary to be obtained by it, in order to consummate the transactions contemplated herein; provided that any provision hereof to the contrary notwithstanding, Seller shall not have any obligation to pay any fee to any third party (other than any lawful fees assessed by a Governmental Entity) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder.   Seller and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

**5.3**    Further Assurances; Accounts.

    **(a)**    At and after the Closing, Seller shall take such reasonable steps as may be necessary to put Purchaser in possession and operating control of the Purchased Assets and the Acquired Assets.   At or after the Closing, Seller shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably request to implement any provision of this Agreement and to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets, free and clear of any and all Interests.

-14-

**(b)**    Following the Closing, at the request of the Purchaser, Purchaser and Seller each shall use its commercially reasonable efforts to transfer, license or assign as promptly as practicable any Third-party Technology designated by Purchaser.  Notwithstanding the foregoing, neither Purchaser nor Seller shall be required to expend any material sum or agree to a material concession to obtain any Third-party Technology.

**(c)**    From and after the date of execution of this Agreement, neither Seller nor any Person acting on behalf and within the control of Seller will operate any of the Purchased Assets in any manner that would adversely affect the value, utility or useful life of such asset, or without the prior written consent of the Purchaser, make any change to any component of the Purchased Assets or make or retain any copies in any media of any Software included in the Purchased Assets, provided that Seller may retain one (1) archival copy of such Software solely for reference in fulfilling its obligations under Section 5.3(a) and Section 7.5(a) hereof.  Seller shall not transfer, assign, deliver or disclose such copies to any Person not acting on behalf of Seller in fulfilling such obligations.

**(d)**    Effective on the Closing Date, Seller hereby appoints Purchaser as its attorney-in-fact to execute any instruments which Seller or Purchaser is required to execute and deliver hereunder and shall fail for any reason to execute and deliver for a period of five (5) business days following receipt by Seller of written request therefor, it being acknowledged that such appointment is coupled with an interest and is irrevocable.  Purchaser will provide Seller with copies of any instruments so executed on Seller's behalf.

**5.4**    <u>Bankruptcy Covenants</u>.

**(a)**    <u>Motions, Orders, etc.</u>  Seller shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court relating to the approval of this Agreement, the Purchased Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings.

**(b)**    <u>Sale Approval Order</u>.  Without limiting the generality of the foregoing Section 5.4(a), the sale approval order shall be substantially in the form annexed hereto as <u>Exhibit H</u> (the "Sale Approval Order"), and only such other and further changes as shall be acceptable in form and substance to Purchaser.

**(c)**    <u>Other Bankruptcy Covenants</u>.  Seller shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within one (1) business day after Seller's receipt thereof a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

**5.5**    <u>Apportioned Obligations</u>.  All personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be

-15-

apportioned between Seller and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for personal property taxes relating to the Purchased Assets, each of Seller and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 5.5 together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within fifteen (15) Business Days after delivery of such statement. In the event that any of Seller or Purchaser shall make any payment for which it is entitled to reimbursement under this Section 5.5, the applicable other party shall make such reimbursement promptly but in no event later than fifteen (15) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Purchaser shall notify Seller of any audit or examination of the Apportioned Obligations.  The Seller shall have the right to participate in any such audit or examination and Purchaser shall not settle any such audit or examination without the consent of Seller, which consent shall not be unreasonably withheld.

   **5.6**   Notification.  From time to time prior to the Closing, Seller shall notify Purchaser in writing with respect to any matter hereafter arising or any information obtained after the date hereof that, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedule or that is necessary to complete or correct any information in such schedule or in any representation and warranty of Seller that has been rendered inaccurate thereby.

6.   Conditions Precedent to Closing.

   **6.1**   Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser:

      **(a)**   Representations and Warranties Accurate.   The representations and warranties of Seller contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).  Notwithstanding anything to the contrary herein, in the event that Purchaser has actual knowledge that any of such representations and warranties of Seller contained in this Agreement are not true and correct and complete in all respects as of the Closing Date, Purchaser's sole remedy shall be to terminate this Agreement in accordance with Section 7.1(b) hereof.

      **(b)**   Performance.  Seller shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by Seller hereunder on or prior to the Closing Date.

123291322 v4

(c)      Consents.  All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser of any material condition, restriction or required undertaking.

(d)      No Legal Prohibition.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted and remain in effect or threatened by any Governmental Entity which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)      No Material Adverse Effect.  No Material Adverse Effect shall have occurred and no other event, loss, damage, condition or state of facts of any kind shall exist which has a Material Adverse Effect or can reasonably be expected to have a Material Adverse Effect.

(f)      Additional Documents, etc.  There shall have been delivered to Purchaser each of the agreements, documents, certificates and other items set forth on Schedule 6.1(g) of this Agreement.

(g)      Entry of Order; Appeal.  On or before November 25, 2015, the Bankruptcy Court shall have entered an order (the "Stalking Horse Order"), in the form attached hereto as Exhibit I, with only such changes as shall be acceptable in form and substance to Purchaser.  In addition the Bankruptcy Court shall have entered the Sale Approval Order in accordance with Section 5.4(b) and the Sale Approval Order shall have become a Final Order, unless the finality of such orders is waived by Purchaser in Purchaser's sole discretion.

6.2      Conditions Precedent to Obligations of Seller.  The obligations of Seller under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Seller:

(a)      Representations and Warranties Accurate.  The representations and warranties of Purchaser contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

(b)      Performance by Purchaser.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

(c)      Consents.  All Consents required to be obtained by Purchaser in connection with the purchase and sale of the Purchased Assets and the Closing shall have been duly obtained, made or given and shall be in full force and effect.

-17-

(d)    No Legal Prohibition.  No injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)    Additional Documents, etc.  There shall have been delivered to Seller each of the agreements, documents and other items set forth on Schedule 6.1(g) of this Agreement to be delivered to Seller.

**6.3**    Sale Approval Order as Final Order..  If Purchaser elects in its sole discretion to waive the condition to Closing that the Sale Approval Order shall be a Final Order, then Seller shall be obligated to proceed with the Closing except during any period during which the Sale Approval Order is stayed.

7.    Miscellaneous

**7.1**    Termination.    This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

(a)    any time before the Closing, by mutual written agreement of Seller and Purchaser;

(b)    any time before the Closing, by Seller, on the one hand, or Purchaser, on the other hand, (i) in the event of a material breach hereof by Seller, on the one hand, or Purchaser, on the other hand, if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party, or (ii) upon written notification to the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party;

(c)    at the election of Purchaser as notified in writing to Seller, if the Schedules and Exhibits to this Agreement are not delivered, in form and substance reasonably acceptable to Purchaser, by November 13, 2015;

(d)    if not earlier terminated, at the election of Purchaser as notified in writing to Seller, if the Closing has not occurred by November 30, 2015 and such failure is not the result of a breach by Purchaser; or

(e)    at the election of the Purchaser as notified in writing to the Seller, if the Auction occurs and Purchaser is not the successful bidder at the Auction or the Back-Up Bidder (as defined in the Bidding Procedures Order) or if the Seller enters into an agreement or transaction, including any Competing Transaction with a third party that is materially inconsistent with this Agreement and the transactions contemplated hereby in a material respect.

**7.2**    Effect of Termination.

(a)    If this Agreement is validly terminated pursuant to Section 7.1, this Agreement will forthwith become null and void, and there will be no liability or obligation on the

123291322 v4

part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except that the provisions with respect to expenses and fees in Section 7.3 will continue to apply following any such termination.

      **(b)**      Notwithstanding the provisions of Section 7.2(a), above:

      **(i)**      if Purchaser, Seller terminates this Agreement pursuant to Section 7.1(a) or Purchaser terminates this Agreement pursuant to Section 7.1(c) or 7.1(d), Purchaser shall receive the prompt return of the Deposit which, in the case of Purchaser terminating this Agreement pursuant to Section 7.1(c) or 7.1(d), shall constitute Purchaser's sole and exclusive remedy available under any law, including the Bankruptcy Code;

      **(ii)**      if Purchaser terminates this Agreement pursuant to Section 7.1(b)(i) or Seller or Purchaser terminates this Agreement pursuant to Section 7.1(b)(ii), Purchaser shall receive the prompt return of the Deposit which, in the case of a termination of this Agreement pursuant to this Section 7.2(b)(ii), shall constitute Purchaser's sole and exclusive remedy available under any law, including the Bankruptcy Code;

      **(iii)**      if Seller terminates this Agreement pursuant to Section 7.1(b)(i), Seller shall receive the Deposit, which shall constitute Seller's sole and exclusive remedy available under any law, including the Bankruptcy Code; and

      **(iv)**      if Purchaser terminates this Agreement pursuant to Section 7.1(e), then Seller shall promptly following the closing of the corresponding transaction pay Purchaser in immediately available funds, and Purchaser shall be deemed to have earned both (i) the Expense Reimbursement and (ii) an amount equal to $69,000 (the "Break-Up Fee"). If this Agreement is terminated by Purchaser for any reason in accordance with Section 7.1 (other than Section 7.1(e)) and the Seller subsequently consummates a sale of all of the Purchased Assets with a Person other than Purchaser, including in connection with any Competing Transaction, Seller shall promptly pay Purchaser, and Purchaser shall be deemed to have earned, the Expense Reimbursement. The Break-Up Fee and the Expense Reimbursement shall constitute an administrative expense of Seller with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid and shall be payable from the proceeds of a sale to a third party within two (2) Business Days, notwithstanding Section 507(a) of the Bankruptcy Code. Purchaser and Seller hereby acknowledge that amounts payable pursuant to this Section 7.2(b)(iv) are commercially reasonable and necessary to induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereby. For the avoidance of doubt, the covenants set forth in this Section 7.2(b)(iv) are continuing obligations, separate and independent from the other obligations of Seller and Purchaser, and survive the termination of this Agreement.

      **7.3**    <u>Expenses</u>.  Except as otherwise set forth in Section 7.2, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

      **7.4**    <u>Compliance with Laws</u>.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

123291322 v4

**7.5**    <u>Further Cooperation</u>.  Without limiting Seller's obligations under Section 5.3, at the request of Purchaser, at any time following the Closing Date, Seller shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary for the operation of the Acquired Assets by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers (which shall include as necessary the execution by Seller of a Power of Attorney in substantially the form attached hereto as <u>Exhibit E</u>), using reasonable efforts to obtain the same from the respective inventors or authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; <u>provided</u> that Seller shall not be obligated to pay any material consideration or incur any material costs to provide such cooperation.

**7.6**    <u>Governing Law; Jurisdiction</u>.    All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules).

**7.7**    <u>Entire Agreement; Interpretation</u>.  The terms and conditions of this Agreement, including its exhibits and the Ancillary Agreements, constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions.  None of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.  The terms "includes" and "including" are not limiting.    These terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions which may appear on any purchase order, acknowledgment or other writing not expressly incorporated into this Agreement.  Unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and (ii) reference to any Article or Section means such Article or Section hereof.  Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

**7.8**    <u>Notices</u>:  All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered by hand, or dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, addressed as follows:

| If to Purchaser | If to Seller |
|---|---|
| Q Holdings LLC<br>C/O HSA Partners II LLC<br>110 Wall Street<br>4th Floor<br>New York, New York 10005<br>Attn: Ronald Adjmi | Quirky, Inc.<br>606 West 28th Street<br>New York, New York 10001<br>Attn: Charles Kwalwasser,<br>CAO<br>Email: charlie@quirkyinc.com |
| with a copy to: | with a copy to: |
| ASK LLP<br>151 West 46th Street, 4th Floor<br>New York, New York 10036<br>Attn:  Edward E. Neiger<br>Phone: (212) 267-7342<br>Fax: (212) 918-3427 | Cooley LLP<br>1114 Avenue of the Americas<br>New York, New York  10036<br>Attn:  Jeffrey Cohen<br>Phone:  (212) 479-6218<br>Fax: (212) 479-6275 |

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery.  Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

**7.9**    Counterparts; Facsimile and Email Transmission.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

**7.10**    No Ongoing Obligations.  Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Seller or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

**7.11**    Survival of Representations and Warranties.  All of the representations and warranties of Purchaser contained in this Agreement shall survive the Closing Date and the consummation of the transactions contemplated hereby.  All of the representations and warranties of Seller contained in this Agreement shall survive until the Closing Date and terminate upon the closing of the transactions contemplated hereby.

**7.12**    Amendment.  This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Purchaser.

**7.13**    Indemnification Obligations.  After the Closing, Purchaser shall indemnify Seller against and shall hold it harmless from any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Seller may suffer or incur by reason of Seller's defense of any claim, suit or proceeding made or commenced against it arising out of obligations that were expressly assumed by Purchaser hereunder and only expressly for liabilities, claims or amounts arising or accruing after the

Closing Date. Seller shall provide written notice to Purchaser of any claim or dispute as to which indemnification is requested under this Section within 10 days of receipt of written notice by Seller of the commencement, or threatened commencement, of any such action; provided that the failure to provide such notice will not affect any rights hereunder except to the extent Purchaser is materially prejudiced thereby.  Seller, on not less than thirty (30) days' notice to Purchaser, may make settlement of such claim, litigation or other proceeding with Purchaser's consent, such consent not to be unreasonably withheld, and such settlement shall be binding on Seller and Purchaser for the purposes of this Section; provided that, if within said thirty-day period Purchaser shall, in writing, have requested Seller to contest such claim, or to defend against such litigation or other proceeding, then Purchaser shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Seller, with counsel of its own choosing, but Seller may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing.  If Purchaser shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Purchaser shall reimburse Seller for the expenses incurred by Seller in such contest or defense.  Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Purchaser for the purposes of this Section.

7.14     No Agency.  The parties hereto are independent contractors.  Except as may be provided in this Agreement, no party has any express or implied right or authority to assume or create any obligations on behalf of any other party or to bind any other party to any contract, agreement or undertaking with any third party.  Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Seller and Purchaser.

7.15     Specific Performance.  Notwithstanding anything to the contrary contained herein (other than Section 7.2(b) hereof), each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm.  Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other parties hereto shall (except to the extent Section 7.2(b) is applicable) be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

7.16     Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

7.17     Waivers.  Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

7.18     Binding Effect; Third Party Beneficiaries; Assignment.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their

respective successors and permitted assigns.  Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  No party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum, nor delegate any of its obligations hereunder, without the prior written consent of the other parties, except that Purchaser may assign its rights under this Agreement in whole or in part to any Affiliate or to any Person providing financing for the transaction, and to any purchaser of all or substantially all of the Purchased Assets from Purchaser.

[Remainder of Page Intentionally Left Blank]

123291322 v4

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

SELLER:                                          PURCHASER:

QUIRKY, INC.                                     Q HOLDINGS LLC


*Ed Kremer*

By: _____          By: _____
    Name: Ed Kremer                               Name:
    Title: Chief Executive Officer                Title:


*[Signature Page to Quirky, Inc. Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

SELLER:                                        PURCHASER:

QUIRKY, INC.                                   Q HOLDINGS LLC

By: _____        By: _____
    Name:                                          Name: Ronald Adjmi
    Title:                                         Title: Member

*[Signature Page to Quirky, Inc. Asset Purchase Agreement]*

123291322 v4

<u>EXHIBIT A</u>

Disclosure Schedule

B-1

<u>Section 3.4 of the Disclosure Schedule</u>

Actions

123291322 v4

<u>Section 3.5 of the Disclosure Schedule</u>

IP Assets - Licenses and other Interests

123291322 v4

Schedule 2.1(a)(i):  Copyright Registrations and Applications for Registration

Schedule 2.1(a)(ii):  Software

123291322 v4

Schedule 2.l(a)(iii):  Trademark Rights

Trademark Applications and Registered Trademarks

| Mark | Territory | Application Serial No. or Registration No. | International Classes | Date Filed | Status |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

B-6

Schedule 2.1(a)(iv):  Patents

<u>PATENT APPLICATIONS, PATENTS</u>

| <u>SERIAL NO.</u> | <u>TITLE</u> | <u>FILING DATE</u> | <u>STATUS</u> |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

B-7

Schedule 2.1(a)(vi):  Web Sites

The Web sites located at the following URLs constitute all Web sites owned or controlled by Seller:

1.  http://www.quirky.com

Schedule 2.1(c): Tangible Personal Property

123291322 v4

Schedule 6.1(g):  Additional Documents

<u>EXHIBIT B</u>

Patent Assignment

B-11

<u>EXHIBIT C</u>

Trademark and Copyright Assignment

**Error! Unknown document property name.**
123291322 v4

<u>EXHIBIT D</u>

Bill of Sale, Assignment and Assumption

123291322 v4

<u>EXHIBIT E</u>

Power of Attorney

E-1

EXHIBIT F

Intellectual Property Assignment

F-1

EXHIBIT G

Domain Name Transfer Form

EXHIBIT H

Sale Approval Order

<u>EXHIBIT I</u>

Stalking Horse Order

**<u>EXHIBIT B</u>**

**Form Bill of Sale**

## BILL OF SALE

SOLD TO:       [*Insert Buyer Name*]
               [*Insert Buyer Address*]

      **KNOW BY THESE PRESENTS**, that QUIRKY, INC., a Delaware corporation ("**Seller**"), in and for the sum of [*Insert purchase price*] ($[_____]), to be paid to Seller on the date hereof, by [*Insert Buyer Name*] ("**Buyer**"), has granted, bargained, sold, released and confirmed, and by these presents does grant, bargain, sell, release and confirm, unto the said Buyer all of Seller's right, title and interest in and to those certain assets (the "**Assets**") set forth and described on Exhibit A attached hereto and made a part hereof.

      **Buyer acknowledges and agrees that Seller conveys the Assets on an "AS IS" and "WHERE IS" condition, without recourse and without any warranty (including without limitation any warranty of merchantability or fitness for a particular use), representation, guaranty, promise or inducement, express or implied, by Seller or any representative, agent, officer, or employee of Seller, including as to their condition or suitability for any use or purpose whatsoever (including any purpose or use intended by Buyer for the Assets). Buyer shall have no right to deem the Assets "non-conforming." BUYER, FOR ITSELF, ITS AGENTS, SUCCESSORS AND ASSIGNS, HEREBY FOREVER FULLY AND COMPLETELY RELEASE SELLER, ITS OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND EMPLOYEES FROM ANY AND ALL LIABILITY, CLAIMS, DAMAGES, COSTS AND EXPENSES, INCLUDING CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE) WHICH RELATE TO OR CONCERN THE ASSETS AND ACCRUE FROM OR AFTER THE DATE HEREOF (INCLUDING RELATED TO THE PHYSICAL CONDITION OF THE ASSETS).**

      This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules). All disputes arising out of or related to this Bill of Sale, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable. If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.

[*Signature page follows*]

WITNESS the due execution hereof, the __ day of _____, 20__.

[*Insert Buyer Signature Block*]


By:_____
   Name:
   Title:



[*Insert Seller Signature Block*]


By:_____
   Name:
   Title:

**Exhibit A**

Schedule of Assets