**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------- x
                                                                :
In re                                                           :    Chapter 11
                                                                :
QUIRKY, INC., et al.¹                                           :
                                                                :    Case No. 15-12596 (MG)
            Debtors.                                            :
                                                                :    (Jointly Administered)
                                                                :
--------------------------------------------------------------- x
```

**ORDER AUTHORIZING (I) THE SALE OF CERTAIN OF THE DEBTORS' ASSETS
RELATED TO THE WINK BUSINESS FREE AND CLEAR OF ALL CLAIMS, LIENS,
LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES, (II) THE DEBTORS TO
ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET
PURCHASE AGREEMENT, (III) THE DEBTORS TO ASSUME AND ASSIGN
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV)
GRANTING RELATED RELIEF**

**The "Wink Sale Order"**

Upon the motion (the "Wink Sale Motion")[2] of Quirky, Inc. and its debtor affiliates

(collectively, the "Debtors"), for entry of an order, pursuant to sections 105(a), 363, 365, 503 and

507 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1,

6004-1 and 6006-1 of the Local Rules for the Southern District of New York (the "Local Rules")

authorizing and approving the following:

  (i)    the sale of the Wink Assets (as defined below);

  (ii)   the entry into, performance under and terms and conditions of the Asset Purchase
         Agreement dated as of September 21, 2015 (collectively with all related
         agreements, amendments, documents or instruments and all exhibits, schedules

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification
number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692).  The
Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

[2]    Unless indicated otherwise, capitalized terms used but not defined herein have the meanings ascribed to
them in the Wink Sale Motion or the Wink Agreement (as defined below), as applicable.

and addenda to any of the foregoing, the "<u>Wink Agreement</u>"), substantially in the form attached hereto as **Exhibit A**, whereby the Debtors have agreed to sell, and Flextronics International USA Inc. (the "<u>Buyer</u>")[3] has agreed to buy, certain of the Debtors' assets (specifically as set forth and defined in the Wink Agreement, the "<u>Wink Assets</u>"), free and clear of all Claims (as defined below), liabilities, rights, interests, setoff rights and encumbrances, and where the Debtors have agreed to transfer and the Buyer has expressly agreed to assume certain specified liabilities of the Debtors (specifically as set forth and defined in the Wink Agreement, the "<u>Assumed Liabilities</u>") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Wink Agreement, the "<u>Transactions</u>");

(iii)    the assumption by and assignment to the Buyer of certain executory contracts and unexpired leases of the Debtors designated for assumption and assignment as Assumed Contracts in accordance with this Order, the Wink Bidding Procedures Order (defined below) and the Wink Agreement (collectively, the "<u>Assumed Contracts</u>"); and

(iv)    other related relief;

and the Court having entered an order approving the bidding procedures and granting certain related relief on October 9, 2015 [Docket No. 86] (the "<u>Wink Bidding Procedures Order</u>"); and any auction having been conducted in accordance with the Wink Bidding Procedures Order (the "<u>Auction</u>"); and the Buyer having submitted the highest or otherwise best offer for the Wink Assets; and the Court having conducted a hearing on the Wink Sale Motion on November 6, 2015 (the "<u>Sale Hearing</u>") at which time all interested parties were offered an opportunity to be heard with respect to the Wink Sale Motion; and the Court having reviewed and considered the Wink Sale Motion, the Wink Agreement, the Wink Bidding Procedures Order, the record of the hearing before the Court on October 8, 2015 at which the Wink Bidding Procedures Order was approved; and all objections to the Transactions and the Wink Agreement filed in accordance with the Wink Bidding Procedures Order; and the appearance of all interested parties and all responses and objections to the Wink Sale Motion having been duly noted in the record of the

---

[3]    Buyer may assign its rights hereunder or take title to some or all of the Wink Assets through one or more affiliated entities.

Sale Hearing; and upon the record of the Sale Hearing, and having heard statements of counsel and the evidence presented in support of the relief requested in the Wink Sale Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and all objections and responses to the relief requested in the Wink Sale Motion having been heard and overruled, continued or resolved on the terms set forth in this Order, and it appearing that due notice of the Wink Sale Motion, the Wink Agreement, the Wink Bidding Procedures Order and the Auction having been provided; and it appearing that the relief requested in the Wink Sale Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Wink Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:[4]**

### Jurisdiction, Venue and Final Order

A.      This Court has jurisdiction to hear and determine the Wink Sale Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d) and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of this Order as set forth herein.

---

[4]      All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Wink Sale Motion are hereby incorporated to the extent not inconsistent herewith.

**Notice of the Transactions, Wink Agreement, Sale Hearing, Auction and the Cure Amounts**

C.      On September 22, 2015 (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

D.      As evidenced by the affidavits of service previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Wink Sale Motion, the Auction, the Sale Hearing, the Wink Agreement and the Transactions has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rules 2002-1 and 6004-1.  The Debtors have complied with all obligations to provide notice of the Wink Sale Motion, the Auction, the Sale Hearing, the Wink Agreement and the Transactions as required by the Wink Bidding Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Wink Sale Motion, the Auction, the Sale Hearing, the Wink Agreement or the Transactions is or shall be required.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Wink Sale Motion was afforded to all interested persons and entities.

F.      In accordance with the Wink Bidding Procedures Order, the Debtors have served a notice (as amended, modified or otherwise supplemented from time to time, the "Assumption and Assignment Notice") of the potential assumption and assignment of the Assumed Contracts and of the proposed amounts necessary to cure monetary defaults under the Assumed Contracts (the "Cure Amounts") upon each non-Debtor counterparty to an Assumed Contract.  As evidenced by the affidavits of service previously filed with this Court, and based on the

representations of Debtors' counsel at the Sale Hearing, the service and provision of the Assumption and Assignment Notice was good, sufficient and appropriate under the circumstances and no further notice is or shall be required in respect of assumption and assignment of the Assumed Contracts or establishing a Cure Amount for the respective Assumed Contracts.

G.      Non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to or to be heard regarding assumption and assignment of the applicable Assumed Contracts and the Cure Amount set forth in the Assumption and Assignment Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code).  The deadline to file an objection to the assumption and assignment to the Buyer of any Assumed Contract (a "Contract Objection") has expired, and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any such party did not timely file a Contract Objection by the Contract Objection deadline, such party is deemed to have consented to (i) the assumption and assignment of the Assumed Contracts pursuant to the terms of this Order; and (ii) the proposed Cure Amount set forth on the Assumption and Assignment Notice.

**Marketing Process**

H.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors and their professionals have complied in all respects with the Wink Bidding Procedures Order.  The Debtors and their professionals have, under the circumstances, adequately and appropriately marketed the Wink Assets.  The

bidding process was duly noticed and conducted in a diligent, non-collusive, fair and good faith manner, and the bidding process set forth in the Wink Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to qualify as a bidder, participate in the Auction and to make a higher or otherwise better offer to purchase the Wink Assets. The Debtors (i) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Wink Assets, and (ii) considered any bids submitted on or before the deadline established by the Court for the submission of bids.

I.      The Buyer is the Successful Bidder for the Wink Assets in accordance with the Wink Bidding Procedures Order. The Buyer and its representatives have complied in all respects with the Wink Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Wink Agreement, and the sale and the Wink Agreement likewise comply with the Wink Bidding Procedures Order and all other applicable orders of this Court.

**Highest or Otherwise Best Offer; Business Judgment**

J.      The Wink Agreement, including the form and total consideration to be realized by the Debtors under the Wink Agreement, (i) constitutes the highest or otherwise best offer received by the Debtors for the Wink Assets; (ii) is fair and reasonable; and (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

K.      The Debtors' determination that the consideration provided by the Buyer under the Wink Agreement constitutes the highest or otherwise best offer for the Wink Assets constitutes a valid and sound exercise of the Debtors' business judgment.

L.      Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the Wink Agreement, including, but not limited to, the

fact that (i) the consideration provided by the Buyer under the Wink Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Wink Assets; and (ii) unless the sale is concluded expeditiously as provided for in the Wink Sale Motion and pursuant to the Wink Agreement, recoveries of creditors will be diminished.

**Good Faith; Arms' Length Sale**

M.      The sale process engaged in by the Debtors, including, without limitation, the Wink Bidding Procedures set forth in the Wink Bidding Procedures Order and the negotiation of the Wink Agreement, was at arms' length, non-collusive, in good faith, for fair value and substantively and procedurally fair to all parties.

N.      The Debtors, the Buyer and their respective representatives have complied, in good faith, in all respects with the Wink Bidding Procedures Order.

O.      The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with these proceedings.  None of the Debtors or the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.

P.      The Wink Agreement and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and the Buyer without collusion, and none of the Debtors or the Buyer has engaged in any conduct that would cause or permit the Wink Agreement or the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

Q.      Neither the Buyer nor any of its affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider"

of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  No

common identity of directors or controlling shareholders exists between the Debtors and the

Buyer.

R.    The Wink Agreement was not entered into, and none of the Debtors or the Buyer

has entered into the Wink Agreement or proposes to consummate the Transactions, for the

purpose of hindering, delaying or defrauding the Debtors' present or future creditors.  None of

the Debtors or the Buyer is entering into the Wink Agreement, or proposing to consummate the

Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance

and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the

United States, any state, territory, possession thereof or the District of Columbia or any other

applicable jurisdiction with laws substantially similar to the foregoing.

S.    The form and total consideration to be realized by the Debtors under the Wink

Agreement constitutes fair value, fair, full and adequate consideration, reasonably equivalent

value and reasonable market value for the Wink Assets.

### Corporate Authority

T.    The Debtors (i) have full corporate or other power to execute, deliver and perform

their obligations under the Wink Agreement and all other Transactions contemplated thereby,

and entry into the Wink Agreement has been duly and validly authorized by all necessary

corporate or similar action; (ii) have all of the corporate or other power and authority necessary

to consummate the Transactions contemplated by the Wink Agreement; and (iii) have taken all

actions necessary to authorize and approve the Wink Agreement and the Transactions

contemplated thereby.  No consents or approvals, other than those expressly provided for herein

or in the Wink Agreement, are required for the Debtors to consummate such Transactions.

**Section 363 Is Satisfied**

U.      The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code.    Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Wink Sale Motion.

V.      The Wink Assets constitute property of the Debtors' estates and exclusive title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

W.      The sale of all Wink Assets to the Buyer under the terms of the Wink Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the sale of the Wink Assets will be free and clear of any and all Claims, and except as expressly provided in the Wink Agreement with respect to Assumed Liabilities, the (i) transfer of the Wink Assets to the Buyer and (ii) assumption by and/or assignment to the Buyer of the Assumed Contracts will be free and clear of all Claims and will not subject the Buyer or any of the Buyer's assets to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, setoff, or successor or transferee liability).    All holders of Claims who did not object, or withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code.    All holders of Claims are adequately protected – thus satisfying section 363(e) of the Bankruptcy Code – by having their Claims, if any, attach to the proceeds of the Transactions ultimately attributable to the property against or in which they assert a Claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Transactions, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

X.      The Buyer would not have entered into the Wink Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if the sale of the Wink Assets was not free and clear of all Claims or if the Buyer would, or in the future could, be liable for any Claims, including, without limitation and as applicable, certain liabilities that expressly are not assumed by the Buyer as set forth in the Wink Agreement or in this Order.  The Buyer asserts that it will not consummate the Transactions unless the Wink Agreement specifically provides, and this Court specifically orders, that none of the Buyer, its assets or the Wink Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any (i) Claim, or (ii) any successor or transferee liability for any of the Debtors other than the Assumed Liabilities.

Y.      The Buyer is not a successor to the Debtors or their respective estates by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their respective estates, except as otherwise expressly provided in the Wink Agreement or this Order.  The Buyer is not a continuation of the Debtors or their respective estates and there is no continuity between the Buyer and the Debtors.  The Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or *de facto* merger of the Buyer and the Debtors.

Z.      The transfer of the Wink Assets to the Buyer under the Wink Agreement will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Wink Assets free and clear of all Claims (other than Assumed Liabilities).

The transfer of the Wink Assets to the Buyer will vest the Buyer with good and marketable title to the Wink Assets.

AA.    There is no legal or equitable reason to delay the Transactions.  The Transactions must be approved and consummated promptly in order to preserve the value of the Debtors' assets.  All factual predicates to the waiver of any stay of this Order under Bankruptcy Rules 6004(h) and 6006(d) have been satisfied.

BB.    The Debtors have demonstrated both (i) good, sufficient and sound business judgment, purposes and justifications; and (ii) compelling circumstances for the Transactions pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, absent the immediate consummation of the Transactions, the value of the Debtors' assets will be harmed.  To maximize the value of the Wink Assets, it is essential that the Transactions occur within the timeframe set forth in the Wink Agreement.  Time is of the essence in consummating the Transactions.

CC.    Entry into the Wink Agreement and consummation of the Transactions do not constitute a *sub rosa* chapter 11 plan.

### Assumption and Assignment of the Assumed Contracts

DD.    The assumption and assignment of the Assumed Contracts (as such Assumed Contracts may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and the Buyer) that are designated for assumption and assignment pursuant to the terms of this Order and the Wink Agreement is integral to the Wink Agreement, does not constitute unfair discrimination, is in the best interests of the Debtors, their estates, their creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

EE.    No section of any Assumed Contract which purports to prohibit, restrict, or condition the use, consideration or assignment of any such Assumed Contract in connection with the Transactions shall have any force or effect.

FF.    The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  Pursuant to the Wink Agreement, the amounts in the Cure Cost Escrow have (a) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assumed Contracts is free and clear of all Claims against the Buyer.

GG.    The Buyer has demonstrated adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the Wink Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

HH.    No monetary or non-monetary defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Amount or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.  In accordance with the terms set forth in the Wink Agreement, the Cure Amount for each of the Assumed Contracts shall be paid from the Cure

Cost Escrow *provided, however,* the Debtors shall provide the Official Committee of Unsecured

Creditors (the "Committee") with five (5) business days' notice of the specific Cure Amounts to

be paid and the Committee shall be entitled to seek appropriate relief from the Court in the event

of a dispute regarding payment of any proposed Cure Amounts. The Committee does not object

to the currently scheduled Cure Amounts payable Sumologic or Development City Lease or the

revised Cure Amounts payable to Home Depot USA, Inc. in the amount of $178,531.00, and has

agreed to the treatment of Flex's claim in Paragraph 25 below.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

### General Provisions

1.      The Wink Sale Motion is granted to the extent provided herein.

2.      Any objections to the Wink Sale Motion or the relief requested therein that have

not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby

overruled on the merits or denied with prejudice. All persons and entities given notice of the

Wink Sale Motion that failed to timely object thereto are deemed to consent to the relief sought

therein, including, without limitation, all non-Debtor counterparties to the Assumed Contracts.

3.      The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact

constitute conclusions of law, they are adopted as such. To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

### Approval of the Wink Agreement

4.      The Wink Agreement, all of the terms and conditions thereof, and consummation

of all of the Transactions contemplated therein, are authorized and approved in all respects

pursuant to section 363(b) of the Bankruptcy Code. The failure specifically to include any

particular provision of the Wink Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Wink Agreement be authorized and approved in its entirety.

5.      The Debtors and their respective officers, employees and agents are authorized and directed to (a) take any and all actions necessary, appropriate or reasonably requested by the Buyer to perform, consummate, implement and close the Transactions, including, without limitation, (i) the sale to the Buyer of all Wink Assets, in accordance with the terms and conditions set forth in the Wink Agreement and this Order, and (ii) executing, acknowledging and delivering such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer, or reducing to possession, the Wink Assets, including any further cooperation after the Closing pursuant to the Wink Agreement; and (b) to assume and assign any and all Assumed Contracts.  The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing, any expenses or costs that are required to be paid in order to consummate the Transactions or perform their obligations under the Wink Agreement; *provided, however*, that any amounts that become payable by the Debtors to the Buyer other than those set forth in Paragraph 25 of this Order shall be subject to further order of the Court after notice and a hearing.

6.      All persons and entities are prohibited and enjoined from taking any action to prevent, adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Wink Assets to the Buyer in accordance with the Wink Agreement and this Order.

**Sale and Transfer Free and Clear of Claims**

7.    Except as otherwise expressly provided in the Wink Agreement and the terms of this Order with respect to Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Wink Assets shall be sold free and clear of all claims, liens (including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees (if any) under section 365(n) of the Bankruptcy Code or any similar statute, rights of tenants and subtenants (if any) under section 365(h) of the Bankruptcy Code or any similar statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or

unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases (but, for the avoidance of doubt, in each case arising from the ownership of the Wink Assets or the operation of the business prior to the Closing Date), and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability or related theories (all of the foregoing collectively being referred to in this Order as "Claims", and, as used in this Order, the term "Claims" includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), with all such Claims to attach to the proceeds of the Transactions to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Wink Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

8.    At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Wink Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims, except for Assumed Liabilities.  Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Buyer with good and marketable title to, the Wink Assets.  All person or entities, presently or on or after the Closing, in possession of some or all of the Wink Assets are directed to surrender possession of the Wink Assets to the Buyer or its designees on the Closing or at such time thereafter as the Buyer may request.  In full resolution of the objection filed by the General Electric related entities ("GE"), (i) GE has agreed that Buyer shall acquire title to the light bulb inventory identified on Schedule 2.1(e) of the Wink Agreement on a free and clear

basis; (ii) Schedule 2.1(a)(ii) of the Wink Agreement shall be modified to include a footnote to "link-hub, link hub firmware" that states "For the purpose of Software listed in this Schedule 2.1(a)(ii), only Software that enables interoperability between the link hub and the Wink platform"; and (iii) GE has no claim to any intellectual property or other rights in the Wink Relay or the Wink Hub.

9.      Section 2.2(g) (Excluded Assets) of the Wink Agreement is deleted in its entirety and replaced with the following:

> All causes of action that the Seller may hold against any current or former director, officer or employee of Seller for breach of fiduciary duty or claims of a similar nature, provided that any such causes of action, whenever arising, that may be asserted against a director, officer or employee of Seller who becomes a director, officer, or employee of the Purchaser may be asserted against such Person solely to the extent of available insurance proceeds and may not be asserted to recover from the personal assets of such Person.

10.     Notwithstanding anything to the contrary in this Order or the Wink Agreement, the Purchased Assets shall not include any of the Products (as defined in the Quirky Sale Motion)[5] regardless of whether the Products operate on the Wink platform. For sake of clarity, the Wink Relay and Wink Hub products are not Products under the Quirky Sale Motion.

11.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by

---

[5]     The "Quirky Sale Motion" shall mean the Debtors' Motion for Entry of (i) an Order (a) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets Related to the Business of Quirky, Inc., (b) Approving Procedures for Assumption and Assignment of Executory Contracts, (c) Approving the Form and Manner of Notice, and (d) Scheduling an Auction and a Sale Hearing; and (ii) an Order Authorizing and Approving the Sale of Assets of Quirky, Inc. filed with the Court on October 1, 2015 (Docket No. 61).

operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Wink Agreement.  The Wink Assets are sold free and clear of any reclamation rights.

12.    Except as otherwise expressly provided in the Wink Agreement with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtors or the Wink Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or affiliates, the Wink Assets, the ownership, sale or operation of the Wink Assets and the business prior to Closing or the transfer of the Wink Assets to the Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Buyer, its successors or assigns, their property or the Wink Assets.  Following the Closing, no holder of any Claim shall interfere with the Buyer's title to or use and enjoyment of the Wink Assets based on or related to any such Claim, or based on any action the Debtors may take in the Chapter 11 Cases.

13.    If any person or entity that has filed financing statements, mortgages, mechanic's Claims, *lis pendens* or other documents or agreements evidencing Claims against or in the Wink Assets shall not have delivered to the Debtors prior to the Closing of the Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims (other than the Assumed Liabilities) that the person or entity

has with respect to the Wink Assets, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Wink Assets; (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims against the Buyer and the applicable Wink Assets; and (c) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims with respect to the Wink Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Wink Assets free and clear of Claims shall be self-executing, and none of the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

14.     To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Wink Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

15.     No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Wink Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Transactions to the extent that any such action

by a governmental unit or any representative thereof would violate section 525 of the Bankruptcy

Code.

### No Successor or Transferee Liability

16.     The Buyer shall not be deemed, as a result of any action taken in connection with

the Wink Agreement, the consummation of the Transactions contemplated by the Wink

Agreement, or the transfer or operation of the Wink Assets to (a) be a legal successor, or

otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an

assignee under the Assumed Contracts arising after the Closing); (b) have, de facto or otherwise,

merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial

continuation of the Debtors or the enterprise(s) of the Debtors, including, without limitation,

within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee

Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act

("COBRA"), WARN (defined below), CERCLA (defined below), the Fair Labor Standard Act,

Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment

Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National

Labor Relations Act, 29 U.S.C. § 151, *et seq.* (the "NLRA"), environmental liabilities, debts,

claims or obligations arising from conditions first existing on or prior to the Closing Date

(including, without limitation, the presence of hazardous, toxic, polluting, or contaminating

substances or wastes), which may be asserted on any basis, including, without limitation, under

CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any

taxes of any kind for any period, labor, employment, or other law, rule or regulation (including,

without limitation, filing requirements under any such laws, rules or regulations), or under any

products liability law or doctrine with respect to the Debtors' liability under such law, rule or

regulation or doctrine.

17.    Other than as expressly set forth in the Wink Agreement with respect to Assumed Liabilities, the Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Wink Assets or (b) any Claims against the Debtors or any of their predecessors or affiliates.    The Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Wink Assets prior to the Closing.    The Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 *et seq.*) ("WARN") or the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of the Buyer's purchase of the Wink Assets or assumption of the Assumed Liabilities by the Buyer.

18.    Except as otherwise provided in the Wink Agreement, nothing in this Order or the Wink Agreement shall require the Buyer to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare and

pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

19.     Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, or its assets (including the Wink Assets), with respect to any (a) Claim (other than an Assumed Liability) or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Wink Assets or conduct any of the businesses operated with such assets.

**Good Faith; Arms' Length Sale**

20.     The Wink Agreement has been negotiated and executed, and the Transactions contemplated by the Wink Agreement are and have been undertaken, by Debtors, the Buyer and their respective representatives at arms' length, without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code.    Accordingly, the reversal or

modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of the sale are duly and properly stayed pending such appeal. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

21.    None of the Debtors or the Buyer has engaged in any conduct that would cause or permit the Wink Agreement or the Transactions to be avoided or costs, or damages or costs, to be imposed, under section 363(n) of the Bankruptcy Code. The consideration provided by the Buyer for the Wink Assets under the Wink Agreement is fair and reasonable, and the Transactions may not be avoided under section 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Assumed Contracts and Resolution with Flex**

22.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors are authorized and directed to assume and assign to the Buyer each of the Assumed Contracts upon the Closing of the Transactions, free and clear of all Claims (other than Assumed Liabilities). The payment of the Cure Amounts from the Cure Cost Escrow under the Wink Agreement (a) cures all monetary and non-monetary defaults existing thereunder as of the Closing Date; (b) compensates the applicable non-Debtor counterparties for any actual pecuniary loss resulting from such default; and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to the Buyer, constitutes adequate assurance of future performance thereof.

23.    To the extent that any counterparty to an Assumed Contract did not timely file a Contract Objection by the Contract Objection deadline, such counterparty is deemed to have consented to (i) the assumption and assignment of the Assumed Contract pursuant to the terms of

this Order; and (ii) the proposed Cure Amounts set forth on the Assumption and Assignment Notice.   If Buyer elects not to assume any Assumed Contract currently designated for assumption prior to the Closing or designates any additional contract as an Assumed Contract that is not currently designated for assumption and assignment pursuant to the Agreement, Debtors shall advise the applicable contract counterparty of that change with notice to the Committee.

24.     Any provision in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the non-Debtor counterparty to such Assumed Contract to impose any penalty, fee, rent increase, profit sharing arrangement or other condition on renewal or extension, or to modify any term or condition upon the assignment of such Assumed Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.   All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied.   Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of the Buyer.

25.     Upon the Closing, and in full and final satisfaction of all prepetition and postpetition amounts owing under the following agreements: Design and Manufacturing Services Agreement dated March 17, 2014 by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P) Ltd. ("Flex"); Source Code License, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated July 16, 2014; Statement of Work – 101 for a Smart Light Switch, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P),

Ltd., dated April 16, 2014; Statement of Work – 102 for a Smart Hub, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 17, 2014, (i) Flex shall receive a dollar for dollar credit (or payment) of $1,000,000 from the Purchase Price at Closing; and (ii) Flex shall be granted an allowed general unsecured claim in the amount of $3,500,000 against the Quirky, Inc. bankruptcy estate (or all estates if they are ultimately substantively consolidated). In connection therewith, the Cure Amount originally scheduled by the Debtors in the amount of $18,493,552 shall be reduced by the $1,000,000 payment contemplated above and further reduced by an additional $13,993,552 million ($18,493,552 - $1,000,000 - $13,993,552 = $3,500,000). In addition, prior to Closing, the Debtors shall pay Flex and its affiliates on account of all post-petition product delivered in the ordinary course of business, engineering and other services performed in the ordinary course of business and any other post-petition amounts due to Flex through the date of the Closing in the ordinary course of business and provide a calculation thereof to Flex.

26.     Effective upon Closing, (a) each of the bankruptcy estates and the Debtors, on behalf of themselves and any party who may claim derivatively through them and any subsequent trustees or examiners (collectively, the "Estates"), shall forever release and acquit Flex Sales and Marketing (A-P) Ltd. and its affiliates (including, without limitation, Flex International USA, Inc.) and their respective officers, directors, members, managers, agents, consultants, representatives, professionals, attorneys, shareholders, employees, predecessors and affiliated parties (in each case solely in their respective capacities, the "Flex Related Parties") from all actions, causes of action, suits, debts, accounts, reckonings, sums of money, bills, covenants, contract, controversies, agreements, promises, damages, claims, judgments, avoidance actions and demands whatsoever, known or unknown, in law or equity, which any of

the Estates may have against Flex or the Flex Related Parties (solely in their capacity as such) of any nature whatsoever, from the beginning of time through the date of the Closing (provided that nothing herein shall release rights granted under this Order or the Wink Agreement); and (b) Flex and the Flex Related Parties shall forever release and acquit the Estates, the Committee, and their respective officers, directors, members, managers, agents, consultants, representatives, professionals, attorneys, shareholders, employees, predecessors and affiliated parties (in each case solely in their respective capacities, the "Estate Related Parties") from all actions, causes of action, suits, debts, accounts, reckonings, sums of money, bills, covenants, contract, controversies, agreements, promises, damages, claims, judgments, avoidance actions and demands whatsoever, known or unknown, in law or equity, which Flex or the Flex Related Parties may have against the Estates or the Estate Related Parties (solely in their capacity as such) of any nature whatsoever, from the beginning of time through the date of the Closing related to the Debtors (provided that nothing herein shall release rights granted under this Order or the Wink Agreement), provided, however, that Flex, the Flex Related Parties, the Debtors, and the Estate Related Parties shall retain their respective rights (including, but not limited to, intellectual property rights) with respect to the following products: (i) Norm-Icebox (thermostat); (ii) P6-Ohno (battery charger); (iii) IFM (infant formula maker); (iv) Poppy pour over coffee (coffee maker); and (v) Spotter next generation (sensor).  This provision shall bind any subsequent Chapter 7 or Chapter 11 trustee or examiner or any plan or liquidating trustee of any nature.  The Committee and Comerica have consented to the Sale Order and these provisions.

27.    Upon the Closing and the payment of the relevant Cure Amounts after notice to the Committee in accordance with this Order, the Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts, and the Debtors and their estates shall

be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts. There shall be no assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

28.     Each non-Debtor counterparty to an Assumed Contract is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Buyer or their respective property (including, without limitation, the Wink Assets) (i) any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing Date or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts; or (ii) any claim, counterclaim, defense, breach, default, condition, setoff or other claim asserted or capable of being asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing, except for Assumed Liabilities.

29.     Other than the Assumed Contracts, the Buyer assumed none of the Debtors' other contracts or leases and shall have no liability whatsoever thereunder.

30.     Nothing in the Wink Sale Motion or this Order shall be deemed or construed as a waiver of any claims or causes of action that the Debtors or the Buyer have or may have against a non-Debtor counterparty to any Assumed Contract, whether or not such claims arise under, are related to the assumption of or are independent of the Assumed Contracts.

**Other Provisions**

31.     In connection with the Transactions and pursuant to a confidential letter agreement, dated October 23, 2015, the Debtors and Flex have agreed that a portion of the Purchase Price totaling $1 million shall be held in escrow for one year after the Closing in order to offset certain potential liabilities or expenses of the Buyer that may be reasonably incurred

with respect to the Purchased Assets (the "Post-Closing Escrow").  For so long as general unsecured creditors retain an interest in the proceeds of the Post-Closing Escrow, the Committee (or any estate representative vested with the rights and privileges of the Committee) shall be provided with ten (10) business days' notice of any proposed disbursement from the Post-Closing Escrow, and no disbursements shall be made unless any timely objections raised by the Committee or its successor in interest are resolved or ruled upon by the Bankruptcy Court.   The Debtors have authority to retain a third party escrow agent reasonably acceptable to the Buyer and the Committee and to enter into agreements related to the escrow related to the same without further order of this Court.

32.    The requirements set forth in Bankruptcy Rules 6003(b), 6004 and 6006 and Local Bankruptcy Rules 6004-1 and 9013-1 have been satisfied or otherwise deemed waived.

33.    The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to give any notice permitted by the Wink Agreement or to enforce any of its remedies under the Wink Agreement or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

34.    Notwithstanding the allocation of the Purchase Price among the Purchased Assets pursuant to Section 2.5(b) of the Wink Agreement, nothing in such allocation shall be binding on the Committee or determinative of the values ascribed to the Purchased Assets, including, but not limited to, for purposes of values ascribed in any plan of reorganization or liquidation or asserted in any subsequent litigation regarding the liens associated with the Purchased Assets.

35.    The provisions of this Order and the Wink Agreement are non-severable and mutually dependent.

36.    The Wink Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

37.    The Court shall retain exclusive jurisdiction (for as long as the Chapter 11 Cases are open) to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Wink Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions.  This Court retains jurisdiction to compel delivery of the Wink Assets, to protect the Buyer and its assets, including the Wink Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to sections 105(a), 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Wink Assets and the Assumed Contracts to the Buyer. Buyer may at its election enforce this Order in any other court of competent jurisdiction in defense of any Claims asserted against it by third parties or similar issues.

38.    As provided by Bankruptcy Rules 7062 and 9014, the terms and conditions of this Order shall be effective immediately upon entry and shall not be subject to the stay provisions contained in Bankruptcy Rules 6004(h) and 6006(d) or any similar rule that would delay the effectiveness of this Order.  Time is of the essence in closing the sale and the Debtors and the Buyer intend to close the sale consummate the Transactions as soon as possible.  Therefore, any

party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk their appeal being foreclosed as moot.

39.    This Order and the Wink Agreement shall be binding in all respects upon all creditors of (whether known or unknown), and holders of equity interests in, any Debtor, any holders of Claims in, against or on all or any portion of the Wink Assets, all non-Debtor counterparties to the Assumed Contracts, all successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries and any subsequent trustee appointed in the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection.  Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases, any order confirming any such chapter 11 plan or any order approving wind-down or dismissal of the Chapter 11 Cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of the Wink Agreement or this Order, and to the extent of any conflict or derogation between this Order or the Wink Agreement and such future plan or order, the terms of this Order and the Wink Agreement shall control.

40.    To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the Wink Agreement or the Wink Bidding Procedures Order, this Order shall govern and control.


**IT IS SO ORDERED.**
Dated:  November 6, 2015
              New York, New York


                                                            _____/s/Martin Glenn_____
                                                                  MARTIN GLENN
                                                            United States Bankruptcy Judge

**EXHIBIT A**

**WINK SALE AGREEMENT**

**ASSET PURCHASE AGREEMENT**

**dated as of**

**September 21, 2015**

**by and between**

**FLEXTRONICS INTERNATIONAL USA INC.**

**As Purchaser**

**and**

**WINK, INC. and QUIRKY, INC.**

**As Seller**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("**Agreement**") is entered into as of September 21, 2015 by and between Flextronics International USA Inc., a California corporation having a place of business at 6201 Americas Center Drive, San Jose, California 95002 (the "**Purchaser**"), and Wink, Inc., a Delaware corporation having a place of business at 606 West 28th Street, New York, New York 10001 ("**Wink**") and Quirky, Inc. a Delaware corporation having a place of business at 606 West 28th Street, New York, New York 10001 ("**Quirky**" and collectively with Wink, "**Seller**"), as debtors and debtor-in-possessions in the jointly administered chapter 11 case (no. 15-12596) (the "**Bankruptcy Case**"), pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

## RECITALS

WHEREAS, Seller has developed (i) an integrated application which allows users to control a variety of smart household electronics through a central platform and (ii) hardware products that are compatible with the integrated application (the "**Business**");

WHEREAS, Quirky and Wink each have filed or following the execution of this agreement intend to file (the date of such filing, the "**Filing Date**"), a voluntary petition with the Bankruptcy Court under chapter 11 of title 11 of the United States Code, Section 101, *et seq.* (the "**Bankruptcy Code**");

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to a Sale Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (as defined below), and this Agreement and the transactions contemplated herein are subject to the approval of the Bankruptcy Court; and

WHEREAS, Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller certain assets related to the Business as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows.

## <u>AGREEMENT</u>

1. **DEFINITIONS**

    **1.1**    "**Actions**" has the meaning set forth in **Section 3.4** hereof.

    **1.2**    "**Additional Purchased Assets**" has the meaning set forth in **Section 2.1** hereof.

    **1.3**    "**Affiliate**" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person.

**1.4**    "**Agreement**" means this Asset Purchase Agreement among the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be amended from time to time.

**1.5**    "**Ancillary Agreements**" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated by this Agreement and shall include, without limitation, any agreement, instrument, or other document that is set forth in **Section 2.6** hereof.

**1.6**    "**Apportioned Obligations**" has the meaning set forth in **Section 5.5** hereof.

**1.7**    "**Assumed Contracts**" has the meaning set forth in **Section 2.1(c)** hereof.

**1.8**    "**Assumed Liabilities**" has the meaning set forth in **Section 2.3(a)** hereof.

**1.9**    "**Auction**" means the auction of the Purchased Assets.

**1.10**    "**Auction Date**" means November 2, 2015, or such other date as the Bankruptcy Court may order for the Auction.

**1.11**    "**Bankruptcy Case**" has the meaning given to it in the recitals hereto.

**1.12**    "**Bankruptcy Code**" has the meaning given to it in the recitals hereto.

**1.13**    "**Bankruptcy Court**" has the meaning given to it in the recitals hereto.

**1.14**    "**Bidding Procedures Order**" means the order approving the bidding procedures at the Auction for the Purchased Assets.

**1.15**    "**Business**" has the meaning given to it in the recitals hereto.

**1.16**    "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City and San Francisco, California are required or authorized by law to be closed.

**1.17**    "**Cash Closing Payment**" has the meaning set forth in **Section 2.5(a)** hereof.

**1.18**    "**Centerview**" has the meaning set forth in **Section 3.3** hereof.

**1.19**    "**Closing**" means the closing of the transactions contemplated by this Agreement.

**1.20**    "**Closing Date**" means the date on which the conditions set forth in Article **6** are satisfied or waived, or such other date as the parties may mutually agree upon which the Closing takes place.

**1.21**    "**Code**" means the Internal Revenue Code of 1986, as amended.

**1.22**    "**Competing Transaction**" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, financing, recapitalization, liquidation or other

disposition of the Business, the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement.

**1.23** "**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement or any Ancillary Agreement, the performance by a Person of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby.

**1.24** "**Copyrights**" has the meaning set forth in **Section 2.1(a)(i)** hereof.

**1.25** "**Copyright Rights**" has the meaning set forth in **Section 2.1(a)(i)** hereof.

**1.26** "**Cure Cost Escrow**" has the meaning set forth in **Section 5.4(a)** hereof.

**1.27** "**Deposit**" has the meaning set forth in **Section 2.5** hereof.

**1.28** "**Disclosure Schedule**" means each, and collectively all, as the context may require, of the disclosure schedules attached to this Agreement as **Exhibit A**, and includes but is not limited to each of the disclosure schedules expressly referred to in **Section 3** of this Agreement.

**1.29** "**Documentation**" has the meaning set forth in **Section 2.1(a)(v)** hereof.

**1.30** "**Domain Names**" has the meaning set forth in **Section 2.1(a)(vii)** hereof.

**1.31** "**Employment Related Plan**" means any employment, consulting, bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock option, stock ownership, stock appreciation rights, phantom stock, equity (or equity-based), leave of absence, layoff, day or dependent care, legal services, cafeteria, life, health, medical, dental, vision, welfare, accident, disability, workmen's compensation or other insurance, severance, separation, termination, change of control, collective bargaining or other benefit plan, understanding, agreement, practice, policy or arrangement of any kind, whether written or oral, and whether or not subject to ERISA, including any "employee benefit plan" within the meaning of Section 3(3) of ERISA.

**1.32** "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

**1.33** "**ERISA Affiliate**" means any Person required at any particular time to be aggregated with any of Seller or any Seller Subsidiary under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

**1.34** "**Excluded Assets**" has the meaning set forth in **Section 2.2** hereof.

**1.35** "**Excluded Liabilities**" has the meaning set forth in **Section 2.3(a)** hereof.

85063970\V-11

**1.36** "**Expense Reimbursement**" means the reimbursement of Purchaser's reasonable and documented out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement, not to exceed $200,000.

**1.37** "**Filing Date**" has the meaning given to it in the recitals hereto.

**1.38** "**Final Order**" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended as to which no appeals or motions for reconsideration are pending and any and all appeal periods with respect to such order, judgment or other decree have expired.

**1.39** "**Flex Cure Stipulation**" means a stipulation among the Sellers and Flextronics Sales and Marketing (A-P) Ltd. providing for payment as a cure cost from the proceeds of the Purchased Assets consistent with that certain term sheet related thereto signed on September 9, 2015.

**1.40** "**GAAP**" means United States generally accepted accounting principles, applied on a consistent basis.

**1.41** "**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

**1.42** **Intellectual Property Rights**" means all proprietary rights and privileges of any kind or nature, however known or denominated, whether arising by operation of law, contractual rights or obligation, or other means, throughout the world, arising from or with respect to (i) the IP Assets and (ii) rights of privacy, publicity and biography, moral rights, and all other similar rights and collateral, ancillary and subsidiary rights of every kind and nature related to or used in any way in the Business, together with the goodwill associated therewith, all rights to protect any interest therein, including all rights, remedies, or causes of action for infringement or misappropriation of any of the foregoing.

**1.43** "**Interests**" means (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, interests and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's interest in the Assumed Contracts or Purchased Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims by the Pension Benefit Guaranty Corporation, (iv) claims in respect of Taxes, and (v) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code.

**1.44** "**IP Assets**" means all of Seller's right, title and interest in and to the following, related to or used in any way in the Business: (i) Copyright Rights; (ii) Software; (iii) Trademark Rights; (iv) Patent Rights; (v) Documentation; (vi) Trade Secrets; (vii) Domain Names; and (viii) Web Sites.

-4-

**1.45** "**Knowledge of Seller**" or "**Knowledge of Wink**" or any other similar knowledge qualification in this Agreement means all facts actually known by the current executive officers of Wink or Quirky, as applicable; provided that such officers shall be deemed to have actual knowledge of any fact or matter such officer would reasonably be expected to have knowledge of in performing his or her duties and responsibilities, in such capacity, for the Seller.

**1.46** "**Lot 1**" has the meaning set forth in **Section 2.1** hereof.

**1.47** "**Lot 2**" has the meaning set forth in **Section 2.1** hereof.

**1.48** "**Material Adverse Effect**" means (A) a material adverse effect (financial or otherwise) on (a) the Business, the Purchased Assets or on the results of operations or condition of the Business or the Purchased Assets, taken as a whole, or the ability of Purchaser to succeed to and exercise rights or interests of Seller that are necessary to operate the Business, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated by this Agreement or (B) if the Seller fails to assign to Purchaser enough of the business partner agreements to have a materially adverse impact on the business or its prospects, in each case, other than effects directly arising as a result of (i) the performance of this Agreement or (ii) events, changes or developments relating to the financial, banking or capital-markets or the economy in general or industry-wide developments affecting Persons in businesses similar to the Business.

**1.49** "**Material Agreements**" means any of those Assumed Contracts listed in Schedule 3.6 hereto.

**1.50** "**Nondisclosure Rights**" has the meaning set forth in **Section 2.1(b)** hereof.

**1.51** "**NYC Facility**" has the meaning set forth in **Section 2.1** hereof.

**1.52** "**NYC FF&E**" has the meaning set forth in **Section 2.1** hereof.

**1.53** "**Patents**" has the meaning set forth in **Section 2.1(a)(iv)** hereof.

**1.54** "**Patent Rights**" has the meaning set forth in **Section 2.1(a)(iv)** hereof.

**1.55** "**Permits**" means all licenses, certificates of authority, permits, orders, consents, franchises, approvals, registrations, clearances, variances, exemptions, local siting approvals, authorizations, qualifications and filings required to be obtained under applicable law or to be filed with any Governmental Entities or other private Persons.

**1.56** "**Person**" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

**1.57** "**Post-Closing Tax Period**" shall mean (i) any Tax period beginning any time after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

**1.58** "**Pre-Closing Tax Period**" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

**1.59** "**Purchased Assets**" has the meaning set forth in **Section 2.1** hereof.

**1.60** "**Purchase Price**" has the meaning set forth in **Section 2.5** hereof.

**1.61** "**Purchaser**" has the meaning given to it in the recitals hereto.

**1.62** "**Sale Approval Order**" has the meaning set forth in **Section 5.4(c)** hereof.

**1.63** "**Sale Hearing**" means the hearing to approve the sale of the Purchased Assets.

**1.64** "**Schenectady Assets**" has the meaning set forth in **Section 2.1** hereof.

**1.65** "**Schenectady Facility**" has the meaning set forth in **Section 2.1** hereof.

**1.66** "**Seller**" has the meaning given to it in the recitals hereto.

**1.67** "**Seller Plan**" means an Employment Related Plan that Seller or any ERISA Affiliate sponsors, maintains, has any obligation to contribute to, has or may have liability under or is otherwise a party to, or that otherwise provides benefits for employees, former employees, independent contractors or former independent contractors (or their dependents and beneficiaries) of Seller on or prior to the Closing Date and, in the case of an Employment Related Plan that is subject to Part 3 of Title I of ERISA, Section 412 of the Code, or Title IV of ERISA, at any time during the five (5) year period preceding the Closing Date.

**1.68** "**Software**" has the meaning set forth in **Section 2.1(a)(ii)** hereof.

**1.69** "**Stalking Horse Order**" has the meaning set forth in **Section 6.1(i)** hereof.

**1.70** "**Subsidiary**" means, with respect to any Person, any other Person (i) of which the first Person owns directly or indirectly fifty percent (50%) or more of the equity interest in the other Person; (ii) of which the first Person or any other Subsidiary of the first Person is a general partner or (iii) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries.

**1.71** "**Tangible Personal Property**" has the meaning set forth in **Section 2.1(e)** hereof.

**1.72** "**Taxes**" (or "**Tax**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory

-6-

rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto.

**1.73** "**Third-party Technology**" means any software, technology, and other proprietary rights licensed by Seller from any Person, related to or used in anyway in the Business, as listed on <u>Section 3.5 of the Disclosure Schedule</u>.

**1.74** "**Trademarks**" has the meaning set forth in **Section 2.1(a)(iii)** hereof.

**1.75** "**Trademark Rights**" has the meaning set forth in **Section 2.1(a)(iii)** hereof.

**1.76** "**Trade Secrets**" means any information which (i) is used in a business, (ii) is not generally known to the public or to Persons who can obtain economic value from its disclosure, and (iii) is subject to reasonable efforts to maintain its secrecy or confidentiality; the term may include but is not limited to inventions, processes, know-how, formulas, computer software, and mask works which are not patented and are not protected by registration (e.g., under copyright, patent, or mask work laws); lists of customers, suppliers, and employees, and data related thereto; business plans and analyses; and financial data.

**1.77** "**Trade Secret Rights**" has the meaning set forth in **Section 2.1(a)(vi)** hereof.

**1.78** "**Web Sites**" has the meaning set forth in **Section 2.1(a)(viii)** hereof.

**1.79** "**Wink Purchased Assets**" has the meaning set forth in **Section 2.1** hereof.

2. **PURCHASE AND SALE OF ASSETS**

**2.1** <u>Purchase and Sale of Assets</u>.    Subject to the terms and conditions of this Agreement together with any Bankruptcy Court approval that may be required, including the payment by Purchaser of the Purchase Price, at the Closing, Seller hereby agrees to sell, assign, transfer, convey and deliver to Purchaser, and Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser, free and clear of any and all Interests, good, valid and marketable title and interest in and to all of the assets, properties and rights of Seller related to or used in any way in the Business, including without limitation the Assumed Contracts (other than the Excluded Assets, such assets, properties and rights are hereinafter collectively referred to as the "**Wink Purchased Assets**" or "**Lot 1**"), including, but not limited to, the following assets, properties and rights:

**(a)**    All IP Assets of Seller related to or used in any way in the Business, including, without limitation, each of the following to the extent related to or used in any way in the Business:

**(i)**    all right, title and interest, whether statutory or common law, including all moral rights, in and to published and unpublished works of authorship in any medium, whether copyrightable or not (including databases, and data collections, and other compilations of information, such as, but not limited to, knowledge databases, partner databases, and customer databases), copyrights  therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof

("**Copyrights**") owned or licensed or otherwise controlled by Seller, including but not limited to those set forth on **Schedule 2.1(a)(i)** (collectively, the "**Copyright Rights**");

(ii)     all right, title and interest in and to any and all proprietary computer software owned or licensed or otherwise controlled by Seller (including without limitations software programs, objects, modules, routines, algorithms and any other software, source or object code, customized application programs, end-user application programs, Seller-hosted software platforms, documentation, designs, related materials, and information pertaining thereto), including but not limited to those set forth on **Schedule 2.1(a)(ii)**, and all related Intellectual Property Rights (collectively, the "**Software**");

(iii)     all right, title and interest in and to any and all trademarks, service marks, certification marks, collective marks, trade names (including without limitation the trade names "Wink", "Wink Relay" and "Wink Hub"), business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising under the common law, state law, federal laws and laws of foreign countries, and all applications, registrations, and renewals for any of the foregoing ("**Trademarks**"), together with the goodwill associated with and symbolized by each of the foregoing held or used or otherwise controlled by Seller and all goodwill associated with the foregoing items set forth in this **subsection 2.1(a)(iii)** (collectively, the "**Trademark Rights**");

(iv)     all right, title and interest in and to any and all patent applications and patents which are owned or licensed or otherwise controlled by Seller (the "**Patents**"), including but not limited to those set forth on **Schedule 2.1(a)(iv)**, all patent applications claiming the benefit of the filing date of any such patent or patent application, all continuations, divisionals, renewals, substitutes, extensions, conversions, continuations-in-part, reissues, provisionals, reexaminations or other equivalents thereof, and all patents issuing in respect of any of the foregoing, and all related patent prosecution files (collectively, the "**Patent Rights**");

(v)     all right, title and interest in and to any and all documentation (whether in tangible or intangible format, and whether or not complete), files, and original documents owned or controlled by Seller and which, in each case, directly or indirectly relate to the other Purchased Assets (collectively, the "**Documentation**"), including, but not limited to, (i) business plans developed by Seller and (ii) those relating to IP Assets, including without limitation all applications and patents included in the Patent Rights and Patents, all applications and trademarks included in the Trademark Rights and Trademarks, and all applications for copyright registration and copyright registrations included in the Copyright Rights and Copyrights;

(vi)     all right, title and interest in and to any and all Trade Secrets, confidential and proprietary information, and know-how, including without limitation methods, processes, business plans, schematics, concepts, software and databases (including source code, object code and algorithms), customized application programs, end-user application programs, Seller-hosted software platforms, formulae, drawings, prototypes, models, designs, design methodologies, devices, technology, research and development and customer information and lists, technology, processes and know-how, as well as any other information that may be deemed

-8-

a trade secret under applicable law, whether or not in written form, which are owned, used, licensed, or otherwise controlled by Seller (collectively, the "**Trade Secret Rights**")

(vii)    all right, title and interest in and to domain name registrations, IP addresses, network addresses and the like held or used by Seller, and the applications therefor, including but not limited to those domain names set forth listed on **Schedule 2.1(a)(vii)** (the "**Domain Names**"), and including further all Intellectual Property Rights in and to such Domain Names;

(viii)    all right, title and interest in and to the web sites set forth on **Schedule 2.1(a)(viii)**, including all designs for such web sites, all underlying code for such web sites, and all contents of such web sites and other similar materials (the "**Web Sites**"), in any and all media now known or hereafter developed, and including further all Intellectual Property Rights in and to such Web Sites and all proprietary aspects of such Web Sites;

(ix)    all right title and interest in and to any other proprietary items or rights, whether statutory or common law, which are reasonably necessary or useful to the Purchaser's ability to succeed to and exercise rights or interests of Seller that are reasonably necessary or useful to operate the Business, taken as a whole, which are owned, used, licensed, or otherwise controlled by Seller.

(b)    Except as specifically excluded under **Section 2.2**, all claims, causes of action, rights of recovery and rights of set-off owned by Seller related to or used in any way in the Business, including, but not limited to, any and all enforcement rights to pursue damages, injunctive relief and other remedies, whether currently pending, filed, or otherwise, relating to the Intellectual Property Rights of Seller, or with respect to confidentiality, noncompetition and/or nondisclosure obligations of any current or former employee, shareholder, director or officer related to or used in any way in the Business whether arising under contract or by operation of law ("**Nondisclosure Rights**"), and all rights to profits and damages due or accrued, arising out of or in connection with, any and all past, present or future infringement, misappropriation or other violation of the Intellectual Property Rights or Nondisclosure Rights of Seller, including all rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of such Intellectual Property Rights or Nondisclosure Rights, in the Purchaser's own name or in the name of Seller, and all rights of Seller to collect royalties, payments, and other consideration under the Intellectual Property Rights related to or used in any way in the Business;

(c)    All rights and privileges of Seller under the contracts, agreements, leases and licenses listed on **Schedule 2.1(c)**, and any additional contracts, agreements, leases and licenses designated by the Purchaser with the consent of Seller (such consent not to be unreasonably withheld) on or before the Auction Date for assumption and assignment pursuant to **Section 3.6** hereof (including all amendments and modifications to any thereof, the "**Assumed Contracts**"), unless Purchaser elects to exclude any such contract, agreement, lease or license with the consent of Seller (such consent not to be unreasonably withheld)  prior to the Closing;

85063970\V-11

(d)    All vested rights and privileges of Seller under or relating to any contracts or leases to which Seller is or was a party that are not capable of being assumed and/or assigned under Section 365 of the Bankruptcy Code, to the extent set forth on **Schedule 2.1(d)**;

(e)    All physical embodiments of the Intellectual Property Rights, and improvements to the foregoing (including, but not limited to, the tangible assets identified on **Schedule** 2.1(e) (collectively, "**Tangible Personal Property**") owned by Wink or owned by Quirky and directly related to and used solely for the Business; provided, however, that, Seller and any successor to Seller, including any trustee appointed in the Bankruptcy Case, shall be provided with reasonable access, subject to Purchaser's policies as to safety, security and confidentiality, to any information on any such computer system relating to Seller's finances, Seller's employment obligations, the Excluded Liabilities, Seller's regulatory compliance or any matters as to which Seller is required by law to respond in an administrative or judicial proceeding, in existence as of the Closing Date for a period of six (6) months thereafter, provided further that in connection with any such administrative or judicial proceeding Purchaser shall be given the opportunity to limit disclosure of Purchaser's confidential information and Seller will cooperate with Purchaser in seeking nondisclosure of, or appropriate protective orders regarding, such information; and

(f)    All goodwill and other intangibles owned by Seller related to, associated with or used in any way in the Business.

The Purchaser is also considering acquiring the Quirky lease for the customer service facility located at 695 Rotterdam Industrial Park, Schenectady, NY 12306 in Schenectady, New York (the "**Schenectady Facility**") and will acquire the related furniture, fixture, equipment, computers and other tangible property located at the Schenectady Facility (the "**Schenectady Assets**"). Purchaser shall have the right in conjunction with the Sellers to have direct discussions with the Schenectady landlord prior to closing regarding (i) a modified lease or (ii) other lease or occupancy arrangement and if such arrangement cannot be timely finalized, to relocate the Schenectady Assets to another location.

The Purchaser is acquiring all equipment in the "fabrication shop" and all photography and video equipment located at Quirky's facility located at 601 West 28th Street in New York City (the "**NYC Facility**"), including, without limitation, all of the 3D printers, photograph equipment and video equipment located at the NYC Facility (the "**NYC FF&E**" and, collectively with the Schenectady Assets, the "**Additional Purchased Assets**" or "**Lot 2**"). Seller may request the Purchaser to exclude certain specific items from the NYC FF&E and the Purchaser agrees to consider any such request in good faith and the parties shall agree upon an adjustment to the Purchase Price for Lot 2 for any such excluded items.

The Wink Purchased Assets and the Additional Purchased Assets are collectively referred to herein as the "**Purchased Assets**."

Except as set forth herein, including but not limited to Article 3, the assets, properties and rights to be conveyed, sold, transferred, assigned and delivered to Purchaser pursuant to this Section 2.1 shall be transferred "as is, where is".

**2.2**    Excluded Assets.    Notwithstanding anything to the contrary herein, Seller shall not cause to be sold, assigned, transferred, conveyed or delivered, to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Seller in, any of the following assets (the "**Excluded Assets**"):

(a)    All rights of Seller under this Agreement and the Ancillary Agreements;

(b)    All cash or cash equivalents held by Seller or held in the name of Seller in a bank or other financial institution;

(c)    All interests in and to the capital stock of Seller and all corporate records, including without limitation, the organizational documents of Seller, accounting documents, tax returns, audit materials, legal records, board and member minutes and related correspondence, stock transfer books, blank stock certificates and other documents, qualification to conduct business as a foreign corporation and any Permits held by Seller that are not transferrable as a matter of law; provided, however, that Purchaser shall be granted reasonable access to, and the right to make copies of, any such documents of Seller;

(d)    All human resources material including without limitation employment and compensation records and benefits information, provided, however, that Purchaser shall be granted reasonable access to, and the right to make copies of, any such materials of Seller, for a period of twelve (12) months after the Closing Date;

(e)    All executory contracts and unexpired leases that are not Assumed Contracts, provided that no executory contract shall be rejected by the Seller if such rejection would adversely affect the Nondisclosure Rights or result in a Material Adverse Effect;

(f)    All bankruptcy avoidance claims of Seller, including, without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code, except to the extent such claims are against ongoing suppliers, ongoing licensors, ongoing manufacturers, ongoing strategic or other business partners of the Business or ongoing customers or ongoing employees of the Purchaser;

(g)    All causes of action that the Seller may hold against any current or former director, officer or employee of the Company for breach of fiduciary duty or claims of a similar nature, provided that any such causes of action, whenever arising, that may be asserted against any Person (and any officer, director, shareholder or member of any Person) who is now or hereafter becomes a member, manager, officer or employee of or independent contractor to the Purchaser is hereby waived and released in its entirety, irrevocably, and shall not be asserted by the Seller or any Person claiming by, through or in the right of the Seller;

(h)    All other claims, causes of action, rights of recovery and rights of set-off that Seller may hold, including any and all enforcement rights to pursue damages, whether currently pending, filed, or otherwise, provided that the relief requested is solely monetary damages and that the pursuit of such claims, causes of action, rights of recovery and rights of set-off would not reasonably be expected to impact the Business.  Claims, causes of action, rights of recovery, rights of set-off and similar items related to ongoing suppliers, ongoing customers,

-11-

ongoing employees or infringement claims related to the Purchased Assets are deemed to impact the Business and are being conveyed to Purchaser;

(i)     All Seller Plans and all assets owned or held by any Seller Plans; and

(j)     All Assets of Quirky not related to or used in any way in the Business other than the Additional Purchased Assets, including for the avoidance of doubt, all IP assets of Quirky that are not related to or used in any way in the Business; and

(k)     All furniture, fixtures or equipment located in NYC Facility other than the NYC FF&E.

**2.3**     Assumed and Excluded Liabilities.

(a)     Subject to the terms and conditions of this Agreement, at the Closing, Purchaser shall assume and agree to perform when due only those liabilities and obligations of Seller (i) for post-closing obligations under the Assumed Contracts (any cure costs as determined by the Bankruptcy Court shall be paid from the Cure Cost Escrow) and (ii) all ordinary course obligations with respect to employees of Seller that are hired by Purchaser for ordinary course wages and benefits related to the current pay cycle and ordinary course vacation pay accruals (the "**Assumed Liabilities**"). Purchaser is not assuming any employment agreements, severance agreements or policies, bonuses, past due wages and benefits, tort or discrimination claims or grievances of any nature and any other non-current employee related claims. Except for the Assumed Liabilities, Seller and Purchaser hereby expressly acknowledge and agree that Purchaser shall not assume any liabilities and obligations of Seller (iii) in connection with this Agreement and the transactions contemplated hereby or (iv) in connection with Seller's current or past employees, consultants, service providers or advisors, nor be liable or obligated with respect to any such liabilities or obligations (the "**Excluded Liabilities**").

(b)     The assumption by Purchaser of the Assumed Liabilities shall not expand the rights or remedies of any third party against Purchaser as compared to the rights and remedies which such third party would have had against Seller had Purchaser not assumed the Assumed Liabilities. Furthermore, the assumption by Purchaser of the Assumed Liabilities shall not create any third party beneficiary rights.

**2.4**     Closing. Subject to the terms and conditions of this Agreement, the Closing shall take place at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, at 10:00 a.m. on four business days after the Sale Order is entered on the Bankruptcy Court docket (unless Purchaser requires that the Sale Order be a Final Order), or at such other place and time as the parties agree in writing, unless this Agreement is before such other time terminated in accordance with the terms hereof.

**2.5**     Consideration. The aggregate consideration to be paid and delivered by Purchaser and accepted by Seller for the Purchased Assets (the "**Purchase Price**") shall be the following:

(a)     a cash amount equal to $14,500,000 for Lot 1, if Purchaser acquires Lot 1 and $500,000 for Lot 2, if Purchaser acquires Lot 2, (the "**Cash Closing Payment**") payable by Purchaser to Seller at Closing by (i) release to Seller of the Deposit which shall be applied to the

Lot 1 portion of the Cash Closing Payment and (ii) wire transfer of immediately available funds in the amount of the Cash Closing Payment (less the Deposit in the case of Lot 1); and

> **(b)** assumption by the Purchaser of the Assumed Liabilities.

If Seller requests that Purchaser exclude certain specific FF&E from Lot 2, then Purchaser and Seller shall negotiate a reasonable adjustment to the Purchase Price for Lot 2 for any such excluded items.

The parties agree to allocate the Purchase Price among the Purchased Assets for all purposes, including financial, accounting and tax purposes, in the manner reasonably requested by Purchaser as set forth in a written notice delivered to Seller by Purchaser within thirty (30) days following the Closing, and the Seller shall acknowledge and agree to such allocation by execution and return to the Purchaser of a counterpart of such notice. Purchaser shall make the initial proposal on such allocation.

As of the date hereof, Cooley LLP (the "**Cooley**") shall have received a deposit from or on behalf of Purchaser in the amount of $1,500,000 (the "**Deposit**"), which shall be held by Cooley separate from its other funds until released to Seller at the Closing or otherwise disposed of as provided hereunder.

> **2.6** <u>Delivery</u>. Subject to entry of the Sale Approval Order, at the Closing:

> **(a)** Purchaser shall release to Seller the Deposit and deliver to Seller the Cash Closing Payment (less the Deposit);

> **(b)** Seller shall deliver to Purchaser the Purchased Assets;

> **(c)** Seller and Purchaser shall execute and deliver the Patent Assignment in the form attached as **Exhibit B** hereto;

> **(d)** Seller and Purchaser shall execute and deliver the Trademark and Copyright Assignment in the form attached as **Exhibit C** hereto;

> **(e)** Seller shall execute and deliver to Purchaser the Bill of Sale and Assignment and Assumption Agreement in the form attached as **Exhibit D** hereto;

> **(f)** Seller shall deliver to Purchaser an executed Power of Attorney in the form attached as **Exhibit E** hereto;

> **(g)** Seller and Purchaser shall execute and deliver the Intellectual Property Assignment in the form attached as **Exhibit F** hereto;

> **(h)** Seller shall deliver to Purchaser an executed domain name transfer form attached as **Exhibit G** hereto;

> **(i)** Seller shall deliver to Purchaser all necessary consents to assignment related to the Assumed Contracts and any Permits that are to be transferred to Purchaser

-13-

(together with all applications, completed and executed by Seller, and Consents received by Seller, for such transfers);

   **(j)** Seller shall deliver to Purchaser such other and further documents, in appropriate formats and media, as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein and to vest in Purchaser all right, title and interest in, to and under the Purchased Assets;

   **(k)** Seller shall deliver to Purchaser any and all Documentation, Software, trademark, patent and copyright prosecution files included in the Purchased Assets, in appropriate formats and media  (without limitation of Seller's obligations under other provisions of this Agreement to deliver the Purchased Assets to Purchaser);

   **(l)** Seller shall deliver a copy of the Sale Approval Order;

   **(m)** Seller shall deliver a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Case evidencing that the Sale Approval Order is a Final Order unless the requirement that the Sale Approval Order has become a Final Order has been waived by the Purchaser;

   **(n)** Seller shall fully fund the Cure Cost Escrow; and

   **(o)** Seller shall deliver any and all other documents or instruments as Purchaser may reasonably request of Seller, which are reasonably necessary or useful to Purchaser's operation of the Business or otherwise required to carry out the intent of this Agreement.

   **2.7** <u>Possession</u>.  Subject to entry of the Sale Approval Order, the right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date.  Seller shall transfer and deliver to Purchaser on the Closing Date such usernames, passwords, account numbers, authorization codes, encryption keys, and other similar items with respect to the Purchased Assets as Purchaser shall require to obtain control of the Purchased Assets, and shall also make available to Purchaser at Seller's then existing locations all documents, Documentation, Software and hardware that are required to be transferred to Purchaser by this Agreement.  Purchaser shall have thirty (30) days from the Closing Date to remove all Purchased Assets from Seller's locations.  Seller shall not reject any leases for property in or on which any Purchased Assets are located for at least thirty (30) days after the Closing Date and, during such period, Seller shall ensure that Purchaser has access to such locations during normal business hours for purposes of removing Purchased Assets that Purchaser has not elected to abandon as provided herein.

   **2.8** <u>Transfer Taxes</u>.  Provided that the Sale Approval Order includes a finding that the sale of the Purchased Assets is in contemplation of a plan to be confirmed under Section 1129 of the Bankruptcy Code, in accordance with section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be free and clear of any and all transfer tax, stamp tax or similar taxes.  Such instruments, orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

-14-

> "Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the Southern District of New York in contemplation of a chapter 11 plan of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(a)."

If such transfer, stamp or similar taxes are ultimately payable, notwithstanding section 1146(a) of the Bankruptcy Code or for any other reason, Seller shall pay any and all such transfer, stamp or similar taxes, which may be payable by reason of the transaction contemplated in this Agreement and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such taxes from the proceeds received from Purchaser as a Closing cost.

## 3.    REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to entry of the Sale Approval Order and except as set forth in the Disclosure Schedule (it being understood and hereby agreed that (i) the disclosures set forth in the Disclosure Schedule shall be organized under separate section and subsection references that correspond to the sections and subsections of this Article 3 to which such disclosure relates and (ii) the disclosure set forth in a particular section or subsection of the Disclosure Schedule shall qualify (A) the representations and warranties set forth in the corresponding section or subsections of this Article 3 and (B) such other representations and warranties set forth in this Article 3 if, and to the extent that, upon a reading of the disclosure, it is reasonably apparent that such disclosure is applicable to such other representations and warranties, each Seller hereby represents and warrants to Purchaser as follows:

**3.1**    Authority, Etc.  Each Seller is a corporation duly organized and in good standing under the laws of the State of Delaware.  Each Seller has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Seller.  This Agreement has been, and upon execution and delivery thereof each of the Ancillary Agreements will be, duly executed and delivered by Seller and constitutes, and such Ancillary Agreements will constitute, the valid and legally binding obligations of Seller, enforceable against Seller in accordance with their respective terms and conditions.

**3.2**    Title.  Quirky has good and marketable title to all of the Additional Purchased Assets and Wink or Quirky, as applicable, has good and marketable title to all of the Wink Purchased Assets and, upon the Closing will convey and transfer to Purchaser all of the Purchased Assets, and Purchaser shall receive good and marketable title to all of the Purchased Assets free and clear of any Interests, pursuant to sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

**3.3**    Brokers.  Other than amounts owed to Centerview Partners, LLC ("**Centerview**") or Hilco IP Services, LLC d/b/a Hilco Streambank ("**Hilco**") for services rendered in connection

-15-

with this Agreement and the transactions contemplated by this Agreement, Seller has no liability or obligation to pay any broker, finder or investment banker, any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement or the transactions contemplated by this Agreement.    Seller shall be solely liable for any commissions, fees or costs owed to Centerview or Hilco.

3.4    <u>Litigation</u>.  Except as set forth in <u>Section 3.4 of the Disclosure Schedules</u>, other than the Bankruptcy Case, there is no claim, action, suit, proceeding, opposition, challenge, cancellation proceeding or investigation (collectively, "**Actions**") pending or, to the Knowledge of Seller, currently threatened against Seller related to the Business, any Nondisclosure Rights or the practice of any of the IP Assets, that questions the validity of this Agreement, any Ancillary Agreement, any of the IP Assets, the Assumed Contracts or any Nondisclosure Rights, or the right of Seller to enter into any thereof, or would prohibit Seller from entering into this Agreement or any Ancillary Agreement, or to consummate the transactions contemplated hereby or thereby, or that, to the Knowledge of Seller, could result, either individually or in the aggregate, in any Material Adverse Effect.  Other than the Bankruptcy Case, there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Business, the Purchased Assets, the Nondisclosure Rights or the practice of the IP Assets or performance of the Assumed Contracts.  <u>Section 3.4 of the Disclosure Schedules</u> sets forth a description of all Actions to which Seller or any Affiliate is a party or the Purchased Assets, the Nondisclosure Rights or the practice of the IP Assets or the Business is subject.

3.5    <u>Intellectual Property</u>.  Except as otherwise disclosed in <u>Section 3.5 of the Disclosure Schedule</u>, Seller owns and possesses all right, title and interest in and to all IP Assets, there are no licenses or other grants of rights from Seller to any Person with respect to such IP Assets, and all IP Assets shall be conveyed and transferred to Purchaser at the Closing free and clear of all Interests.  Without limiting the foregoing:

(a)    (i) Schedules 2.1(a)(i), 2.1(a)(ii), 2.1(a)(iii) 2.1(a)(iv), 2.1(a)(vii) and 2.1(a)(viii) set forth a true and complete list of  all registered Copyrights, Software, Trademarks, Patents, Domain Names and Web Sites, all of which are wholly owned by and registered to Seller; and (ii) other than as set forth on <u>Schedule 3.5</u>, there are no registered Copyrights, Trademarks, or Patents, Domain Names and Web Sites, used in connection with the Business that Seller has licensed or otherwise permitted to be used by other Persons.

(b)    Except as set forth on <u>Schedule 3.5</u> of the Disclosure Schedule:

(i)    Seller owns all IP Assets or possesses or has the right to use pursuant to a valid and enforceable license, sublicense, or agreement all Intellectual Property Rights included in the Purchased Assets, as such were used in the operation of the Business by Seller.  No Person other than Seller has any ownership interest in, or a right to receive a royalty or similar payment with respect to, any of the IP Assets.  Wink has not granted any options, licenses, assignments or agreements of any kind relating to ownership of rights in the IP Assets.

(ii)    The IP Assets are not the subject of any ownership, validity, use, or enforceability challenge or claim received by Seller in writing or, to the Knowledge of Seller,

-16-

any outstanding Final Order restricting the use by Seller or adversely affecting any of the rights of Seller hereto.

> **(iii)**    Other than indemnities pursuant to service agreements entered into in the normal course of business, Seller has not entered into any agreement to indemnify any other Person against any charge of infringement with respect to any of Seller's Intellectual Property Rights. Seller has not entered into any agreement which granted any third party the right to bring infringement actions or otherwise to enforce rights with respect to IP Assets or pursuant to which Seller has agreed not to sue or otherwise enforce any legal rights with respect to any of Seller's Intellectual Property Rights.

> **(iv)**    To the Knowledge of Seller, no Person has infringed, misappropriated, or otherwise violated any IP Assets in the past; or is currently infringing, misappropriating, or otherwise violating any IP Assets.

> **(v)**    (A) Neither Seller nor, to the Knowledge of Seller, any of its Affiliates in connection with the operation of the Business is currently infringing, misappropriating, or otherwise violating,  and has not infringed, misappropriated, or otherwise violated, any Intellectual Property Rights of any other Person without the consent of the holder of such Intellectual Property Rights and (B) there are no Actions pending or, to the Knowledge of Seller, threatened concerning any claim that Seller, or to the Knowledge of Seller, any of its Affiliates have infringed, diluted, misappropriated, or otherwise violated any Intellectual Property Rights of any other Person in connection with the operation of the Business.

> **(c)**    Seller has taken steps consistent with generally-accepted industry standards, and in any event no less than commercially reasonable efforts to protect the confidentiality of any Trade Secrets and other confidential and proprietary information included in the IP Assets, and any trade secrets of third parties provided to Seller or any of its Affiliates on a confidential basis, according to the laws of the applicable jurisdictions where such trade secrets are developed, practiced or disclosed.

> **(d)**    Seller has acquired from each relevant employee, consultant and contractor completely executed proprietary information, confidentiality and assignment agreements that assign to Seller all rights to any technology relating to the Business that have been developed by the employees, consultants or contractors, as applicable, and that otherwise reasonably protect the Intellectual Property Rights.

> **(e)**    All documents, payments, and instruments as applicable and necessary to (i) establish, secure and perfect the rights of Seller in the IP Assets have been validly executed, delivered and filed in a timely manner with the appropriate governmental entity; and (ii) to maintain each such IP Asset of Seller in full force and effect have been made by any applicable deadline, in each case except to the extent such IP Assets have been purposefully abandoned by Seller in Seller's reasonable business judgment

> **(f)**    Licenses-In. Other than (i) licenses to generally commercially available off-the-shelf software code or programs, (ii) licenses to Third-party Technology as listed on <u>Section 3.5 of the Disclosure Schedule</u>, (iii) non-disclosure agreements and (iv) customer

agreements that do not materially differ in substance from Seller's standard form(s) entered into in the ordinary course of business, Section 3.5 of the Disclosure Schedule lists all contracts (i) that are material to the business of Seller, (ii) to which Seller is a party, and (iii) under which Seller has been granted or provided any rights to IP Assets or Intellectual Property Rights by a third party. All Assumed Contracts providing for the license or other use of IP Assets or Intellectual Property Rights by Seller that are material to the Business are in full force and effect, and enforceable in accordance with their terms.

(g)     Licenses-Out. Other than (i) written non-disclosure agreements and (ii) non-exclusive licenses and related agreements with respect thereto (including software and maintenance and support agreements) of current products to end-users (in each case, pursuant to written agreements that have been entered into in the ordinary course of business that do not materially differ in substance from Seller's standard form(s)), Section 3.5 of the Disclosure Schedule lists all contracts providing for the license of or other use of IP Assets or Intellectual Property Rights to which Seller is a party.

(h)     To the knowledge of Seller, Seller is not in violation of any GNU Free Documentation License or other similar license in respect of open source code used by Seller in the Business.

(i)     Seller conducts and has conducted the Business in such a manner as to take reasonable advantage, if and when applicable, of the safe harbors provided by Section 512 of the Digital Millennium Copyright Act (the "DMCA") and by any substantially similar applicable law in any other jurisdiction in which Seller conducts the Business, including by informing users of its products of such policy, designating an agent for notice of infringement claims, registering such agent with the United States Copyright Office, and taking appropriate action expeditiously upon receiving notice of possible infringement in accordance with the "notice and take-down" procedures of the DMCA or such other applicable law.

(j)     Seller's currently licensed and marketed commercially available products related to the Business, including any customized products, perform in all material respects in accordance with the functions described in any agreed written specifications or end user documentation provided to customers or potential customers of Seller and in accordance with Seller's contractual obligations to Seller's customers or Seller's partners. Seller has not been notified, either verbally or in writing, that such products do not perform as set forth above.

(k)     The Software used in the operation of the Business, the Websites, and other applicable IP Assets are free of (i) any material defects, including without limitation any material error or omission in the processing of any transactions and (ii) any disabling codes or instructions and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software routines or hardware components that permit unauthorized access or the unauthorized disruption, impairment, disablement or erasure of such software (or any parts thereof) or data or other software of users ("Contaminants"). Seller has taken commercially reasonable steps and implemented commercially reasonable procedures to ensure that information technology systems used in connection with Business are free from Contaminants.

-18-

**(l)**    Seller has complied with all applicable law, generally-accepted industry standards, and their respective published privacy policies and internal guidelines and procedures, each as in effect from time to time, relating to privacy and data security, including without limitation with respect to the collection, use, disclosure and transfer (including cross-border transfers) of personally identifiable financial information collected, used or held by Seller.  Seller has appropriate disaster recovery plans, procedures and facilities for their businesses and has taken all commercially reasonable steps to safeguard the information technology systems utilized in the operation of the Business of Seller as it is currently conducted. There has been no unauthorized access, disclosure, use, modification or other misuse or other breaches of the security of the information technology systems used in the Business. Seller has implemented all reasonably necessary and prudent security patches and upgrades that are generally available for the information technology systems used in their businesses, including the Business.

**(m)**    Solely for the purpose of ensuring that the Purchaser may successfully operate the Business after the Closing, in the event and to the extent that Seller either owns or licenses or controls any Intellectual Property Rights in any of the IP Assets after the Closing (collectively, the "**Seller Retained IP**"), Seller shall grant Purchaser a perpetual, exclusive (to the extent commercially  practicable and the Seller Retained IP relates solely to the Business), nonrevocable, sublicensable, fully-paid up, royalty-free, limited license to make, use, sell, import, export, distribute, copy, perform, reproduce, make derivatives, or otherwise utilize the Seller Retained IP.  Such license is freely transferable by the Purchaser, including but not limited to upon a change of control or sale of the assets related to the Business.

**3.6**    Contracts.  No Assumed Contract has been orally modified or amended.  Other than with respect to Seller's cure obligations under Section 365 of the Bankruptcy Code, each Assumed Contract is in full force and effect and constitutes a legal, valid, binding agreement, enforceable against Seller and, to the Knowledge of Seller, each other party thereto, in accordance with its terms. Other than with respect to Seller's cure obligations under Section 365 of the Bankruptcy Code, neither Seller nor, to the Knowledge of Seller, any Affiliate of Seller or any other party to each such contract is in violation or material breach of, or in default under, nor has there occurred an event or condition that with the passage of time or giving of notice (or both) would constitute a material default under, or permit the termination of, any such contract. Purchaser shall have the right to designate additional executory contracts for assumption by the Seller and assignment to the Purchaser at any time up to the Closing Date by written notice to the Seller. Upon receipt of such notice, Seller shall use commercially reasonable efforts to cause the Bankruptcy Court to approve the assumption by Seller and assignment to Purchaser of such additional executory contracts provided, (i) approval of the assumption and assignment of such additional executory contracts shall not be a condition to Closing, (ii) failure of the Bankruptcy Court to approve such assumption and assignment shall not be a breach by Seller of its obligations hereunder, and (iii) in the event the assumption and assignment of such additional executory contracts is approved by the Bankruptcy Court, Purchaser shall pay all related cure costs. Upon approval by the Bankruptcy Court of the assumption and assignment of any additional executory contracts, such additional executory contracts shall be Assumed Contracts. Schedule 3.6 (Material Agreements) includes all Assumed Contracts which are material to the Business, the Purchased Assets, or the results of operations or condition of the Business or the Purchased Assets, taken as a whole, or the ability of Purchaser to succeed to and exercise rights or interests of Seller that are necessary to operate the Business, taken as a whole.

-19-

**3.7**    <u>Tangible Personal Property</u>.  The Tangible Personal Property of Seller included in the Purchased Assets is free from material defects, subject to normal wear and tear and continued repair and replacement in accordance with past practice.  All such Tangible Personal Property has been maintained, repaired and replaced by Seller in accordance with manufacturer's recommendations and industry best practices, and, to the Knowledge of Seller, any such Tangible Personal Property that is susceptible to the same contains no virus, malware, timebomb or similar defect.  Seller has not received notice that any of the Tangible Personal Property included in the Purchased Assets is in violation of any existing law or order of any Governmental Authority.  No approval or Consent of any Person is needed so that the interest of Seller in the Tangible Property as transferred to Purchaser hereunder shall continue to be in full force and effect and enforceable by Purchaser following the Closing.

**3.8**    <u>Subsidiaries</u>.    Other than Undercurrent Acquisition, LLC, Seller has no Subsidiaries or any other equity interest in any other Person.

**3.9**    <u>Real Property</u>.  Seller does not own any real property.  <u>Section 3.9 of the Disclosure Schedule</u> contains a correct and complete list of each parcel of real property leased, subleased or licensed to Seller that is now, or at the time of Closing will be, used or held for use in the Business ("**Leased Real Property**"), and includes the expiration date of such lease or sublease and any consents, approvals or other documents necessary or required such that each lease and sublease will be in full force and effect and remain binding on all parties thereto in accordance with the terms of such lease, sublease or license as of the Closing Date and after giving effect to the Closing.  Neither Seller nor any of its Affiliates owes any brokerage commissions with respect to any such leased space (including any contingent obligation in respect of future lease extensions).  Seller has valid leasehold interests in all Leased Real Property and Seller is in possession of each parcel of Leased Real Property.  Seller has made available to Purchaser prior to the execution of this Agreement correct and complete copies of all leases set forth in <u>Section 3.9 of the Disclosure Schedule</u> (including any amendments and renewal letters) to the Leased Real Property.

**3.10**    <u>Insurance</u>.  <u>Section 3.10 of the Disclosure Schedule</u> sets forth a complete and correct list of all insurance policies held by or on behalf of Seller relating to the Business, the Purchased Assets and the Assumed Contracts.  The insurance policies listed on <u>Section 3.10 of the Disclosure Schedule</u> include all policies of insurance that are required by material commercial contracts relating to the Business, in the amounts required under the Assumed Contracts.  All the insurance policies listed on <u>Section 3.10 of the Disclosure Schedule</u> are in full force and effect, all premiums due and payable thereon have been paid, no notice of cancellation or termination has been received by Seller with respect to any such policy and no claim under any such policy is pending or has been made by any insured thereunder.

**3.11**    <u>Good Faith</u>.  This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Seller's Knowledge, in good faith, and Seller and Purchaser did not engage in any collusion with respect to setting or fixing the Purchase Price, and to the Knowledge of Seller, there are no facts to support a finding that Purchaser negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

-20-

**3.12**    Projections.    The projections provided by Seller to Purchaser for the Wink business as a standalone business are a reasonable estimate of the going forward expenses of the standalone Wink business and are consistent with the revenues earned and the expenses historically paid or incurred related to the Wink business.

**4.**    **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Seller as follows:

**4.1**    Authority.    Purchaser is a corporation organized and in good standing under the laws of the State of California.    Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements to which it is to be a party and to carry out the obligations hereunder and thereunder, without the need for any further approval of its officers and directors.    All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the Ancillary Agreements to which it is to be a party has been taken.    Upon its execution and delivery by Purchaser, this Agreement and each Ancillary Agreement to which it is to be a party will be the valid and legally binding obligations of the Purchaser in accordance with their respective terms.

**4.2**    Compliance with Other Instruments.    The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is to be a party, and the consummation of the transactions contemplated hereby and thereby will not result in any violation or default or be in conflict with or constitute, with or without the passage of time and giving of notice, a default under any provision of any instrument, judgment, order, writ, decree or contract to which it is a party.

**4.3**    Brokers.    No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements to which it is to be a party or the transactions contemplated by this Agreement and such Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.

**4.4**    Litigation.    There is no action, suit, proceeding or investigation pending or, to Purchaser's knowledge, currently threatened in writing against Purchaser that questions the validity of this Agreement or any Ancillary Agreement to which it is to be a party, or the right of Purchaser to enter into such agreements, or to consummate the transactions contemplated hereby or thereby.

**4.5**    Financial Assurance.    The Purchaser (or its affiliates) have sufficient cash, available lines of credit or other sources of immediately available funds to enable payment of the Purchase Price and any other amounts to be paid by it hereunder.

**4.6**    Good Faith.    This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Purchaser's knowledge, in good faith, and Seller and Purchaser did not engage in any collusion with respect to setting or fixing the Purchase Price, and to the knowledge of Purchaser, there are no facts to support a finding that Seller negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

-21-

## 5.    COVENANTS

**5.1**    <u>Seller Records</u>.    Prior to the Closing Date, and without limiting the other provisions of this Agreement, Seller shall afford Purchaser, its attorneys, accountants and representatives, free and full access to Seller's Business, assets, contracts, facilities, books, records and employees at any time and from time to time upon reasonable notice and request, and shall provide to Purchaser and its representatives such additional financial and operating data, in each case, that is related to the Business, as Purchaser shall from time to time reasonably request

**5.2**    <u>Filings and Authorizations</u>.    Each of Seller and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Entities and non-governmental Persons necessary to be obtained by it, in order to consummate the transactions contemplated herein; <u>provided</u>, <u>however</u>, that, any provision hereof to the contrary notwithstanding, Seller shall have no obligation to pay any fee to any third party (other than any lawful fees assessed by a Governmental Entity) for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder.    Seller and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

**5.3**    <u>Further Assurances; Accounts</u>.

**(a)**    At and after the Closing, Seller shall take such steps as may be necessary to put Purchaser in possession and operating control of the Purchased Assets and the Business. At or after the Closing, Seller shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably deem necessary or desirable to implement any provision of this Agreement and to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets, free and clear of any and all Interests.  Purchaser may take title to the assets through one or more related nominee entities.

**(b)**    Following the Closing, at the request of the Purchaser, Purchaser and Seller each shall use its commercially reasonable efforts to transfer, license or assign as promptly as practicable any Third-party Technology designated by Purchaser.   Notwithstanding the foregoing, neither Purchaser nor Seller shall be required to expend any material sum or agree to a material concession to obtain any Third-party Technology.

**(c)**    From and after the date of execution of this Agreement, neither the Seller nor any Person acting on behalf of the Seller and acting within the Seller's control will operate

any of the Purchased Assets in any manner that would adversely affect the value, utility or useful life of such asset, or without the prior written consent of the Purchaser, make any change to any component of the Purchased Assets or make or retain any copies in any media of any software and other proprietary materials included in the Purchased Assets, provided that Seller may retain one (1) archival copy of such materials solely for reference in fulfilling its obligations under **Section 5.3(a)** and **Section 7.5(a)** hereof.  Seller shall not transfer, assign, deliver or disclose such copies to any Person not acting on behalf of Seller in fulfilling such obligations.

(d)    Effective on the Closing Date, Seller hereby appoints Purchaser as Seller's attorney in fact to execute any instruments which Seller shall fail for any reason to execute and deliver for a period of five (5) business days following Seller's receipt of written request therefor, it being acknowledged that such appointment is coupled with an interest and is irrevocable.  Purchaser will provide Seller with copies of any instruments so executed on Seller's behalf.

(e)    Effective on the Closing Date, if requested prior thereto by Purchaser, Seller shall name Purchaser an additional insured and additional loss payee in regard to each insurance policy identified on Section 3.10 of the Disclosure Schedule, for the remainder of the policy term, and shall instruct the respective insurers to settle with Purchaser all claims made on or after the Closing Date thereunder.

**5.4**    <u>Bankruptcy Covenants</u>.

(a)    <u>Cure of Defaults</u>.  Seller shall, as soon as reasonably practicable after the Closing Date, cure any and all defaults and breaches and satisfy any liability or obligation arising and/or accruing from or relating to pre-Closing periods under the Assumed Contracts from the Cure Cost Escrow (defined below), so that such Assumed Contracts may be assigned by Seller to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code, the Sale Approval Order, any other orders of the Bankruptcy Court effectuating such assignments, and this Agreement.  In connection with the above, on the Closing Date the Seller shall establish a cure cost escrow with Seller's bankruptcy counsel (the "**Cure Cost Escrow**").  The Cure Cost Escrow will be funded with cash from the Purchase Price in an amount sufficient to pay all cure costs related to the Assumed Contracts.  In the event that there is a dispute between the Seller and a non-debtor third party to an Assumed Contract, the Seller shall place into the Cure Cost Escrow cash in the amount of the cure demand from such non-debtor third party, which amounts shall remain in escrow pending an agreement between the parties or further order of the Bankruptcy Court.

(b)    <u>Motions, Orders, etc.</u>  Seller shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court relating to the approval of this Agreement, the Purchased Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings.

(c)    <u>Sale Approval Order</u>.  Without limiting the generality of the foregoing **Section 5.4(b)**, the sale approval order shall be in the form annexed hereto as **Exhibit I** (the

-23-

"**Sale Approval Order**"), with only non-material changes to such form, and only such other changes as shall be acceptable in form and substance to Purchaser.

(d)    Stalking Horse Order.  Without limiting the generality of the foregoing **Section 5.4(b)**, the order approving the break-up fee, expense reimbursement and bidding procedures shall be in the form annexed hereto as **Exhibit I** (the "**Stalking Horse Order**"), with only non-material changes to such form, and only such other changes as shall be acceptable in form and substance to Purchaser and that Order shall include, among other things, that the cash amount of any initial overbid bid for Lot 1 or subsequent bid for Lot 1 must equal at least $150,000 million and that the Break-up Fee and Expense Reimbursement are payable directly from the purchase price of any overbid that is accepted.

(e)    Other Bankruptcy Covenants.  Seller shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within one (1) business day after Seller's receipt thereof a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

5.5    Apportioned Obligations.  All personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period.  Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for personal property taxes relating to the Purchased Assets, each of Seller and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this **Section 5.5** together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within fifteen (15) Business Days after delivery of such statement.  In the event that either Seller or Purchaser shall make any payment for which it is entitled to reimbursement under this **Section 5.5**, the other party shall make such reimbursement promptly but in no event later than fifteen (15) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Purchaser shall notify Seller of any audit or examination of the Apportioned Obligations.  The Seller shall have the right to participate in any such audit or examination and Purchaser shall not settle any such audit or examination without the consent of Seller, which consent shall not be unreasonably withheld.

5.6    <u>Notification</u>.  From time to time prior to the Closing, Seller shall notify Purchaser in writing with respect to any matter hereafter arising or any information obtained after the date hereof that, if existing, occurring or known at or prior to the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedule or that is necessary to complete or correct any information in such schedule or in any representation and warranty of Seller that has been rendered inaccurate thereby.  Seller shall promptly inform Purchaser in writing of any claim by a third party made to Seller that an Assumed Contract, or a lease, sublease or license relating to Leased Real Property, that has been assigned to Purchaser, has been breached, is in default, may not be renewed or that a consent would be required as a result of the transactions contemplated by this Agreement.

5.7    <u>Employees</u>.  Purchaser shall offer employment to substantially all of the permanent employees of Wink as of the Closing, such employment to commence substantially concurrently with Closing.

6.    **CONDITIONS PRECEDENT TO CLOSING.**

6.1    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser in its sole discretion:

(a)    <u>Representations and Warranties Accurate</u>.  The representations and warranties of Seller contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

(b)    <u>Performance by Seller</u>.  Seller shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

(c)    <u>Consents</u>.  All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser of any condition, restriction or required undertaking.

(d)    <u>Permits</u>.  All Permits and related materials required under Section 2.6(m) to be delivered to Purchaser at the Closing shall have been so delivered and shall be in full force and effect, and no Permit required for Purchaser's operation of the Business and the Purchased Assets and consummation of the transactions contemplated by this Agreement shall have been denied or issued with limitations that are material and that are deemed burdensome by Purchaser.

(e)    <u>No Legal Prohibition</u>.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted and remain in

-25-

effect or threatened by any Governmental Entity which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(f)     No Material Adverse Effect.  No Material Adverse Effect shall have occurred and no other event, loss, damage, condition or state of facts of any kind shall exist which has a Material Adverse Effect or can reasonably be expected to have a Material Adverse Effect.

(g)     Additional Documents, etc.  There shall have been delivered to Purchaser each of the agreements, documents, certificates and other items set forth on **Schedule 6.1(h)** of this Agreement, including those required by **Section 2.6** of this Agreement.

(h)     Entry of Order; Appeal.  On or before October 12, 2015, the Bankruptcy Court shall have entered the Stalking Horse Order, with only such changes as shall be acceptable in form and substance to Purchaser.  In addition the Bankruptcy Court shall have entered the Sale Approval Order in accordance with **Section 5.4(c)** and the Sale Approval Order shall have become a Final Order, unless the finality of such orders is waived by Purchaser in Purchaser's sole discretion.

6.2     Conditions Precedent to Obligations of Seller.  The obligations of Seller under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Seller:

(a)     Representations and Warranties Accurate.  The representations and warranties of Purchaser contained in this Agreement which are qualified as to materiality shall be correct and complete in all respects, and those not so qualified shall be correct and complete in all material respects, as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be correct and complete as of such specified date or time).

(b)     Performance by Purchaser.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

(c)     Consents.  All Consents required to be obtained by Purchaser in connection with the purchase and sale of the Purchased Assets and the Closing shall have been duly obtained, made or given and shall be in full force and effect.

(d)     No Legal Prohibition.  No injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any

Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)     Additional Documents, etc.  There shall have been delivered to Seller each of the agreements, documents and other items set forth on **Schedule 6.1(g)** of this Agreement to be delivered to Seller, including those required by **Section 2.6** of this Agreement.

**6.3**     Sale Approval Order as Final Order.  If Purchaser elects in its sole discretion to waive the condition to Closing that the Sale Approval Order shall be a Final Order, then Seller shall be obligated to proceed with the Closing except during any period during which the Sale Approval Order is stayed.

**7.     MISCELLANEOUS**

**7.1**     Termination.   This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

(a)     any time before the Closing, by mutual written agreement of Seller and Purchaser;

(b)     any time before the Closing, by Seller, on the one hand, or Purchaser, on the other hand, (i) in the event of a material breach hereof by the non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party, or (ii) upon written notification to the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party;

(c)     if not earlier terminated, at the election of Purchaser as notified in writing to Seller, if the Closing has not occurred by November 23, 2015 and such failure is not the result of a breach by Purchaser;

(d)     at the election of the Purchaser as notified in writing to the Seller, if the Stalking Horse Order or an order approving the Flex Cure Stipulation is not entered on or before October 12, 2015;

(e)     at the election of the Purchaser as notified in writing to the Seller, if the Sale Order is not entered on or before November 7, 2015;

(f)     at the election of the Purchaser if the exhibits and schedules to this Agreement are not finalized in form reasonably acceptable to both Purchaser and Sellers by the date or the hearing in respect of the Stalking Horse Order (which shall be not later than October 12, 2015), provided that Purchaser has acted diligently and in a commercially reasonable manner in respect of the negotiation of such exhibits and schedules;

(g)     at the election of the Purchaser as notified in writing to the Seller, if the Auction occurs and Purchaser is not the successful bidder at the Auction or the Back-Up Bidder

-27-

(as defined in the Bidding Procedures Order) or if the Seller enters into an agreement or transaction, including any Competing Transaction with a third party that is materially inconsistent with this Agreement and the transactions contemplated hereby in a material respect; or

       **(h)**    by Purchaser if the Bankruptcy Court does not approve assignment of any of the Material Agreements to Purchaser.

       **7.2**    Effect of Termination.

       **(a)**    If this Agreement is validly terminated pursuant to **Section 7.1**, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except that the provisions with respect to expenses and fees in **Section 7.3** will continue to apply following any such termination.

       **(b)**    Notwithstanding the provisions of **Section 7.2(a)**, above:

       **(i)**    if Purchaser or Seller terminate this Agreement pursuant to **Section 7.1(a)** or Purchaser terminates this Agreement pursuant to **Section 7.1(c), (d), (e)** or **(f)**, Purchaser shall receive the prompt return of the Deposit;

       **(ii)**    if Purchaser terminates this Agreement pursuant to **Section 7.1(b)(i)** or Seller or Purchaser terminates this Agreement pursuant to **Section 7.1(b)(ii)**, Purchaser shall receive the prompt return of the Deposit which, in the case of Seller terminating this Agreement pursuant to **Section 7.2(b)(ii)**, shall constitute Purchaser's sole and exclusive remedy available under any law, including the Bankruptcy Code;

       **(iii)**    if Seller terminates this Agreement pursuant to **Section 7.1(b)(i)**, Seller shall receive the Deposit, which shall constitute Seller's sole and exclusive remedy available under any law, including the Bankruptcy Code; and

       **(iv)**    if Purchaser terminates this Agreement pursuant to **Section 7.1(g)**, then Seller shall promptly following the closing of the corresponding transaction pay Purchaser in immediately available funds, and Purchaser shall be deemed to have earned both (a) the Expense Reimbursement and (ii) an amount equal to $450,000 (the "**Break-Up Fee**"). If this Agreement is terminated by Purchaser for any reason in accordance with Section 7.1 (other than Section 7.1(g)) and the Seller subsequently consummates a sale of all or a substantial portion of the Purchased Assets with a Person other than Purchaser, including in connection with any Competing Transaction, Seller shall promptly pay Purchaser, and Purchaser shall be deemed to have earned, the Expense Reimbursement. The Break-Up Fee and the Expense Reimbursement shall constitute an administrative expense of Seller with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code and as an agreed carve out by all secured lenders or DIP financing lenders until paid and shall be payable from the proceeds of a sale to a third party within two (2) Business Days, notwithstanding Section 507(a) of the Bankruptcy Code. Purchaser and Seller hereby acknowledge that amounts payable pursuant to this **Section 7.2(b)(iv)** are commercially reasonable or necessary to induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereby. For the

85063970\V-11

avoidance of doubt, the covenants set forth in this **Section 7.2(b)(iv)** are continuing obligations, separate and independent from the other obligations of Seller and Purchaser, and survive the termination of this Agreement.

**7.3**    Expenses.  Except as otherwise set forth in **Section 7.2**, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

**7.4**    Compliance with Laws.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

**7.5**    Further Cooperation.  Without limiting Seller's obligations under **Section 5.3**, at the request of Purchaser, at any time following the Closing Date, Seller shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary or useful for the operation of the Business by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers (which shall include as necessary the execution by Seller of a Power of Attorney in the form attached hereto as **Exhibit F**), using reasonable efforts to obtain the same from the respective inventors or authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; provided, however, that Seller shall not be obligated to pay any material consideration or incur any material costs to provide such cooperation.

**7.6**    Governing Law; Jurisdiction.    All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules).

**7.7**    Entire Agreement; Interpretation.  The terms and conditions of this Agreement, including its exhibits and the Ancillary Agreements, constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions.  Neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.    The terms "includes" and "including" are not limiting.    These terms and conditions will prevail notwithstanding any

-29-

different, conflicting or additional terms and conditions which may appear on any purchase order, acknowledgment or other writing not expressly incorporated into this Agreement.  Unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and to any certificates delivered pursuant hereto; and (ii) reference to any Article or Section means such Article or Section hereof.  Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

       **7.8**    <u>Notices</u>:  All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered by hand, or dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, addressed as follows:

<u>If to Purchaser</u>

Flextronics International USA Inc.
6201 Americas Center Drive
San Jose, CA 95002
Attn:  Sumir Kapur
Phone: (408) 576-7666

with a copy to:

Dentons US LLP
233 S. Wacker Drive, Suite 5900
Chicago, Illinois 60606
Attn:   Robert Richards
Phone:  (312) 876-7396

<u>If to Seller</u>

Wink, Inc.
606 West 28th Street
New York, New York 10001
Attn:  Nathan Smith
Phone:

And to:

Wink, Inc.
606 West 28th Street
New York, New York 10001
Attn:  Charlie Kwalwasser
Phone:  (212) 419-2856

with a copy to:

Cooley LLP
1114 Avenue of the Americas
New York, New York  10036
Attn:  Jeffrey Cohen
Phone:  (212) 479-6218

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery.  Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

       **7.9**    <u>Counterparts; Facsimile and Email Transmission</u>.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by

facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

**7.10**    No Ongoing Obligations.    Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Seller or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

**7.11**    Survival of Representations and Warranties.    All of the representations and warranties of Purchaser contained in this Agreement shall survive the Closing Date.  All of the representations and warranties of Seller contained in this Agreement shall survive until the Closing Date and terminate upon the closing of the transactions contemplated hereby.

**7.12**    Amendment.    This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Purchaser.

**7.13**    Indemnification Obligations.    After the Closing, Purchaser shall indemnify Seller against and shall hold it harmless from any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Seller may suffer or incur by reason of Seller's defense of any claim, suit or proceeding made or commenced against it arising out of obligations of Seller that were expressly assumed by Purchaser hereunder and only expressly for liabilities, claims or amounts arising or accruing after the Closing Date, other than expressly provided for herein.  Seller shall provide written notice to Purchaser of any claim or dispute as to which indemnification is provided under this Section within 10 days of receipt of written notice by Seller of the commencement, or threatened commencement, of any such action; provided that the failure to provide such notice will not affect any rights hereunder except to the extent Purchaser is materially prejudiced thereby.  Seller, on not less than thirty (30) days' notice to Purchaser, may make settlement of such claim, litigation or other proceeding with Purchaser's consent, such consent not to be unreasonably withheld, and such settlement shall be binding on Seller and Purchaser for the purposes of this Section; provided, however, that, if within said thirty-day period Purchaser shall, in writing, have requested Seller to contest such claim, or to defend against such litigation or other proceeding, then Purchaser shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Seller, with counsel of its own choosing, but Seller may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing.  If Purchaser shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Purchaser shall reimburse Seller for the expenses incurred by Seller in such contest or defense.  Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Purchaser for the purposes of this Section.

**7.14**    No Agency.    The parties hereto are independent contractors.  Except as may be provided in this Agreement, neither party has any express or implied right or authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party.  Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between Seller and Purchaser.

-31-

**7.15**   <u>Specific Performance</u>.  Notwithstanding anything to the contrary contained herein (other than **Section 7.2(b)** hereof), each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm.   Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other parties hereto shall (except to the extent **Section 7.2(b)** is applicable) be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

**7.16**   <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

**7.17**   <u>Waivers</u>.  Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

**7.18**   <u>Binding Effect; Third Party Beneficiaries; Assignment</u>.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns.  Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  No party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum, nor delegate any of its obligations hereunder, without the prior written consent of the other parties, except that Purchaser may assign its rights under this Agreement in whole or in part to any Affiliate or to any Person providing financing for the transaction, and to any purchaser of all or substantially all of the Purchased Assets from Purchaser.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

**SELLER:**

**WINK, INC.**

By: _____
    Name:  Charles Kwalwasser
    Title: Secretary

**PURCHASER:**

**FLEXTRONICS INTERNATIONAL USA INC.**

By: _____
    Name:
    Title:

**QUIRKY, INC.**

By: _____
    Name:  Charles Kwalwasser
    Title:  Chief Administrative Officer

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

SELLER:                                     PURCHASER:

WINK, INC.                                  FLEXTRONICS INTERNATIONAL USA INC.


By: _____          By: _____
   Name:                                     Name:  Mike Dennison
   Title:                                    Title:  President



QUIRKY, INC.



By: _____
   Name:
   Title:

121648027 v6

## **EXHIBIT A**

Disclosure Schedule

<u>Schedule 2.1(a)(i):  Copyright Registrations and Applications for Registration</u>

**None.**

Schedule 2.1(a)(ii):  Software

- dd-to-wink, A service to provide clients with all supported Wink products, as well as the steps needed to provision each one.

- admin-portal, Wink admin / customer service portal

- admin-portal-api, Helper API for customer service tasks that do not strictly match what the core Wink API provides

- agent-client, Wink Channel client.

- agent-conduit, Wink Channel packet server.

- agent-diverter, Wink Channel diverter.

- agent-packetizer, Agent packetizer code.

- agent-transport, Consume a stream of Wink Channel packets.

- bcm-platform, Any projects on the broadcom wireless platform.

- brillion, GE Brillion API client

- canary, Canary API consumer

- chamberlain, Chamberlain gem for Ruby

- cloudwatch-custom-metrics, executable container for AWS CloudWatch CLI

- developer-portal, Third-party developer self service

- docker-logrotate, logrotate Docker container logs on the host

- dockerhub-webhook-listener, automated deploys

- dropcam, Dropcam API

- echo-add-to-wink, echo provisioning page

- echo-handler, Handle Echo interface in an AWS Lambda function

- ecobee, Ecobee Client

- electric-imp-service,

- emissary, Subscribe/receive postbacks from third party services

- emr-docker, A dockerized EMR build environment

- google-auth-proxy, Google SSO for internal apps

- greenwave, Greenwave gem for Ruby

- hadoop-common, Common java lib for Hadoop jobs

- hatchet, First-stage EMR job to split monolithic API logs

- honeywell, Honeywell API gem for Ruby

A-3

- hub-soft-reflash, wifi reflash runner for hubs
- hue, modification of soffes/hue package to handle Philips Hue remote API
- ifttt-service, two-way communication for Wink IFTTT channels
- ihome, ihome client gem
- ios-assets, All of the assets.
- ios-travis-tester, Dummy project to test the travis settings.
- java-common, wink common java libraries
- kinesthesis, dump logs into s3
- link-hub, link hub firmware
- loaded-tokens-rb, Ruby library for generating and validating meaningful cryptographic tokens
- mcfly-dns, DNS component of time traveling hub project
- mcfly-ntp, NTP component of time traveling hubs project
- metrix, collect metrics from services (Agent, Emissary, etc..) to InfluxDB
- ml-log-parser, Project that parses mlAnalytics logs from Server
- ml-pipeline, Redshift-based repository for raw data segmented in various ways
- ml-util, Python Utility Functions for Machine Learning Projects
- nest, Ruby Nest integration
- nginx-frontdoor, nginx front door for auth, etc...
- OTA_Firmware_Tool, Rails app to manage firmware assignments. Initially designed for Spotter UNIQ.
- philips-hue, Philips Hue integration
- pithos-project, documentation jam session
- podspecs, Wink's private Cocoapods repo
- provisioning-flows, Contains the images and manifest.json files that define the device provisioning flows, which are returned by the provisioning_flows api.
- python-wink-api, Python module for querying wink api
- rachio, Rach.io ruby client
- rds-transfer, RDS transfer script
- reconnect.wink.com, Site to help users Reconnect smoothly after they get their hub back
- relay-firmware,
- rheem, Rheem API gem for Ruby

- ring.wink.com, HTML landing page for Ring users to download Wink

- robot-butler, Secret robot butler site shhh

- rollups, Hadoop jobs for creating analytics rollups

- sensor-fusion, machine learning program for predicting desired device state from sensor data

- Spotter-Manufacturing-Scripts, Scripts used during Spotter manufacturing in micro factory.

- spotter-v2, Spotter V2 Source Repository for all IC Vendors

- spotter-v2-ti, Retail Version of Spotter V2 based on TI CC3200 Chipset

- Spotter_uniq_atmega, code for the 8bit sensor micro

- StressSimulator, Ruby script for testing the OTA server if thousands of devices randomly "phone home"

- style-guide, Wink's development and design style reference

- sumologic-collector, sumologic collector for docker containers

- upc-service, Code and data to hlpe identify all of the devices we can talk to

- wink-aau, local control server for wink hub

- wink-android, Android wink-related projects

- wink-api, Wink core API

- wink-api-log-analysis, temp repo to count log line volume for raising throttles with our log provider

- wink-api-monitor, Wink API monitoring

- wink-assets-ui, Repo for getting assets from API

- wink-botler, our Slack bot for stats & deploys

- wink-calendar-prototype, iOS event calendar prototype

- wink-cert-tools, internal certificate management tool

- wink-channel, Device side SDK for implementing products using wink-channel

- wink-coreos-units, CoreOS configs

- wink-device-identification-service, What is this thing that you're trying to provision?

- wink-docs, Magical documentation for all!

- wink-factory-support, Any manufacturer-specific hooks which might be required for partners

- wink-firmware, Wink firmware repo

- wink-hub, ntp

- wink-hub-api, Hub API

- wink-hub-api-cookbooks, Deployment cookbooks for use with AWS OpsWorks

- wink-hub-apron, Apron application set for the Wink HUB

- wink-hub-kernel, The kernel for the Wink HUB

- wink-hub-mfg-tools, Contains the manufacturing tools application and profiles using to program the wink hub via the micro-usb connector

- wink-hub-rootfs, hub-updates

- wink-hub-uboot, Contains the source for uboot running on the Wink Hub

- wink-ios, iOS wink-related projects

- wink-ios-autolayout-example,

- Wink-iOS-Design-Kit, Library for defining all UI Kit elements used in the iOS app

- wink-logs, Clearing house for wink logs. Responsible for transforms and routing.

- wink-logstash, logstash + Docker

- wink-updater-build, This git contains the build system for generating complete upgrade packages for wink updater.

- wink.com, wink e commerce site living at wink.com

- winkapp.com, winkapp.com

- wink_automation, parseMLFile.py

- wink_edison, edison bulb firmware

- wink_edison_android, The Android source tree for Edison including boot loader and kernel

- wink_edison_tester, Edison Android Testing Program

- wmsdk, Main Spotter Uniq Repo

- zendesk-sync, program to sync wink users to zendesk

Schedule 2.I(a)(iii):  Trademark Rights

**Trademark Applications and Registered Trademarks**

| Title | US Applications | Classes |
|---|---|---|
| WINK LOGO | US filed 6/19/14<br>App 86/314,732 | Class 9, 42 |
| WINK NO HUB SEAL | US filed 6/19/14<br>App 86/314,740 | Class 9 |
| WINK NEED HUB SEAL | US filed 6/19/14<br>App 86/314,750 | Class 9 |

Schedule 2.1(a)(iv):  Patents

PATENT APPLICATIONS, PATENTS

| Title | US Applications | Foreign Applications | Status |
|---|---|---|---|
| WINK RELAY | PA 3.24.14 <br> 61/969,725 <br> UA 3.24.15 <br> 14/667,127 | PCT 3.24.15 <br> PCT/US15/22247 | Pending |

Schedule 2.1(a)(vii):  Domain Names

The following constitute the domain names owned or controlled by Seller:

www.wink.com
www.winkapp.com
www.wink.sucks
www.therobotbutler.com

<u>Schedule 2.1(a)(viii):  Web Sites</u>

The Web sites located at the following URLs constitute all Web sites owned or controlled by Seller:

www.wink.com
www.winkapp.com
www.therobotbutler.com

Schedule 2.1(c):  Assumed Contracts

*Material Agreements*

1. Trademark License Agreement by and between Walter Kidde Portable Equipment, Inc. and Wink, Inc., dated June 5, 2014.

2. License Agreement by and between Lutron Electronics, Co., Inc. and Wink, Inc., dated June 10, 2014.

3. Design and Manufacturing Services Agreement, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dates March 7, 2014, as amended by the Source Code License, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated July 16, 2014.

4. Statement of Work – 101 for a Smart Light Switch, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 16, 2014.

5. Flextronics Source License Agreement.

6. Statement of Work – 102 for a Smart Hub, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 17, 2014.

7. Canada Supplier Buying Agreement, by and between the Home Depot and Wink, Inc., dated as of September 10, 2015, as amended.

8. Supplier Buying Agreement, by and between Home Depot, Inc. and Wink, Inc., dated as of September 8, 2015.

9. Return Freight Amendment to the SBA, by and between Home Depot and Wink, Inc., dated as of September 15, 2015.

10. Wink-Amazon Vendor Supply Agreement

11. MDF/Coop Agreement, by and between Amazon Fulfillment Services, Inc. and Wink, Inc., dated as of August 26, 2015.

*Mutual NDA's*

1. Wink-Unikey- 2/6/2014

2. Quirky-Somfy- 11/4/2013

3. Quirky-Andersen- 11/15/2013

4. Wink-Lutron- 4/7/2014

5. Wink-Google- 5/20/2014

6. Quirky-Broadcom- 12/3/2013

7. Quirky-Crane- 12/19/2013

8. Wink-Airbnb- 5/14/2014

9. Wink-UTC Fire and Security Corp.- 12/11/2013

10. Wink-Bateman Group- 8/11/2014

11. Wink-Beewi- 4/23/2015

12. Wink-Binatone NA- 2/27/2015

13. Wink-Rainbird- 2/5/2015

14. Wink-Cooper Lighting- 9/18/2014

15. Wink-Emberlight- 9/22/2014

16. Wink-Feit Electric- 7/21/2014

17. Wink-Standard Euler- 10/29/2014

18. Wink-Clayton Homes- 2/10/2015

19. Wink-D Link- 7/15/2014

20. Wink-DGL Group- 9/15/2014

21. Wink-Flextherm- 11/3/2014

22. Wink-Google (II)- 9/29/2014

23. Wink-GreenIQ- 4/16/2015

24. Wink-Griffin Technology-9/15/2014

25. Wink-IdeaPond/TAO Home- 9/15/2014

26. Wink-Thermal Solution Resources- 12/2013

27. Wink-Immedia Semiconductor- 10/29/2014

28. Wink-Magtech- 8/22/2014

29. Wink-Manythings- 12/2013

30. Wink-MBooth Assoc- 8/11/2014

31. Wink-MMB Research- 2/5/2015

32. Wink-RIL USA- 3/10/2015

33. Wink-Telecom Italia- 9/2015

34. Wink-BRK Brands- 7/11/2014

35. Wink-ME Systems- 7/10/2014

36. Wink-2D2C- 7/10/2014

37. Wink-Wistron- 8/12/2014

38. Wink-Netamo- 8/22/2014

39.  Wink- NNI Northern Int'l- 8/5/2014

40. Wink-Oplink Comms- 8/22/2014

41. Wink-Ryobi-7/2015

42. Wink-SDI Tech- 10/28/2014

43. Wink-Playtabase- 7/15/2015

44. Wink-Skybell- 7/31/2014

45. Wink-Spark PR- 8/11/2014

46. Wink-Sprint- 11/12/2014

47. Wink-Text 100- 8/11/2014

48. Wink-Voxx- 10/29/2014

49. Wink-Whirpool- 11/11/2014

50. Wink-Solar Universe- 2/13/2015

51. Wink-Ayla Networks- 8/22/2014

52. Wink-Delta Faucet- 7/23/2014

53. Wink-Dimplex- 7/23/2014

54. Wink-Handy Technologies- 10/6/2014

55. Wink-Karma Mobility- 9/15/2014

56. Wink-Lennar- 9/24/2014

57. Wink-Levolor/QMotion- 5/27/2014

58. Wink-LG- 7/2014

59. Wink-Reckitt Benckiser- 12/3/2014

60. Wink-Samsung Opto-Electrics- 12/2013

61. Wink-VTech- 7/18/2014

62. Wink-Zubie- 11/30/2014

63. Wink-ZMODO- 9/12/2014

64. Wink-TTI Group (need to confirm)

65. Wink-Enphase (need to confirm)

66. Wink-Solar City

67. Wink-Midea

68. Wink-USG- 6/23/2015

69. Wink-Toshiba- 4/13/2015

70. Wink-Direct Energy-3/6/2015

71. Wink-Schneider Electric-3/4/2015

72. Wink-DISH- 4/7/2015

73. Wink-Artika

74. Wink-Capital

75. Wink-Colortiger

76. Wink-NYCESensors

*Wink Partner Agreements*

1. Andersen- 4/20/2015

2. Bosch- 8/14/2014

A-15

3.  Carrier- 6/12/2015

4.  Chamberlain- 9/5/2014

5.  Cree- 8/10/2014

6.  Eastfield- 3/24/2015

7.  Ecobee- 8/14/2015

8.  ETI- 7/13/2015

9.  Fibar- 3/30/2014

10. Honeywell- 5/27/2014

11. iHome- 7/23/2015

12. King of Fans- 3/1/2015

13. Kwikset- 6/11/2014

14. Lutron

15. Nortek- 2/8/2015

16. Pella- 9/29/2015

17. Philips- 7/6/2015

18. Rachio- 6/12/2014

19. Rheem- 6/17/2014

20. Ring- 6/5/2015

21. Schlage- 6/13/2014

22. Springs Window Fashions- 6/2/2014

23. Sylvania- 4/9/2015

24. TCP- 6/18/2014

25. Tradewinds- 10/19/2014

26. Canary- 8/26/2015

27. Scout Security-

28. Nest- 9/2014

29. Emerson- 4/14/2015

30. Waxman- 9/10/2015

31. Kidde- 6/5/2014

*Miscellaneous Agreements*

1.    *Wink*-Capri Films, Master Service Agreement- 5/12/2014

2.    Wink-Google, Device and Software Evaluation Agreement- 5/20/2014

3.    Wink-OutCast PR, Program Agreement- 3/17/2014

4.    Wink-Quirky IP Assignment and Services Agreement- 11/4/2013

5.    Quirky-Development at Center City, LLC (Schnectedy) Lease Agreement- 2/28/2014

6.    Wink-Apple Developer Program License Agreement- 6/8/2015

7.    Wink-Apple Developer Advertising Services Agreement-

8.    Wink-Amazon Web Services Beta Test Participation Agreement- 9/9/2015

9.    Quirky-Coordinated Systems Cloud Software License Agreement- 8/29/2014

10.    Quirky-Zendesk Agreement

11.    Quirky-SumoLogic Agreement

12.    Wink-Mixpanel Agreement

*Wink Retail/Distribution Agreements*

1.    Wink-Amazon Vendor Supply Agreement

2.    Wink-Target Vendor Supply Agreement

3.    Wink-Dish Network Supply Agreement

4.    Wink-Solar Universe Supply Agreement

<u>Schedule 2.1(d):  Vested Rights and Privileges under Non-Assumable Contracts</u>

*Contractor Service Agreements*
1. Alex Gutierrez- 5/14/2014

*Termination and Separation Agreements*
2. Charles Flexman- 2/5/2015
3. Gilad Shah- 6/6/2014
4. Jose Rivera- 1/21/2015
5. Nicholas DiMoro- 11/5/2014

*Product Tester Agreements*
6. Adam Miarka-8/26/2014
7. Erik and Brooke Cool- 8/26/2014
8. Felipe Payet- 8/26/2014
9. Jeffrey Marous- 8/27/2014
10. Robert Czeizinger- 8/26/2014

*Name and Likeness Release*

11. Oksung Kim- 2/17/2015

## Schedule 2.1(e): Tangible Personal Property

### Inventory

| Product | Quantity | | |
| --- | --- | --- | --- |
| | OHL - Wink | OHL Riverside | OHL Allentown |
| *GE Link A19 (Quirky Consumer) Finished Good (soft white) | 6,155 | | |
| *GE Link Starter Kit (2 A19 smartbulbs + Wink Hub Lite) | 4,022 | | |
| *GE Link BR30 (Quirky Consumer) Finished Good (soft white) | 894 | | |
| *GE Link PAR38 (Quirky Consumer) Finished Good (bright white) | 885 | | |
| Cree Connected 60W Replacement Soft White LED Bulb | 530 | | |
| Wink Hub Finished Good (version 1.7) | 285 | 3,007 | |
| Wink Hub Finished Good (Canada version 1.7) | | | 1,112 |
| Wink Relay Finished Good (regular packaging) | 214 | 62,671 | 328 |
| Lutron Caséta™ Wireless 300 Watt Plug-In Lamp Dimmer, White | 200 | | |
| Z-Wave enabled 100W LED/CFL or 300W Incandescent Scene Capable Plug-in Lamp Module with LED Locator - White | 171 | | |
| WINK PREMIUM Security Kit,3DW,1PIR,1SREN,ZW | 169 | | |
| Lutron Caséta™ Wireless Plug-In Lamp Dimmer Kit, White | 150 | | |
| Z-Wave enabled 450W LED/CFL or 1,000W Incandescent Scene Capable Dimmer with LED Locator - White/Ivory/Lt Almond | 135 | | |
| Z-Wave enabled 15A Scene Capable Receptacle with LED Locator - White/Ivory/Lt Almond | 130 | | |
| LIGHTIFY Smart Connected Lighting LED Tunable White A19 Bulb | 100 | | |
| WINK ESSENTIAL Security Kit,2DW,1PIR,ZW | 51 | | |
| Smart Bundle (Link Hub + (2) A19 bulbs) Finished Good | 50 | | |
| Z-Wave enabled 15A Scene Capable Plug-in Appliance Module with LED Locator - White | 42 | | |
| Link Hub Finished Good (direct shipper) | 38 | | |
| Sensi™ Wi-Fi-Programmable Thermostat | 28 | | |
| Home Keypad Lever with Z-Wave Technology, Aged Bronze | 22 | | |
| SCHLAGE CONNECT DEADBOLT CAMELOT SATIN NICKEL | 21 | | |
| Philips Friends of Hue Bloom Extension | 19 | | |
| Kwikset SmartCode® 910 Z-Wave Contemporary Electronic Deadbolt featuring SmartKey® in Polished Chrome | 18 | | |
| 16 Zone Iro Smart Irrigation Controller | 18 | | |
| SCHLAGE CONNECT DEADBOLT CAMELOT AGED BRONZE | 18 | | |
| Kwikset SmartCode® 910 Z-Wave Arched Electronic Deadbolt featuring SmartKey® in Satin Nickel | 14 | | |
| Philips HUE BR30 Lighting Kit | 10 | | |
| Home Keypad Lever with Z-Wave Technology, Satin Nickel | 10 | | |
| 8 Zone Iro Smart Irrigation Controller | 9 | | |
| Kwikset SmartCode® 910 Z-Wave Contemporary Electronic Deadbolt featuring SmartKey® in Satin Chrome | 6 | | |
| Kwikset SmartCode® 910 Z-Wave Contemporary Electronic Deadbolt featuring SmartKey® in Venetian Bronze | 6 | | |
| Kwikset SmartCode® 910 Z-Wave Arched Electronic Deadbolt featuring SmartKey® in Lifetime Polished Brass | 5 | | |
| Kwikset SmartCode® 910 Z-Wave Contemporary Electronic Deadbolt featuring SmartKey® in Satin Nickel | 5 | | |
| Philips Friends of Hue LightStrips Extension | 5 | | |
| Kwikset SmartCode® 910 Z-Wave Arched Electronic Deadbolt featuring SmartKey® in Venetian Bronze | 4 | | |
| Philips HUE A19 Single Bulb | 4 | | |
| *GE Link A19 (Quirky Consumer, 2 pack) | 1 | | |
| Lutron Caséta™ Wireless 600 Watt In-Wall Dimmer, White | 1 | | |
| Philips HUE BR30 Single Bulb | 1 | | |
| Z-Wave enabled 1,800VA Scene Capable Switch with LED Locator - White/Ivory/Lt Almond | | | |
| Lutron Caséta™ Wireless Dimmer Kit, White | | | |
| Lutron Pico® Wallplate Bracket | | | |
| Lutron Pico® Remote Control with Wall Mounting Kit, White | | | |
| Philips HUE A19 Lighting Kit | | | |

A-19

*For the purpose of the inventory listed in this Schedule 2.1(e), only GE inventory that has been supplied or acquired for the purpose of selling such products on wink.com should be considered tangible property that will be assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement.

## Additional Computer and Technology Assets

| Asset Name | Type | Date in Service |
|---|---|---|
| NY Kaufman Air / ipod touches for Wink | Computers & Equipment | 8/31/2013 |
| Refuel + Leviton Switch + Rachio + Wink Hub + Lutron Dimmer + tcp | Computers & Equipment | 7/30/2014 |
| GE Appliances for Wink/SF/Normal | Furniture | 7/31/2014 |
| AT1603-BU CAT 6 STR VIP 3FT - Computers & Equipment | Computers & Equipment | 4/16/2014 |
| AT1601-BU CAT 6 STR VIP 1FT - Computers & Equipment - | Computers & Equipment | 4/16/2014 |
| LCLCDUPMM-1M DUPLEX MM 62.5/125 LC/LC1M | Computers & Equipment | 4/16/2014 |
| LCLCDUPMM-10M DUPLEX MM 62.5/125 LC/LC10M | Computers & Equipment | 4/16/2014 |
| WMPFSE HORZ MGR FRONT ONLY 1RU 3.7IN D | Computers & Equipment | 4/16/2014 |
| WMPF1E HORZ MGR FRONT ONLY 2RU 3.7IN D | Computers & Equipment | 4/16/2014 |
| S144 LOW PROFILE WIRE HANGER | Computers & Equipment | 4/16/2014 |
| 55053-703 STANDARD 19IN RACKBLK | Computers & Equipment | 4/16/2014 |
| 10758-701 SM PERIPHERAL SHELF BLK | Computers & Equipment | 4/16/2014 |
| HLS-75R0 VELCRO CABLE TIE 75FT BLACK | Computers & Equipment | 4/16/2014 |
| SURTA3000XL SMART UPS RT 3000VA 120V | Computers & Equipment | 4/16/2014 |
| AP9630 UPS NETWORK MANAGEMENT CARD 2 | Computers & Equipment | 4/16/2014 |
| AP7800 RACK PDU METERED 1U 15A 8 OUTLETS | Computers & Equipment | 4/16/2014 |
| 69586-U48 CAT 6 48 PORT PATCH PANEL | Computers & Equipment | 4/16/2014 |
| FREIGHT SHIPPING COST - Computers & Equipment | Computers & Equipment | 4/16/2014 |
| WS-C3750X-24T-S CAT3750X 24PT DATA IP BASE | Computers & Equipment | 4/16/2014 |
| CON-SNTP-3750X2TS SMARTNET 24Z7X4 CAT3750X 24PT DATA IP B | Computers & Equipment | 4/16/2014 |
| C3KX-NM-1G= CAT3K-X 350W AC P/S - Computers & Equipment | Computers & Equipment | 4/16/2014 |
| C3KX-NM-1G= CAT3K-X 1G NTWK MOD - Computers & Equipment | Computers & Equipment | 4/16/2014 |
| GLC-SX-MMD= 1000BASE-SX SFP XCVR MOD MMF 850NM DOM | Computers & Equipment | 4/16/2014 |
| WS-C2960X-48FPS-L CATALYST 2960-X 48 GIGE POE 740W 4 X 1G | Computers & Equipment | 4/16/2014 |
| CON-SNTP-WSC294SL SMARTNET 24X7X4 CATALYST 2960-X 48 G | Computers & Equipment | 4/16/2014 |
| C2960X-STACK= CAT 2960-X FLEX STACK PLUS STACKING MOD | Computers & Equipment | 4/16/2014 |
| CON-SNTP- WSC224SL Cisco SMARTnet Extended Service | Computers & Equipment | 4/16/2014 |
| ASA5512-K9ASA 5512-X W/ S/W 6GE DATA 1GE MGMT AC | Computers & Equipment | 4/16/2014 |
| CON-SNTP- A12K9SMARTNET 24x7x4 ASA 5512-X W/ S/ | Computers & Equipment | 4/16/2014 |
| L-ASA5512-SEC- PL=ASA 5512-X SEC PLUS LIC HA SEC MORE VLAN | Computers & Equipment | 4/16/2014 |
| AIR-CT2504-15- K92504 WLS CTRL W/ 15 AP LIC - Computers & Equipment | Computers & Equipment | 4/16/2014 |
| CON-SNTP- CT2515SMARTNET 24x7x4 2504 WLS LAN CTRL W/15 | Computers & Equipment | 4/16/2014 |
| AIR-CAP3702I-A- K9802.11AC CTRLR AP 4X4 3SS W/CLEANAIR IN | Computers & Equipment | 4/16/2014 |
| CON-SNTP- 3702IA SMARTNET 8X5XNBD 802.11AC CTRLR AP 4X | Computers & Equipment | 4/16/2014 |
| Network Jacksleviton quick jacks - Computers & Equipment | Computers & Equipment | 4/16/2014 |
| Wall plates Surface mount boxes and/or wall plates | Computers & Equipment | 4/16/2014 |
| CPI InstallationAs Outlined in Professional Services Agreement Quirky In | Computers & Equipment | 4/16/2014 |
| iMacs for CSR - Schenectady | Computers & Equipment | 4/16/2014 |

Section 3.4 of the Disclosure Schedule

Actions

| Title of Action | Court | Nature of Action | Status |
|---|---|---|---|
| Antonio Acebo v. Quirky, Inc. | Arbitration | Alleged royalty payments owing | Pending |
| Fusco Personnel v. Quirky, Inc. | Supreme Court, State of New York, Albany Division | Collection of unpaid invoices | Pending |
| Busy Bee Cleaning Service Corp. v. Quirky, Inc. and Susan Lovaglio | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |
| H.K. Glory Colourboxes & Paper Limited v. Quirky, Inc. | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |
| The Stable Group LLC v. Quirky, Inc. | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |
| Letter from SIPCO, LLC | None | Patent licensing | Letter Received July 7, 2014 |
| Letters from Adapt it Ventures | None | Patent licensing | Emails received February 17, 2015 and January 30, 2015. |
| Planetary Corporation v. Quirky, Inc. | Supreme Court, State of New York, County of New York | Collection of unpaid invoices | Pending |

Schedule 3.5 of the Disclosure Schedule

IP Assets - Licenses and other Interests

1. Andersen- 4/20/2015
2. Bosch- 8/14/2014
3. Carrier- 6/12/2015
4. Chamberlain- 9/5/2014
5. Cree- 8/10/2014
6. Eastfield- 3/24/2015
7. Ecobee- 8/14/2015
8. ETI- 7/13/2015
9. Fibar- 3/30/2014
10. Mattel- 4/10/2015
11. Honeywell- 5/27/2014
12. iHome- 7/23/2015
13. Jasco- 12/10/2014
14. King of Fans- 3/1/2015
15. Kwikset- 6/11/2014
16. Lutron
17. Nortek- 2/8/2015
18. Pella- 9/29/2015
19. Philips- 7/6/2015
20. Rachio- 6/12/2014
21. Rheem- 6/17/2014
22. Ring- 6/5/2015
23. Schlage- 6/13/2014
24. Springs Window Fashions- 6/2/2014
25. Sylvania- 4/9/2015
26. TCP- 6/18/2014
27. Tradewinds- 10/19/2014
28. Canary- 8/26/2015
29. Scout Security
30. Nest- 9/2014
31. Emerson- 4/14/2015
32. Waxman- 9/10/2015
33. Kidde- 6/5/2014
34. Trademark License Agreement by and between Walter Kidde Portable Equipment, Inc. and Wink, Inc., dated June 5, 2014.
35. License Agreement by and between Lutron Electronics, Co., Inc. and Wink, Inc., dated June 10, 2014.
36. Design and Manufacturing Services Agreement, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dates March 7, 2014, as amended by the Source Code License, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated July 16, 2014.
37. Statement of Work – 101 for a Smart Light Switch, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 16, 2014.

38. Statement of Work – 102 for a Smart Hub, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 17, 2014.

39. Flextronics Source License Agreement.

40. Canada Supplier Buying Agreement, by and between the Home Depot and Wink, Inc., dated as of September 10, 2015, as amended.

41. Supplier Buying Agreement, by and between Home Depot, Inc. and Wink, Inc., dated as of September 8, 2015.

42. Return Freight Amendment to the SBA, by and between Home Depot and Wink, Inc., dated as of September 15, 2015.

43. Wink-Amazon Vendor Supply Agreement

44. MDF/Coop Agreement, by and between Amazon Fulfillment Services, Inc. and Wink, Inc., dated as of August 26, 2015.

45. Quirky-Zendesk Agreement

46. Quirky-SumoLogic Agreement

47. Wink-Mixpanel Agreement

48. Quirky-Coordinated Systems Cloud Software License Agreement- 8/29/2014

49. Certain Wink users were unable to access their Wink Hubs when a security certificate expired in April 2015. Wink users who have not had their Wink Hubs  updated may not be able to use the product as it was designed.

50. Reference is made to the Actions listed in Schedule 3.4.

## Schedule 3.6: Material Agreements

1. Trademark License Agreement by and between Walter Kidde Portable Equipment, Inc. and Wink, Inc., dated June 5, 2014.

2. License Agreement by and between Lutron Electronics, Co., Inc. and Wink, Inc., dated June 10, 2014.

3. Design and Manufacturing Services Agreement, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dates March 7, 2014, as amended by the Source Code License, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated July 16, 2014.

4. Statement of Work – 101 for a Smart Light Switch, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 16, 2014.

5. Statement of Work – 102 for a Smart Hub, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 17, 2014.

6. Canada Supplier Buying Agreement, by and between the Home Depot and Wink, Inc., dated as of September 10, 2015, as amended.

7. Supplier Buying Agreement, by and between Home Depot, Inc. and Wink, Inc., dated as of September 8, 2015.

8. Return Freight Amendment to the SBA, by and between Home Depot and Wink, Inc., dated as of September 15, 2015.

9. Wink-Amazon Vendor Supply Agreement

10. MDF/Coop Agreement, by and between Amazon Fulfillment Services, Inc. and Wink, Inc., dated as of August 26, 2015.

11. Flextronics Source License Agreement.

Section 3.9 of the Disclosure Schedule

Leased Real Property

| PROPERTY | ADDRESS | Agreement |
|----------|---------|-----------|
| Schenectady, New York | 433 State Street (also known as 695 Rotterdam Industrial Park) | Lease Agreement by and between Development At Center City, LLC and Quirky, Inc., dated as of February 28, 2014. The Term of the lease is 10 years and 6 months from the commencement date, barring an earlier termination. |
| Terminal Warehouse, New York, New York | 601 West 27th Street | Co-occupancy agreement by and between Quirky, Inc. and Flextronics America, LLC. The term of the co-occupancy is the earlier of (a) two months from September 9, 2015 or (b) until the completion of the bankruptcy case. |

<u>Section 3.10 of the Disclosure Schedule</u>

Insurance Policies

| TYPE | PROVIDER | DATE OF EXPIRATION |
|---|---|---|
| General Liability Only (includes products) | Indian Harbor Insurance Co. | September 1, 2016 |
| Property Only | Great Northern Ins Co (Chubb) | July 1, 2016 |
| Workers Compensation | Federal Insurance Company (Chubb) | July 1, 2016 |
| Automobile Liability (Hired & Non-Owned) | Federal Insurance Company (Chubb) | July 1, 2016 |
| Foreign Package[1] | Great Northern Insurance Co (Chubb) | July 1, 2016 |
| Umbrella Liability | Starr Surplus Lines Insurance Co. | September 1, 2016 |
| Management Risk Package (Director & Officer and Employment Practices Liability) | US Specialty Co. (HCC) | October 20, 2016 |
| Professional Liability | Illinois National Insurance Co. (AIG) | December 31, 2015 |
| ERISA Bond | Federal Insurance Co. (Chubb) | January 4, 2018 |
| Cargo | Allianz Global Corporate & Specialty | November 3, 2016 |
| Customs Bond | American Alternative Insurance Co. | September 26, 2016 |

---

[1] Includes liability coverage for US employees travelling overseas.

<u>Schedule 6.1(h)</u>

None.

## **EXHIBIT B**

Patent Assignment

None.

## **EXHIBIT C**

Trademark and Copyright Assignment

None.

C-1

# **EXHIBIT D**

Bill of Sale and Assignment and Assumption

# BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This **BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "*Agreement*") is entered into as of [●], 2015, by and between **FLEXTRONICS INTERNATIONAL USA INC.**, a California corporation ("*Buyer*") and **WINK, INC.**, a Delaware corporation ("*Wink*"), and **QUIRKY, INC.**, a Delaware corporation ("*Quirky*" and, together with Wink, "*Seller*"). Buyer and Seller are sometimes individually referred to in this Agreement as a "*Party*" and collectively as the "*Parties*." All capitalized terms used but not defined herein have the meanings assigned to them in the Purchase Agreement as defined below.

## W I T N E S S E T H:

**WHEREAS**, pursuant to the terms of the Asset Purchase Agreement, dated as of September 21, 2015, by and among Buyer and Seller (the "*Purchase Agreement*"), Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, the Purchased Assets;

**WHEREAS**, pursuant to the terms of the Purchase Agreement, in connection with the purchase of the Purchased Assets, Buyer has agreed to assume the Assumed Liabilities; and

**WHEREAS**, the Parties wish formally to acknowledge such sale, assignment and assumption.

**NOW, THEREFORE**, for good and valuable consideration paid by Buyer to Seller, the receipt and sufficiency of which are hereby acknowledged, pursuant to the terms of the Purchase Agreement, Seller and Buyer hereby agree as follows:

1.    Purchase and Sale of Assets.  Subject to the terms and conditions set forth in the Purchase Agreement, Seller does hereby sell, convey, assign, transfer and deliver to Buyer all right, title and interest of Seller in and to all of the Purchased Assets, free and clear of all Interests thereon.  Notwithstanding anything to the contrary contained herein, the Excluded Assets are specifically excluded from the Purchased Assets sold, conveyed, assigned, transferred or delivered to Buyer hereby and are retained by Seller.

2.    Assumption of Liabilities.  Subject to the terms and conditions set forth in the Purchase Agreement, Seller hereby assigns the Assumed Liabilities to Buyer and Buyer hereby assumes and agrees to pay, perform and discharge when due the Assumed Liabilities. Notwithstanding anything to the contrary contained herein, the Excluded Liabilities are specifically excluded from the Assumed Liabilities assumed by Buyer hereby and are retained by Seller.

3.    Conflicts with Purchase Agreement.  Each party acknowledges and agrees that neither the representations and warranties nor the rights, remedies or obligations of any party under the Purchase Agreement shall be deemed to be enlarged, modified or altered in any way by this Agreement.  In the event of any conflict or inconsistency between the terms of this Agreement and the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

4.    Entire Agreement. This Agreement and the Purchase Agreement contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way.

5.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall

constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

6.      <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules). All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.

7.      <u>No Modifications</u>.  No modification of this Agreement shall be binding unless in writing and signed by the Party or Parties against which it is sought to be enforced.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**WINK, INC.**

By: _____
Name:
Title:

**QUIRKY, INC.**

By: _____
Name:
Title:

**FLEXTRONICS INTERNATIONAL USA INC.**

By: _____
Name:
Title:

## **EXHIBIT E**

Power of Attorney

## POWER OF ATTORNEY

Each of the undersigned (referred to herein as "**Seller**"), hereby irrevocably designates, makes, constitutes and appoints **FLEXTRONICS INTERNATIONAL USA INC.**, a California corporation (together with its successors and assigns, the "**Purchaser**"), acting by and through its authorized representatives, as Seller's lawful agent and attorney-in-fact, with full power of substitution, to act in the name of Seller, to implement any provision of that certain Asset Purchase Agreement dated as of September 21, 2015, by and between the Seller and the Purchaser (the "Asset Purchase Agreement") and to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets (as defined in the Asset Purchase Agreement), including without limitation to execute and deliver, or cause to be executed and delivered, such assignments, bills of sale, consents and other instruments and take all such other actions as Purchaser may reasonably deem necessary or desirable to more effectively transfer to and vest in Purchaser, ownership in, and to put Purchaser in possession of, all of the Purchased Assets, in each case to the extent that Seller has failed for any reason to execute and deliver such documentation for a period of five (5) business days following Seller's receipt of written request therefor.

Any person or entity shall have the absolute right and authority to rely on this Power of Attorney, and any acts taken or omitted to be taken by Purchaser pursuant to this Power of Attorney, and shall have no duty to inquire as to the underlying circumstances entitling Purchaser to act hereunder.

This power of attorney shall be effective upon execution by the Seller.  Any photocopy of this Power of Attorney, certified to be true and correct by the Purchaser, shall have the same legal force and effect as an original.

This Power of Attorney and the rights and authority granted hereunder are durable, irrevocable and coupled with an interest, and shall survive and not be affected in any way by the dissolution of Seller.

Purchaser shall have the right by written instrument to delegate any or all of the foregoing powers to any person or entity whom Purchaser may select.

121862342 v1

IN WITNESS WHEREOF, each of the undersigned has executed this Power of Attorney as of _____, 2015.

**WINK, INC.**

By: _____
Name:
Title:

STATE OF _____
COUNTY OF _____

On this __ day of _____ 2015, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of Wink, Inc., who is duly authorized to execute this Assignment on behalf of Wink, Inc. and who signed and executed the foregoing instrument on behalf of Wink, Inc.

Notary Public: _____
My Commission Expires: _____

**QUIRKY, INC.**

By: _____
Name:
Title:

STATE OF _____
COUNTY OF _____

On this __ day of _____ 2015, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of Quirky, Inc., who is duly authorized to execute this Assignment on behalf of Quirky, Inc. and who signed and executed the foregoing instrument on behalf of Quirky, Inc.

Notary Public: _____
My Commission Expires: _____

*Signature Page to Power of Attorney*

121862342 v1

**<u>EXHIBIT F</u>**

Intellectual Property Assignment

# INTELLECTUAL PROPERTY ASSIGNMENT

This **INTELLECTUAL PROPERTY ASSIGNMENT** (the "*IP Assignment*"), dated as of [●], 2015, is entered into by and among **WINK, INC.**, a Delaware corporation ("*Wink*"), and **QUIRKY, INC.**, a Delaware corporation ("*Quirky*" and, together with Wink, the "*Assignor*") and **FLEXTRONICS INTERNATIONAL USA INC.**, a California corporation (the "*Assignee*").

## RECITALS:

**WHEREAS**, pursuant to the terms and conditions of an Asset Purchase Agreement, dated as of September 21, 2015 (the "*Asset Purchase Agreement*"), by and between the Assignor, Assignee and the other parties thereto, the Assignor wishes to sell, transfer, convey, assign and deliver to the Assignee, and the Assignee has agreed to acquire and accept, all of the Assignor's right, title and interest in and to the IP Assets of the Assignor and all of the related Intellectual Property Rights, all on the terms and subject to the conditions set forth in the Asset Purchase Agreement (capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the Asset Purchase Agreement);

**WHEREAS**, the IP Assets include all Copyright Rights, Software, Trademark Rights, Patent Rights, Documentation, Trade Secrets, Domain Names and Web Sites;

**WHEREAS**, the Assignee wishes to acquire, and the Assignor wishes to transfer all right, title and interest in and to the IP Assets of the Assignor and the related Intellectual Property Rights;

**WHEREAS,** in connection with the Closing, Assignee and Assignor have entered into that certain Bill of Sale and Assignment and Assumption Agreement, dated as of even date herewith, (the "*Bill of Sale*") pursuant to which, among other things, the parties consummated the sale, conveyance, assignment, transfer and delivery to Assignee of the Purchased Assets including the IP Assets of the Assignor and all of the related Intellectual Property Rights; and

**WHEREAS,** Assignor and Assignee now desire to enter into this IP Assignment for the purpose of recording the sale, conveyance, assignment, transfer and delivery to Assignee of the IP Assets of the Assignor and all of the related Intellectual Property Rights with any applicable Governmental Entity worldwide.

**NOW, THEREFORE**, for good and valuable consideration, including the consideration set forth in the Asset Purchase Agreement and the Bill of Sale, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment. Assignor hereby irrevocably sells, assigns, transfers, conveys and delivers to Assignee without any restrictions, limitations or reservations, and Assignee hereby accepts the sale, assignment, transfer, conveyance and delivery of, all of Assignor's right, title and interest in and to the IP Assets and related Intellectual Property Rights, including, without limitation:

(a)      the Trademarks listed on **Exhibit A** and all Trademark Rights associated therewith;

(b)      the Patents listed on **Exhibit B** and all Patent Rights associated therewith; and

(c)      the Domain Names and Web Sites (including all sub-domains and related URLs) listed on **Exhibit C** and all Intellectual Property Rights in and to such Domain Names and Web Sites;

(d)      all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world; and

(e)      any and all rights to the IP Assets included in the Purchased Assets , including without limitation those set forth in Sections 2.1(a) and 2.1(b) of the Asset Purchase Agreement.

2.      <u>Authorization</u>. Assignor hereby authorizes and requests the Commissioner of Patents of the United States, the Commissioner of Trademarks of the United States, the Librarian of Congress of the United States and any other official of any applicable Governmental Entity worldwide and each registrar of a Domain Name or Web Site, to record all registrations and applications for registration included in such IP Assets and Intellectual Property Rights in the name of Assignee and issue any and all registrations from any and all applications for registration included in such IP Assets and Intellectual Property Rights to and in the name of Assignee.

3.      <u>Further Assurances</u>. The Assignor agrees to execute all documents necessary to perfect, register, and/or record this IP Assignment and the rights of the Assignee to the IP Assets and the related Intellectual Property Rights as the Assignee reasonably deem appropriate provided, however, that the Assignee shall not be obligated to pay any material consideration or incur any material costs in connection therewith.  If the Assignor does not, within five (5) business days of presentment by the Assignee of documents necessary to register the transfer to the Assignee of the rights of the Assignor in and to the IP Assets and the related Intellectual Property Rights, execute and return such documents to the Assignee, then the Assignee is hereby granted a limited power of attorney to execute such documents on behalf of the Assignor.  This power of attorney is coupled with an interest and is irrevocable.

4.      <u>Interpretation</u>.  This IP Assignment has been executed and delivered by the Assignor for the purpose of recording the sale, conveyance, assignment, transfer and delivery to Assignee of the IP Assets and the related Intellectual Property Rights with any applicable Governmental Entity worldwide. This IP Assignment is intended to implement the provisions of the Asset Purchase Agreement and the Bill of Sale, is expressly subject to the terms and conditions thereof, and shall not be construed to enhance, extend or limit the representations and warranties, rights, obligations or remedies of any party thereunder. In the event of any conflict or inconsistency between the terms of this IP Assignment and the terms and conditions of the Asset Purchase Agreement or the Bill of Sale, the terms and conditions of the Asset Purchase Agreement or the Bill of Sale, as the case may be, shall govern.

5.      <u>Successors and Assigns</u>. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.      <u>Counterparts</u>.  This IP Assignment may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and any such executed counterpart may be delivered by transmission of the manually signed document by facsimile transmission or in "pdf" form delivered by electronic mail, and such facsimile or "pdf" representation of such manual signature shall constitute execution thereof.

7.      <u>Governing Law; Jurisdiction</u>. This IP Assignment shall be governed by and construed in accordance with the internal laws of the State of New York (i.e., without regard to its conflicts of law rules).  All disputes arising out of or related to this IP Assignment, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable.  If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this IP Assignment, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Southern District of New York.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this IP Assignment to be duly executed as of the day and year first above written.


**WINK, INC.**

By: _____
Name:
Title:


STATE OF _____
COUNTY OF _____

On this __ day of _____ 2015, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of Wink, Inc., who is duly authorized to execute this Assignment on behalf of Wink, Inc. and who signed and executed the foregoing instrument on behalf of Wink, Inc.


Notary Public: _____
My Commission Expires: _____


**QUIRKY, INC.**

By: _____
Name:
Title:


STATE OF _____
COUNTY OF _____

On this __ day of _____ 2015, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of Quirky, Inc., who is duly authorized to execute this Assignment on behalf of Quirky, Inc. and who signed and executed the foregoing instrument on behalf of Quirky, Inc.


Notary Public: _____
My Commission Expires: _____

**FLEXTRONICS INTERNATIONAL USA INC.**

By:    _____

Name:

Title:

STATE OF _____

COUNTY OF _____

On this __ day of _____ 2015, before me, a Notary Public in and for the State and County foresaid, personally appeared _____, known by me to be the person above named and an officer of Flextronics International USA Inc., who is duly authorized to execute this Assignment on behalf of Flextronics International USA Inc. and who signed and executed the foregoing instrument on behalf of Flextronics International USA Inc.

Notary Public: _____

My Commission Expires: _____

## Exhibit A


Trademarks

## **Exhibit B**

Patents

**<u>Exhibit C</u>**

Domain Names and Web Sites
(including all sub-domains and related URLs)

## **EXHIBIT G**

Domain Name Transfer Form

None.

**<u>EXHIBIT H</u>**

Sale Approval Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                            :
In re                                   :   Chapter 11
                                         :
QUIRKY, INC., *et al.*[1]           :
                                       :   Case No. 15-12596 (MG)
       Debtors.              :
                                       :   (Jointly Administered)
                                       :
---------------------------------------------------------------- x

**ORDER AUTHORIZING (I) THE SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATED
TO THE WINK BUSINESS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES,
RIGHTS, INTERESTS AND ENCUMBRANCES, (II) THE DEBTORS TO ENTER INTO AND
PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (III) THE
DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

**The "Wink Sale Order"**

Upon the motion (the "Wink Sale Motion")[2] of Quirky, Inc. and its debtor affiliates

(collectively, the "Debtors"), for entry of an order, pursuant to sections 105(a), 363, 365, 503 and

507 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1,

6004-1 and 6006-1 of the Local Rules for the Southern District of New York (the "Local Rules")

authorizing and approving the following:

    (i)      the sale of the Wink Assets (as defined below);

    (ii)     the entry into, performance under and terms and conditions of the Asset
            Purchase Agreement dated as of September 21, 2015 (collectively with all
            related agreements, amendments, documents or instruments and all exhibits,
            schedules and addenda to any of the foregoing, the "Wink Agreement"),
            substantially in the form attached hereto as **Exhibit A**, whereby the Debtors have

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

[2] Unless indicated otherwise, capitalized terms used but not defined herein have the meanings ascribed to them in the Wink Sale Motion or the Wink Agreement (as defined below), as applicable.

agreed to sell, and Flextronics International USA Inc. (the "<u>Buyer</u>")[3] has agreed to buy, certain of the Debtors' assets (specifically as set forth and defined in the Wink Agreement, the "<u>Wink Assets</u>"), free and clear of all Claims (as defined below), liabilities, rights, interests, setoff rights and encumbrances, and where the Debtors have agreed to transfer and the Buyer has expressly agreed to assume certain specified liabilities of the Debtors (specifically as set forth and defined in the Wink Agreement, the "<u>Assumed Liabilities</u>") (collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Wink Agreement, the "<u>Transactions</u>");

(iii)    the assumption by and assignment to the Buyer of certain executory contracts and unexpired leases of the Debtors designated for assumption and assignment as Assumed Contracts in accordance with this Order, the Wink Bidding Procedures Order (defined below) and the Wink Agreement (collectively, the "<u>Assumed Contracts</u>"); and

(iv)    other related relief;

and the Court having entered an order approving the bidding procedures and granting certain related relief on October 9, 2015 [Docket No. 86] (the "<u>Wink Bidding Procedures Order</u>"); and any auction having been conducted in accordance with the Wink Bidding Procedures Order (the "<u>Auction</u>"); and the Buyer having submitted the highest or otherwise best offer for the Wink Assets; and the Court having conducted a hearing on the Wink Sale Motion on November 6, 2015 (the "<u>Sale Hearing</u>") at which time all interested parties were offered an opportunity to be heard with respect to the Wink Sale Motion; and the Court having reviewed and considered the Wink Sale Motion, the Wink Agreement, the Wink Bidding Procedures Order, the record of the hearing before the Court on October 8, 2015 at which the Wink Bidding Procedures Order was approved; and all objections to the Transactions and the Wink Agreement filed in accordance with the Wink Bidding Procedures Order; and the appearance of all interested parties and all responses and objections to the Wink Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and having heard statements of counsel and the evidence presented in support of the relief requested in the Wink Sale Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and all objections and

---

[3] Buyer may assign its rights hereunder or take title to some or all of the Wink Assets through one or more affiliated entities.

responses to the relief requested in the Wink Sale Motion having been heard and overruled, continued or resolved on the terms set forth in this Order, and it appearing that due notice of the Wink Sale Motion, the Wink Agreement, the Wink Bidding Procedures Order and the Auction having been provided; and it appearing that the relief requested in the Wink Sale Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Wink Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:[4]**

**Jurisdiction, Venue and Final Order**

A.     This Court has jurisdiction to hear and determine the Wink Sale Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d) and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of this Order as set forth herein.

**Notice of the Transactions, Wink Agreement, Sale Hearing, Auction and the Cure Amounts**

C.     On September 22, 2015 (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  Since the Petition Date, the Debtors have continued in possession and

---

[4] All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Wink Sale Motion are hereby incorporated to the extent not inconsistent herewith.

management of their businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

D.      As evidenced by the affidavits of service previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Wink Sale Motion, the Auction, the Sale Hearing, the Wink Agreement and the Transactions has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rules 2002-1 and 6004-1.   The Debtors have complied with all obligations to provide notice of the Wink Sale Motion, the Auction, the Sale Hearing, the Wink Agreement and the Transactions as required by the Wink Bidding Procedures Order.   The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Wink Sale Motion, the Auction, the Sale Hearing, the Wink Agreement or the Transactions is or shall be required.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Wink Sale Motion was afforded to all interested persons and entities.

F.      In accordance with the Wink Bidding Procedures Order, the Debtors have served a notice (as amended, modified or otherwise supplemented from time to time, the "<u>Assumption and Assignment Notice</u>") of the potential assumption and assignment of the Assumed Contracts and of the proposed amounts necessary to cure monetary defaults under the Assumed Contracts (the "<u>Cure Amounts</u>") upon each non-Debtor counterparty to an Assumed Contract. As evidenced by the affidavits of service previously filed with this Court, and based on the representations of Debtors' counsel at the Sale Hearing, the service and provision of the Assumption and Assignment Notice was good, sufficient and appropriate under the circumstances and no further notice is or shall be required in respect of assumption and assignment of the Assumed Contracts or establishing a Cure Amount for the respective Assumed Contracts.

G.      Non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to or to be heard regarding assumption and assignment of the applicable Assumed Contracts and the Cure Amount set forth in the Assumption and Assignment Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code).  The deadline to file an objection to the assumption and assignment to the Buyer of any Assumed Contract (a "Contract Objection") has expired, and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any such party did not timely file a Contract Objection by the Contract Objection deadline, such party is deemed to have consented to (i) the assumption and assignment of the Assumed Contracts pursuant to the terms of this Order; and (ii) the proposed Cure Amount set forth on the Assumption and Assignment Notice.

**Marketing Process**

H.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors and their professionals have complied in all respects with the Wink Bidding Procedures Order.  The Debtors and their professionals have, under the circumstances, adequately and appropriately marketed the Wink Assets.  The bidding process was duly noticed and conducted in a diligent, non-collusive, fair and good faith manner, and the bidding process set forth in the Wink Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to qualify as a bidder, participate in the Auction and to make a higher or otherwise better offer to purchase the Wink Assets.  The Debtors (i) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Wink Assets, and (ii)

considered any bids submitted on or before the deadline established by the Court for the submission of bids.

I.       The Buyer is the Successful Bidder for the Wink Assets in accordance with the Wink Bidding Procedures Order.  The Buyer and its representatives have complied in all respects with the Wink Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Wink Agreement, and the sale and the Wink Agreement likewise comply with the Wink Bidding Procedures Order and all other applicable orders of this Court.

**Highest or Otherwise Best Offer; Business Judgment**

J.       The Wink Agreement, including the form and total consideration to be realized by the Debtors under the Wink Agreement, (i) constitutes the highest or otherwise best offer received by the Debtors for the Wink Assets; (ii) is fair and reasonable; and (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

K.       The Debtors' determination that the consideration provided by the Buyer under the Wink Agreement constitutes the highest or otherwise best offer for the Wink Assets constitutes a valid and sound exercise of the Debtors' business judgment.

L.       Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transactions and the performance of their obligations under the Wink Agreement, including, but not limited to, the fact that (i) the consideration provided by the Buyer under the Wink Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Wink Assets; and (ii) unless the sale is concluded expeditiously as provided for in the Wink Sale Motion and pursuant to the Wink Agreement, recoveries of creditors will be diminished.

**Good Faith; Arms' Length Sale**

M.      The sale process engaged in by the Debtors, including, without limitation, the Wink Bidding Procedures set forth in the Wink Bidding Procedures Order and the negotiation of the Wink Agreement, was at arms' length, non-collusive, in good faith, for fair value and substantively and procedurally fair to all parties.

N.      The Debtors, the Buyer and their respective representatives have complied, in good faith, in all respects with the Wink Bidding Procedures Order.

O.      The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with these proceedings.  None of the Debtors or the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.

P.      The Wink Agreement and the Transactions contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and the Buyer without collusion, and none of the Debtors or the Buyer has engaged in any conduct that would cause or permit the Wink Agreement or the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

Q.      Neither the Buyer nor any of its affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling shareholders exists between the Debtors and the Buyer.

R.      The Wink Agreement was not entered into, and none of the Debtors or the Buyer has entered into the Wink Agreement or proposes to consummate the Transactions, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors.  None of the Debtors or the Buyer is entering into the Wink Agreement, or proposing to consummate the

7

Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

S.      The form and total consideration to be realized by the Debtors under the Wink Agreement constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Wink Assets.

### Corporate Authority

T.      The Debtors (i) have full corporate or other power to execute, deliver and perform their obligations under the Wink Agreement and all other Transactions contemplated thereby, and entry into the Wink Agreement has been duly and validly authorized by all necessary corporate or similar action; (ii) have all of the corporate or other power and authority necessary to consummate the Transactions contemplated by the Wink Agreement; and (iii) have taken all actions necessary to authorize and approve the Wink Agreement and the Transactions contemplated thereby.   No consents or approvals, other than those expressly provided for herein or in the Wink Agreement, are required for the Debtors to consummate such Transactions.

### Section 363 Is Satisfied

U.      The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code.   Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Wink Sale Motion.

V.      The Wink Assets constitute property of the Debtors' estates and exclusive title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

W.     The sale of all Wink Assets to the Buyer under the terms of the Wink Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the sale of the Wink Assets will be free and clear of any and all Claims, and except as expressly provided in the Wink Agreement with respect to Assumed Liabilities, the (i) transfer of the Wink Assets to the Buyer and (ii) assumption by and/or assignment to the Buyer of the Assumed Contracts will be free and clear of all Claims and will not subject the Buyer or any of the Buyer's assets to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, setoff, or successor or transferee liability).   All holders of Claims who did not object, or withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code.   All holders of Claims are adequately protected – thus satisfying section 363(e) of the Bankruptcy Code – by having their Claims, if any, attach to the proceeds of the Transactions ultimately attributable to the property against or in which they assert a Claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Transactions, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

X.     The Buyer would not have entered into the Wink Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if the sale of the Wink Assets was not free and clear of all Claims or if the Buyer would, or in the future could, be liable for any Claims, including, without limitation and as applicable, certain liabilities that expressly are not assumed by the Buyer as set forth in the Wink Agreement or in this Order.   The Buyer asserts that it will not consummate the Transactions unless the Wink Agreement specifically provides, and this Court specifically orders, that none of the Buyer, its assets or the Wink Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity,

9

whether by payment, setoff or otherwise, directly or indirectly, any (i) Claim, or (ii) any successor or transferee liability for any of the Debtors other than the Assumed Liabilities.

Y.      The Buyer is not a successor to the Debtors or their respective estates by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their respective estates, except as otherwise expressly provided in the Wink Agreement or this Order.   The Buyer is not a continuation of the Debtors or their respective estates and there is no continuity between the Buyer and the Debtors.   The Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or *de facto* merger of the Buyer and the Debtors.

Z.      The transfer of the Wink Assets to the Buyer under the Wink Agreement will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Wink Assets free and clear of all Claims (other than Assumed Liabilities). The transfer of the Wink Assets to the Buyer will vest the Buyer with good and marketable title to the Wink Assets.

AA.     There is no legal or equitable reason to delay the Transactions.   The Transactions must be approved and consummated promptly in order to preserve the value of the Debtors' assets.   All factual predicates to the waiver of any stay of this Order under Bankruptcy Rules 6004(h) and 6006(d) have been satisfied.

BB.     The Debtors have demonstrated both (i) good, sufficient and sound business judgment, purposes and justifications; and (ii) compelling circumstances for the Transactions pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, absent the immediate consummation of the Transactions, the value of the Debtors' assets will be harmed.   To maximize the value of the Wink Assets, it is essential that the Transactions occur within the timeframe set forth in the Wink Agreement.   Time is of the essence in consummating the Transactions.

CC.    Entry into the Wink Agreement and consummation of the Transactions do not constitute a *sub rosa* chapter 11 plan.

**Assumption and Assignment of the Assumed Contracts**

DD.    The assumption and assignment of the Assumed Contracts (as such Assumed Contracts may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and the Buyer) that are designated for assumption and assignment pursuant to the terms of this Order and the Wink Agreement is integral to the Wink Agreement, does not constitute unfair discrimination, is in the best interests of the Debtors, their estates, their creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

EE.    No section of any Assumed Contract which purports to prohibit, restrict, or condition the use, consideration or assignment of any such Assumed Contract in connection with the Transactions shall have any force or effect.

FF.    The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  Pursuant to the Wink Agreement, the amounts in the Cure Cost Escrow have (a) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Assumed Contracts is free and clear of all Claims against the Buyer.

GG.    The Buyer has demonstrated adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the

Assumed Contracts to be assumed and assigned under the Wink Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

HH.    No monetary or non-monetary defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Amount or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.   In accordance with the terms set forth in the Wink Agreement, the Cure Amount for each of the Assumed Contracts shall be paid from the Cure Cost Escrow *provided, however,* the Debtors shall provide the Official Committee of Unsecured Creditors (the "Committee") with five (5) business days' notice of the specific Cure Amounts to be paid and the Committee shall be entitled to seek appropriate relief from the Court in the event of a dispute regarding payment of any proposed Cure Amounts.  The Committee does not object to the currently scheduled Cure Amounts payable Sumologic or Development City Lease or the revised Cure Amounts payable to Home Depot USA, Inc. in the amount of $178,531.00, and has agreed to the treatment of Flex's claim in Paragraph 25 below.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

**General Provisions**

1.    The Wink Sale Motion is granted to the extent provided herein.

2.    Any objections to the Wink Sale Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled on the merits or denied with prejudice.   All persons and entities given notice of the Wink Sale Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including, without limitation, all non-Debtor counterparties to the Assumed Contracts.

3.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.    To the extent any of the findings of fact constitute conclusions of law, they are adopted as such.    To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Approval of the Wink Agreement**

4.        The Wink Agreement, all of the terms and conditions thereof, and consummation of all of the Transactions contemplated therein, are authorized and approved in all respects pursuant to section 363(b) of the Bankruptcy Code.    The failure specifically to include any particular provision of the Wink Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Wink Agreement be authorized and approved in its entirety.

5.        The Debtors and their respective officers, employees and agents are authorized and directed to (a) take any and all actions necessary, appropriate or reasonably requested by the Buyer to perform, consummate, implement and close the Transactions, including, without limitation, (i) the sale to the Buyer of all Wink Assets, in accordance with the terms and conditions set forth in the Wink Agreement and this Order, and (ii) executing, acknowledging and delivering such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying and confirming to the Buyer, or reducing to possession, the Wink Assets, including any further cooperation after the Closing pursuant to the Wink Agreement; and (b) to assume and assign any and all Assumed Contracts.    The Debtors are further authorized to pay, without further order of this Court, whether before, at or after the Closing, any expenses or costs that are required to be paid in order to consummate the Transactions or perform their obligations under the Wink Agreement; *provided, however*, that any amounts that become payable by the Debtors to the Buyer other than those set forth in Paragraph 25 of this Order shall be subject to further order of the Court after notice and a hearing.

6.       All persons and entities are prohibited and enjoined from taking any action to prevent, adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Wink Assets to the Buyer in accordance with the Wink Agreement and this Order.

**Sale and Transfer Free and Clear of Claims**

7.       Except as otherwise expressly provided in the Wink Agreement and the terms of this Order with respect to Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Wink Assets shall be sold free and clear of all claims, liens (including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees (if any) under section 365(n) of the Bankruptcy Code or any similar statute, rights of tenants and subtenants (if any) under section 365(h) of the Bankruptcy Code or any similar

statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases (but, for the avoidance of doubt, in each case arising from the ownership of the Wink Assets or the operation of the business prior to the Closing Date), and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability or related theories (all of the foregoing collectively being referred to in this Order as "Claims", and, as used in this Order, the term "Claims" includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), with all such Claims to attach to the proceeds of the Transactions to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Wink Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

8.      At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Wink Assets shall be immediately vested in the Buyer pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims, except for Assumed Liabilities.  Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Buyer with good and marketable title to, the Wink Assets.  All person or entities, presently or on or after the Closing, in possession of some or all of the Wink Assets are directed to surrender possession of the Wink Assets to the Buyer or its designees on the Closing or at such time thereafter as the Buyer may request.  In full resolution of the objection filed by the General Electric related entities ("GE"), (i) GE has agreed that Buyer shall acquire title to the light bulb inventory identified on Schedule 2.1(e) of the Wink Agreement on a free and clear basis; (ii) Schedule 2.1(a)(ii) of the Wink Agreement shall be modified to include a

footnote to "link-hub, link hub firmware" that states "For the purpose of Software listed in this Schedule 2.1(a)(ii), only Software that enables interoperability between the link hub and the Wink platform"; and (iii) GE has no claim to any intellectual property or other rights in the Wink Relay or the Wink Hub.

9.      Section 2.2(g) (Excluded Assets) of the Wink Agreement is deleted in its entirety and replaced with the following:

> All causes of action that the Seller may hold against any current or former director, officer or employee of Seller for breach of fiduciary duty or claims of a similar nature, provided that any such causes of action, whenever arising, that may be asserted against a director, officer or employee of Seller who becomes a director, officer, or employee of the Purchaser may be asserted against such Person solely to the extent of available insurance proceeds and may not be asserted to recover from the personal assets of such Person.

10.     Notwithstanding anything to the contrary in this Order or the Wink Agreement, the Purchased Assets shall not include any of the Products (as defined in the Quirky Sale Motion)[5] regardless of whether the Products operate on the Wink platform.  For sake of clarity, the Wink Relay and Wink Hub products are not Products under the Quirky Sale Motion.

11.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons

---

[5] The "Quirky Sale Motion" shall mean the Debtors' Motion for Entry of (i) an Order (a) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets Related to the Business of Quirky, Inc., (b) Approving Procedures for Assumption and Assignment of Executory Contracts, (c) Approving the Form and Manner of Notice, and (d) Scheduling an Auction and a Sale Hearing; and (ii) an Order Authorizing and Approving the Sale of Assets of Quirky, Inc. filed with the Court on October 1, 2015 (Docket No. 61).

and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Wink Agreement.  The Wink Assets are sold free and clear of any reclamation rights.

12.    Except as otherwise expressly provided in the Wink Agreement with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtors or the Wink Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or affiliates, the Wink Assets, the ownership, sale or operation of the Wink Assets and the business prior to Closing or the transfer of the Wink Assets to the Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Buyer, its successors or assigns, their property or the Wink Assets.  Following the Closing, no holder of any Claim shall interfere with the Buyer's title to or use and enjoyment of the Wink Assets based on or related to any such Claim, or based on any action the Debtors may take in the Chapter 11 Cases.

13.    If any person or entity that has filed financing statements, mortgages, mechanic's Claims, *lis pendens* or other documents or agreements evidencing Claims against or in the Wink Assets shall not have delivered to the Debtors prior to the Closing of the Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims (other than the Assumed Liabilities) that the person or entity has with respect to the Wink Assets, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Wink Assets; (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims

17

against the Buyer and the applicable Wink Assets; and (c) the Buyer may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims with respect to the Wink Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.  Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Wink Assets free and clear of Claims shall be self-executing, and none of the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

14.    To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Wink Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

15.    No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Wink Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Transactions to the extent that any such action by a governmental unit or any representative thereof would violate section 525 of the Bankruptcy Code.

**No Successor or Transferee Liability**

16.    The Buyer shall not be deemed, as a result of any action taken in connection with the Wink Agreement, the consummation of the Transactions contemplated by the Wink Agreement, or the transfer or operation of the Wink Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as

18

an assignee under the Assumed Contracts arising after the Closing); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), WARN (defined below), CERCLA (defined below), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (the "NLRA"), environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

17.    Other than as expressly set forth in the Wink Agreement with respect to Assumed Liabilities, the Buyer shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Wink Assets or (b) any Claims against the Debtors or any of their predecessors or affiliates.  The Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor

19

and employment or products liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Wink Assets prior to the Closing.  The Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 *et seq.*) ("WARN") or the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of the Buyer's purchase of the Wink Assets or assumption of the Assumed Liabilities by the Buyer.

18.     Except as otherwise provided in the Wink Agreement, nothing in this Order or the Wink Agreement shall require the Buyer to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

19.     Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, or its assets (including the Wink Assets), with respect to any (a) Claim (other than an Assumed Liability) or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any

manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Wink Assets or conduct any of the businesses operated with such assets.

### Good Faith; Arms' Length Sale

20.     The Wink Agreement has been negotiated and executed, and the Transactions contemplated by the Wink Agreement are and have been undertaken, by Debtors, the Buyer and their respective representatives at arms' length, without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code.   Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Transactions (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of the sale are duly and properly stayed pending such appeal.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

21.     None of the Debtors or the Buyer has engaged in any conduct that would cause or permit the Wink Agreement or the Transactions to be avoided or costs, or damages or costs, to be imposed, under section 363(n) of the Bankruptcy Code.  The consideration provided by the Buyer for the Wink Assets under the Wink Agreement is fair and reasonable, and the Transactions may not be avoided under section 363(n) of the Bankruptcy Code.

### Assumption and Assignment of Assumed Contracts and Resolution with Flex

22.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors are authorized and directed to assume and assign to the Buyer each of the Assumed Contracts

upon the Closing of the Transactions, free and clear of all Claims (other than Assumed Liabilities).   The payment of the Cure Amounts from the Cure Cost Escrow under the Wink Agreement (a) cures all monetary and non-monetary defaults existing thereunder as of the Closing Date;  (b) compensates the applicable non-Debtor counterparties for any actual pecuniary loss resulting from such default; and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to the Buyer, constitutes adequate assurance of future performance thereof.

23.      To the extent that any counterparty to an Assumed Contract did not timely file a Contract Objection by the Contract Objection deadline, such counterparty is deemed to have consented to (i) the assumption and assignment of the Assumed Contract pursuant to the terms of this Order; and (ii) the proposed Cure Amounts set forth on the Assumption and Assignment Notice.   If Buyer elects not to assume any Assumed Contract currently designated for assumption prior to the Closing or designates any additional contract as an Assumed Contract that is not currently designated for assumption and assignment pursuant to the Agreement, Debtors shall advise the applicable contract counterparty of that change with notice to the Committee.

24.      Any provision in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the non-Debtor counterparty to such Assumed Contract to impose any penalty, fee, rent increase, profit sharing arrangement or other condition on renewal or extension, or to modify any term or condition upon the assignment of such Assumed Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right,

title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts shall remain in full force and effect for the benefit of the Buyer.

25.    Upon the Closing, and in full and final satisfaction of all prepetition and postpetition amounts owing under the following agreements: Design and Manufacturing Services Agreement dated March 17, 2014 by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P) Ltd. ("Flex"); Source Code License, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated July 16, 2014; Statement of Work – 101 for a Smart Light Switch, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 16, 2014; Statement of Work – 102 for a Smart Hub, by and between Quirky, Inc. and Flextronics Sales and Marketing (A-P), Ltd., dated April 17, 2014, (i) Flex shall receive a dollar for dollar credit (or payment) of $1,000,000 from the Purchase Price at Closing; and (ii) Flex shall be granted an allowed general unsecured claim in the amount of $3,500,000 against the Quirky, Inc. bankruptcy estate (or all estates if they are ultimately substantively consolidated).  In connection therewith, the Cure Amount originally scheduled by the Debtors in the amount of $18,493,552 shall be reduced by the $1,000,000 payment contemplated above and further reduced by an additional $13,993,552 million ($18,493,552 - $1,000,000 - $13,993,552 = $3,500,000).  In addition, prior to Closing, the Debtors shall pay Flex and its affiliates on account of all post-petition product delivered in the ordinary course of business, engineering and other services performed in the ordinary course of business and any other post-petition amounts due to Flex through the date of the Closing in the ordinary course of business and provide a calculation thereof to Flex.

26.    Effective upon Closing, (a) each of the bankruptcy estates and the Debtors, on behalf of themselves and any party who may claim derivatively through them and any subsequent trustees or examiners (collectively, the "Estates"), shall forever release and acquit Flex Sales and Marketing (A-P) Ltd. and its affiliates (including, without limitation, Flex International USA, Inc.) and their respective officers, directors, members, managers, agents,

23

consultants, representatives, professionals, attorneys, shareholders, employees, predecessors and affiliated parties (in each case solely in their respective capacities, the "Flex Related Parties") from all actions, causes of action, suits, debts, accounts, reckonings, sums of money, bills, covenants, contract, controversies, agreements, promises, damages, claims, judgments, avoidance actions and demands whatsoever, known or unknown, in law or equity, which any of the Estates may have against Flex or the Flex Related Parties (solely in their capacity as such) of any nature whatsoever, from the beginning of time through the date of the Closing (provided that nothing herein shall release rights granted under this Order or the Wink Agreement); and (b) Flex and the Flex Related Parties shall forever release and acquit the Estates, the Committee, and their respective officers, directors, members, managers, agents, consultants, representatives, professionals, attorneys, shareholders, employees, predecessors and affiliated parties (in each case solely in their respective capacities, the "Estate Related Parties") from all actions, causes of action, suits, debts, accounts, reckonings, sums of money, bills, covenants, contract, controversies, agreements, promises, damages, claims, judgments, avoidance actions and demands whatsoever, known or unknown, in law or equity, which Flex or the Flex Related Parties may have against the Estates or the Estate Related Parties (solely in their capacity as such) of any nature whatsoever, from the beginning of time through the date of the Closing related to the Debtors (provided that nothing herein shall release rights granted under this Order or the Wink Agreement), provided, however, that Flex, the Flex Related Parties, the Debtors, and the Estate Related Parties shall retain their respective rights (including, but not limited to, intellectual property rights) with respect to the following products: (i) Norm-Icebox (thermostat); (ii) P6-Ohno (battery charger); (iii) IFM (infant formula maker); (iv) Poppy pour over coffee (coffee maker); and (v) Spotter next generation (sensor).    This provision shall bind any subsequent Chapter 7 or Chapter 11 trustee or examiner or any plan or liquidating trustee of any nature.    The Committee and Comerica have consented to the Sale Order and these provisions.

27.    Upon the Closing and the payment of the relevant Cure Amounts after notice to the Committee in accordance with this Order, the Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts, and the Debtors and their estates shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts.  There shall be no assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

28.    Each non-Debtor counterparty to an Assumed Contract is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Buyer or their respective property (including, without limitation, the Wink Assets) (i) any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing Date or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts; or (ii) any claim, counterclaim, defense, breach, default, condition, setoff or other claim asserted or capable of being asserted against the Debtors existing as of the Closing Date or arising by reason of the Closing, except for Assumed Liabilities.

29.    Other than the Assumed Contracts, the Buyer assumed none of the Debtors' other contracts or leases and shall have no liability whatsoever thereunder.

30.    Nothing in the Wink Sale Motion or this Order shall be deemed or construed as a waiver of any claims or causes of action that the Debtors or the Buyer have or may have against a non-Debtor counterparty to any Assumed Contract, whether or not such claims arise under, are related to the assumption of or are independent of the Assumed Contracts.

**Other Provisions**

31.    In connection with the Transactions and pursuant to a confidential letter agreement, dated October 23, 2015, the Debtors and Flex have agreed that a portion of the

Purchase Price totaling $1 million shall be held in escrow for one year after the Closing in order to offset certain potential liabilities or expenses of the Buyer that may be reasonably incurred with respect to the Purchased Assets (the "Post-Closing Escrow").  For so long as general unsecured creditors retain an interest in the proceeds of the Post-Closing Escrow, the Committee (or any estate representative vested with the rights and privileges of the Committee) shall be provided with ten (10) business days' notice of any proposed disbursement from the Post-Closing Escrow, and no disbursements shall be made unless any timely objections raised by the Committee or its successor in interest are resolved or ruled upon by the Bankruptcy Court.  The Debtors have authority to retain a third party escrow agent reasonably acceptable to the Buyer and the Committee and to enter into agreements related to the escrow related to the same without further order of this Court.

32.    The requirements set forth in Bankruptcy Rules 6003(b), 6004 and 6006 and Local Bankruptcy Rules 6004-1 and 9013-1 have been satisfied or otherwise deemed waived.

33.    The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to give any notice permitted by the Wink Agreement or to enforce any of its remedies under the Wink Agreement or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

34.    Notwithstanding the allocation of the Purchase Price among the Purchased Assets pursuant to Section 2.5(b) of the Wink Agreement, nothing in such allocation shall be binding on the Committee or determinative of the values ascribed to the Purchased Assets, including, but not limited to, for purposes of values ascribed in any plan of reorganization or liquidation or asserted in any subsequent litigation regarding the liens associated with the Purchased Assets.

35.     The provisions of this Order and the Wink Agreement are non-severable and mutually dependent.

36.     The Wink Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

37.     The Court shall retain exclusive jurisdiction (for as long as the Chapter 11 Cases are open) to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Wink Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions.  This Court retains jurisdiction to compel delivery of the Wink Assets, to protect the Buyer and its assets, including the Wink Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to sections 105(a), 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Wink Assets and the Assumed Contracts to the Buyer.  Buyer may at its election enforce this Order in any other court of competent jurisdiction in defense of any Claims asserted against it by third parties or similar issues.

38.     As provided by Bankruptcy Rules 7062 and 9014, the terms and conditions of this Order shall be effective immediately upon entry and shall not be subject to the stay provisions contained in Bankruptcy Rules 6004(h) and 6006(d) or any similar rule that would delay the effectiveness of this Order.  Time is of the essence in closing the sale and the Debtors and the Buyer intend to close the sale consummate the Transactions as soon as possible.

Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk their appeal being foreclosed as moot.

39.     This Order and the Wink Agreement shall be binding in all respects upon all creditors of (whether known or unknown), and holders of equity interests in, any Debtor, any holders of Claims in, against or on all or any portion of the Wink Assets, all non-Debtor counterparties to the Assumed Contracts, all successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries and any subsequent trustee appointed in the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection.  Nothing contained in any chapter 11 plan confirmed in the Chapter 11 Cases, any order confirming any such chapter 11 plan or any order approving wind-down or dismissal of the Chapter 11 Cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of the Wink Agreement or this Order, and to the extent of any conflict or derogation between this Order or the Wink Agreement and such future plan or order, the terms of this Order and the Wink Agreement shall control.

40.     To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the Wink Agreement or the Wink Bidding Procedures Order, this Order shall govern and control.

Dated: November [___], 2015
       New York, New York

_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT I**

Stalking Horse Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                :

In re:                                :     Chapter 11
                                :

QUIRKY, INC., *et al.*[1]               :
                                :

        Debtors.                :     Case No. 15-12596 (MG)
                                :

                                :     (Jointly Administered)
                                :

---------------------------------------------------------------- x

### ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF CERTAIN ASSETS RELATED TO THE WINK BUSINESS, (B) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, (C) APPROVING THE FORM AND MANNER OF NOTICE, AND (D) SCHEDULING AN AUCTION AND A SALE HEARING

### The "Wink Bidding Procedures Order"

Upon the motion (the "Wink Sale Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Wink Bidding Procedures Order"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2002-1, 6004-1, and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), (a) authorizing and approving the bidding procedures with stalking horse bid protections in connection with the sale of certain of the Debtors' assets related to the Wink Business, (b) approving the form and manner of notice of the Auction and Sale Hearing, (c) approving procedures for the assumption and assignment of Assumed Contracts and noticing of related cure amounts, and (d) scheduling an Auction and a Sale Hearing, as more fully set forth in the Wink Sale Motion; and upon the

---

[1]      The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Wink Sale Motion.

Kwalwasser Declaration; and upon the Bosacco Declaration; and this Court having jurisdiction to consider the Wink Sale Motion and the relief requested therein; and consideration of the Wink Sale Motion and the relief requested being a core proceeding; and venue being proper before this Court; and due and sufficient notice of the Wink Sale Motion having been given under the particular circumstances to the Notice Parties; and it appearing that no other or further notice need be provided; and this Court having determined that the relief requested in the Motion being in the best interests of the Debtors, their creditors, and all parties in interest; and this Court having determined that the legal and factual bases set forth in the Wink Sale Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     **Bidding Procedures**.  The Debtors have articulated good and sufficient reasons for authorizing and approving the bidding procedures attached hereto as Exhibit 1 (the "Wink Bidding Procedures"), which are fair and reasonable and appropriate under the circumstances and designed to maximize recovery on, and realizable value of, the Wink Business Assets.

B.     **Stalking Horse Bid Protections**.  The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break Up Fee and Expense Reimbursement (together, the "Bid Protections") to the Wink Stalking Horse Bidder, including:

i.      the Bid Protections are the product of negotiations among the Wink Stalking Horse Bidder, Comerica and the Debtors, conducted in good faith and at arm's length, and the Wink Agreement with respect to the Transaction is the culmination of a process undertaken by the Debtors, in consultation with Comerica, and their respective professionals to negotiate a transaction with a bidder who was prepared to pay the highest or otherwise best purchase price to date for the Wink Business Assets to maximize the value of the Debtors estates;

ii.     the Bid Protections are an actual and necessary cost and expense of preserving the respective Debtors' estates;

iii.    the Bid Protections are fair, reasonable and appropriate in light of, among other things, the size and nature of the Transaction, the substantial efforts that have been and will be expended by the Wink Stalking Horse Bidder, notwithstanding that the Transaction is subject to higher or otherwise better offers, and the substantial benefits the Wink Stalking Horse Bidder has provided to the Debtors, their estates and creditors and all parties in interest herein, including, among

other things, by increasing the likelihood that the best possible price for the Wink Business Assets will be received;

iv.    the protections afforded to the Wink Stalking Horse Bidder by way of the Bid Protections were material inducements for, and express conditions of, the Wink Stalking Horse Bidder's willingness to enter into the Wink Agreement, and were necessary to ensure that the Wink Stalking Horse Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding; and

v.    the assurance of the payment of the Bid Protections has promoted more competitive bidding by inducing the Wink Stalking Horse Bidder's bid, which otherwise would not have been made, without which competitive bidding would be limited, and which may be the highest or otherwise best available offer for the Wink Business Assets, induced the Wink Stalking Horse Bidder to conduct due diligence with respect to the Debtors' business, assets, operations and liabilities, and propose the sale of the Wink Business Assets contemplated by the Wink Agreement, including, among other things, submission of a bid that will serve as a minimum or floor bid on which all other bidders can rely and increases the likelihood that the final purchase price reflects the true value of the Wink Business Assets.

C.    **Auction and Sale Notice**.  The form of Auction and Sale Notice attached hereto as Exhibit 2 is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale of the Wink Business Assets, including:  (i) the date, time and place of the Auction (if one is held); (ii) the Wink Bidding Procedures and certain dates and deadlines related thereto; (iii) the Sale Objection Deadline and the date, time and place of the Sale Hearing; (iv) reasonably specific identification of Wink Business Assets; (v) instructions for promptly obtaining a copy of the Wink Agreement; (vi) representations describing the sale of the Wink Business Assets as being free and clear of liens, claims, interests and other encumbrances, with all such liens, claims, interests and other encumbrances attaching with the same validity and priority to the sale proceeds; (vii) the commitment by the Wink Stalking Horse Bidder to assume certain liabilities of the Debtors; and (viii) notice of the proposed assumption and assignment of Assumed Contracts to the Wink Stalking Horse Bidder pursuant to the Wink Agreement (or to another Successful Bidder arising from the Auction, if any) and the right, procedures and deadlines for objecting thereto.  No other or further notice of the Auction and Sale Hearing shall be required.

D.      **Assumption Procedures**.    The Assumption and Assignment Notice are reasonably calculated to provide counterparties to the Assumed Contracts with proper notice of the intended assumption and assignment of their executory contracts, any cure amounts relating thereto and the Assumption and Assignment Procedures.

**NOW, THEREFORE, IT IS ORDERED:**

1.      The Wink Sale Motion is granted to the extent set forth herein.

I.      **Important Dates and Deadlines:**

2.      **Sale Hearing**:  November 6, 2015, at 10:00 a.m. (Eastern Time), is the date and time the hearing to approve the Transaction (the "Sale Hearing") will be held before the Honorable Martin Glenn, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004.  **Please take notice** that the Sale Hearing may be adjourned without further notice other than announcement in open Court or on the Court's calendar.

3.      **Sale Objection Deadline**:  October 29, 2015, at 4:00 p.m. (Eastern Time), is the deadline to object to entry of the proposed Sale Order (the "Sale Objection Deadline"); *provided*, *however*, that objections to the identity of the successful bidder (only if different than the Wink Stalking Horse Bidder) may be made on November 4, 2015 at 12:00 p.m. (Eastern Time).  Objections, if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and any orders of the Court; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than the Sale Objection Deadline by the following parties (the "Notice Parties"):

| Debtors | Proposed Counsel to the Debtors |
|---|---|
| Quirky, Inc.<br>606 West 28th Street<br>New York, New York 10010<br>Attn:  Charles Kwalwasser, Esq.<br>        Ed Kremer | Cooley LLP<br>1114 Avenue of the Americas<br>New, York, New York 10036<br>Attn:  Jeffrey L. Cohen, Esq.<br>        Michael A. Klein, Esq. |

| United States Trustee | Counsel to the Wink Stalking Horse Bidder |
|---|---|
| Office of the United States Trustee for the Southern District of New York 201 Varick Street, Suite 1006 New York, New York 10014 Attn:  Paul Schwartzberg, Esq. | Dentons US LLP 233 South Wacker Drive Suite 5900 Chicago, IL 60606 Attn:  Robert E. Richards, Esq. |
| **Counsel to Comerica** | **Proposed Counsel to the Committee** |
| Sheppard, Mullin, Richter & Hampton LLP Four Embarcadero Center 17th Floor San Francisco, CA 94111 Attn:  William R. Wyatt, Esq. | Otterbourg P.C. 230 Park Avenue New York, NY 10169 Attn: Melanie L. Cyganowski, Esq.      Kevin Zuzolo, Esq. |

> **The failure to timely file an objection in accordance with this order shall forever bar the assertion of any objection to the Wink Sale Motion, entry of the Wink Sale Order and/or consummation of the Transaction, including the assumption and assignment of the Assumed Contracts to the Successful Bidder pursuant to the Wink Agreement, and shall be deemed to constitute any such party's consent to entry of the Wink Sale Order and consummation of the Transaction and all transactions related thereto.**

4.      **Bidding Dates and Deadlines**:  The following dates and deadlines with respect to bidding on the Wink Business Assets are hereby established (subject to modification as needed):

a)      <u>Bid Deadline</u>:  October 29, 2015 at 12:00 p.m. (prevailing Eastern Time) is the deadline by which all "Qualified Bids" (as defined in the Wink Bidding Procedures) must be actually received by the parties specified in the Wink Bidding Procedures (the "<u>Bid Deadline</u>"); and

b)      <u>Auction</u>:  November 2, 2015 at 10:00 a.m. (prevailing Eastern Time) is the date and time the Auction, if one is needed, will be held at the offices of counsel to the Debtors:  Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036.

## II.      Wink Bidding Procedures and Related Relief

5.      The Wink Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u> and incorporated by reference as though fully set forth herein, are hereby approved.  The Wink Bidding Procedures shall govern the submission, receipt and analysis of all bids relating to the Transaction, and any party desiring to submit a higher or otherwise better offer for the Wink Business Assets shall do so strictly in accordance with the terms of the Wink Bidding Procedures and this Order.

6.      As described in the Wink Bidding Procedures, if the Debtors do not receive any Qualified Bids other than from the Wink Stalking Horse Bidder or if no Qualified Bidder other than the Wink Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtors will not hold the Auction, the Wink Stalking Horse Bidder will be named the Successful Bidder and the Debtors will seek approval of the Wink Agreement at the Sale Hearing.  In such case, the Debtors may continue to market those assets of the Debtors other than the Wink Business Assets.  If one or more Qualified Bids is timely received from a Qualified Bidder (other than the Wink Stalking Horse Bidder) in accordance with the Wink Bidding Procedures, the Debtors shall conduct the Auction as set forth herein.

7.      Notwithstanding anything in this Wink Bidding Procedures Order, the Wink Bidding Procedures, or the Wink Sale Motion to the contrary, no bid may be placed on Quirky Assets under the Wink Bidding Procedures except for those Quirky Assets already set forth in the Wink Agreement.

8.      If the Auction is conducted, each Qualified Bidder participating in the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding process or the Transaction.  The Auction will be conducted openly and shall be either transcribed or videotaped.

9.      The Bid Protections described in the Wink Sale Motion and set forth in the Wink Agreement are hereby approved to the extent set forth herein.  If the Wink Stalking Horse Bidder becomes entitled to receive the Bid Protections in accordance with the terms of Wink Agreement, (a) the Debtors are authorized, upon the closing of the Successful Bid or the Back Up Bid (as applicable) and the payment of the purchase price for the Wink Business Assets to pay from the proceeds of such purchase price any and all amounts owing to the Wink Stalking Horse Bidder in accordance with the terms of the Wink Agreement, including the Break Up Fee and Expense Reimbursement, without further action or order by the Bankruptcy Court, in accordance with the terms and conditions of the Wink Agreement and this Order, and (b) the Wink Stalking Horse Bidder shall be, and hereby is, granted an allowed administrative claim in the Debtors' chapter 11 cases in an amount equal to the Break Up Fee and Expense Reimbursement under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  Comerica has consented to the payment of the Break-Up Fee and Expense Reimbursement from such proceeds.

10.    No person or entity, other than the Wink Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fee, "topping," termination or other similar fee or payment in connection with the sale of the Wink Business Assets.

## III.    Auction and Sale Notice and Related Relief

11.    The Auction and Sale Notice, substantially in the form attached hereto as <u>Exhibit 2</u> is hereby approved.

12.    Within (3) business days of entry of the Wink Bidding Procedures Order, the Debtors shall serve the Auction and Sale Notice by first class mail upon the following parties:  (i) the Office of the United States Trustee; (ii) counsel to Comerica; (iii) proposed counsel for the Committee; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Wink Business Assets; (vii) any party known or reasonably believed to have expressed an interest in acquiring any of the Wink Business Assets; and (viii) entities known or reasonably believed to have any such other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b).  The Debtors may also serve notice electronically where authorized to do so by separate order of the Court. The Debtors shall also place a publication notice in a newspaper with national circulation.  No other or further notice need be given.   The Auction may be adjourned to a later date by the Debtors, in consultation with the Consultation Parties, by filing a notice of adjournment with the Court.  No further notice of any such continuance will be required to be provided to any party.  **Please take notice** that the Auction may be adjourned to a later date by the Debtors by filing a notice of adjournment with the Court. No further notice of any such continuance shall be required to be provided to any party.

## IV.    Auction and Sale Notice and Related Relief

13.    The procedures set forth below regarding the assumption of the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code and assigned to the Wink Stalking Horse Bidder (or other successful bidder arising from the Auction, if any) pursuant to section 365(f) of the Bankruptcy

Code in connection with the Transaction are hereby approved to the extent set forth herein (the "Assumption Procedures").

14.    These Assumption Procedures shall govern the assumption and assignment of all Assumed Contracts assumed and assigned in connection with the Transaction:

    a.    Assumption and Assignment Notice.  As soon as is practicable, but no later than October 14, 2015, the Debtors shall serve the Assumption and Assignment Notice, substantially in the form attached hereto as Exhibit 3 by first class mail on all counterparties to the Assumed Contracts (and provide a copy of the same to the Wink Stalking Horse Bidder).  The Assumption and Assignment Notice shall inform each recipient that its respective contract may be designated as Assumed Contract in connection with the Transaction and should contain (i) the title of the Assumed Contract, (ii) the name of the Assumed Contract Counterparty, (iii) the Debtors' good faith estimates of the cure amounts required in connection with such Assumed Contract, (iv) the identity of Wink Stalking Horse Bidder; and (v) the deadline by which the Assumed Contract Counterparty must file an objection to the proposed assumption and assignment and/or cure amount, and (vi) the Assumption Procedures relating thereto; provided, however, that service of an Assumption and Assignment Notice does not constitute an admission that such Assumed Contract is an executory contract.

    b.    Objections.  Objections, if any, to the proposed assumption and assignment of the Assumed Contract or the cure amount proposed with respect thereto, must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules and Case Management Order entered in these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served upon, so as to be actually received by, the Notice Parties before the Sale Objection Deadline.  Notwithstanding the foregoing, objections to the identity of the successful bidder (only if different than the Wink Stalking Horse Bidder) may be made on November 4, 2015 at 12:00 p.m. (Eastern Time).

    c.    Dispute Resolution.  Any objection to the assumption and assignment of a contract or cure amount proposed in connection with the Transaction that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

15.    Any party failing to timely file an objection to the cure amount listed on the Assumption and Assignment Notice (a) shall be forever barred from objecting thereto, including making any demands for additional cure amounts or monetary compensation on account of any alleged defaults against the Debtors, their estates, the Wink Stalking Horse Bidder, or other successful bidder arising from the

Auction, if any, with respect to any such Assumed Contract, and (b) shall be deemed to consent to the Transaction.

16.    The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this order.

17.    This Order shall be effective and enforceable immediately upon entry.

18.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**IT IS SO ORDERED.**

Dated:  October 9, 2015
        New York, New York

                                        _____/s/Martin Glenn_____
                                            MARTIN GLENN
                                        United States Bankruptcy Judge

**Exhibit 1 to Wink Bidding Procedures Order**

**Wink Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------  x
                                                                :
In re                                                           :    Chapter 11
                                                                :
QUIRKY, INC., et al.¹                                           :
                                                                :    Case No. 15-12596 (MG)
               Debtors.                                         :
                                                                :    (Jointly Administered)
                                                                :
--------------------------------------------------------------  X
```

### BIDDING PROCEDURES FOR ASSETS RELATED TO THE WINK BUSINESS.

These bidding procedures (the "Wink Bidding Procedures") have been approved by an order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on October 8, 2015 [Docket No. ___] (the "Wink Bidding Procedures Order") in the above-captioned jointly administered chapter 11 cases of Quirky, Inc. and its debtor affiliates (collectively, the "Debtors").

These Wink Bidding Procedures set forth the process by which the Debtors are authorized to conduct the auction (the "Auction") for the sale (the "Sale") of certain of the Debtors' assets related to the Wink business (the "Wink Business Assets"). The Asset Purchase Agreement, dated as of September 21, 2015, by and among the Debtors and Flextronics International USA Inc., a copy of which is attached hereto as Exhibit A (the "Wink Agreement") sets forth the proposed terms of sale of the Wink Business Assets.

The Sale of the Wink Business Assets will be implemented pursuant to the terms and conditions of the Wink Agreement, as the same may be amended pursuant to the terms hereof, subject to the receipt of higher or otherwise better bids in accordance with these Wink Bidding Procedures. Please take notice that all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Wink Agreement.

> Copies of the Wink Bidding Procedures Order, the Wink Agreement and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Rust Omni Management, www.quirkybankruptcy.com, or upon request by contacting Rust Omni Management, by telephone at (866) 989-6144, or by e-mail at quirky@omnimgt.com.

**A.    Approval of Stalking Horse Bid Protections.**

The Wink Bidding Procedures Order approved, among other things, the approval of (i) a fee equal to 3% of the Purchase Price ($450,000) (the "Break Up Fee"); and (ii) reimbursement of actual, documented, out-of-pocket expenses of up to $200,000 (the "Expense Reimbursement", and together with the Break Up Fee, the "Bid Protections") which is payable to the Wink Stalking Horse Bidder in the event

---

¹ The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

the Bankruptcy Court approves the Sale of the Wink Business Assets to any other person or entity other than the Wink Stalking Horse Bidder, and such Sale closes.

**B.    Participation Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity (other than the Wink Stalking Horse Bidder) interested in submitting a Bid (a "Potential Bidder") must, on or before October 27, 2015 at 12:00 p.m. (Eastern Time) (the "Preliminary Bid Deadline") deliver (unless previously delivered) the following documents along with an offer for the Wink Business Assets in accordance with Section D below (the "Preliminary Bid Documents"):

    a.    an executed confidentiality agreement on terms reasonably acceptable to the Debtors and containing terms in the aggregate no less favorable to the Debtors in any material respect (other than with respect to the effective periods and the non-disclosure and non-solicitation provisions contained therein, all of which terms shall be commercially reasonable) than those contained in the confidentiality agreement by and among the Wink Stalking Horse Bidder (or its affiliate), the Debtors and certain of their respective affiliates (the "Confidentiality Agreement"), except that Potential Bidders who have already signed a confidentiality agreement prior to September 22, 2015 need not execute another agreement; and

The Preliminary Bid Documents shall be delivered to the following parties (collectively, the "Notice Parties"):

| Debtors | Proposed Counsel to the Debtors |
|---|---|
| Quirky, Inc.<br>606 West 28th Street<br>New York, New York 10010<br>Attn:  Charles Kwalwasser, Esq.<br>      Ed Kremer | Cooley LLP<br>1114 Avenue of the Americas<br>New York, New York 10036<br>Attn:  Jeffrey L. Cohen, Esq.<br>      Michael A. Klein, Esq. |
| **Investment Banker to the Debtors** | **Counsel to Comerica** |
| Centerview Partners LLC<br>31 West 52nd Street<br>22nd Floor<br>New York, NY 10019<br>Attn:  John Bosacco<br>      Emlen Fischer<br>      Ryan Kielty | Sheppard, Mullin, Richter & Hampton LLP<br>Four Embarcadero Center<br>17th Floor<br>San Francisco, CA 94111<br>Attn:  William R. Wyatt, Esq. |

Within one (1) business day after a Potential Bidder delivers the Preliminary Bid Documents, the Debtors shall determine, in consultation with their advisors and (i) any statutory committee appointed in the Chapter 11 Cases (the "Committee"); and (ii) Comerica Bank ("Comerica" and, together with the Committee, the "Consultation Parties"), and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may conduct a due diligence review with respect to the Wink Business Assets.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "Acceptable Bidder") may submit bids.  The Wink Stalking Horse Bidder shall at all times be deemed an Acceptable Bidder.

### C.    Access to Due Diligence.

Only Acceptable Bidders shall be eligible to receive due diligence and access to additional non-public information.  The Debtors shall provide to each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request.  To the extent the Debtors provide any information to any Acceptable Bidder that they had not previously provided to the Wink Stalking Horse Bidder, the Debtors shall promptly provide such information to the Wink Stalking Horse Bidder.  The due diligence period will end on the Bid Deadline (as defined herein) and the Debtors shall have no obligation to furnish any due diligence information after the Bid Deadline.

All requests for access to the Debtors' vendors must be made through the Debtors who, in their discretion, may require that a representative of the Debtors be included in any communications between such parties.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not, except with respect to the Wink Business Assets, furnish any other confidential information relating to the Debtors, the Debtors' assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; provided, however, the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment and following consultation with the Consultation Parties, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid.  No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

Each Acceptable Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Wink Business Assets and liabilities that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Wink Business Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated herein or in the Wink Agreement.  Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors or professionals are responsible for, and shall bear no liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale.

> **The Debtors have designated Centerview Partners to coordinate all reasonable requests for additional information and due diligence access, including requests for the Microsoft Word version of the Wink Agreement.  Requests for due diligence access and additional information can be made by contacting Emlen Fischer at efischer@centerview.com or 212-429-2227.**

### D.    Bid Requirements.

To be eligible to participate in the Auction, an Acceptable Bidder (other than the Wink Stalking Horse Bidder) must deliver to (i) the Debtors and (ii) their counsel and investment banker, which shall be shared with the Committee within one (1) business day following receipt thereof, a written, irrevocable offer that must be determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:

a.  **Same or Better Terms/Identification of Assumed Contracts**.  Each Bid must be accompanied by clean and duly executed transaction documents (including schedules and exhibits thereto that identify with particularity which of the Debtors' contracts the Acceptable Bidder seeks to have assigned, along with a copy of the Wink Agreement that is marked to reflect the amendments and modifications from such agreement, which modifications, taken as a whole, may not be materially more burdensome to the Debtors than the Wink Agreement or inconsistent with these Wink Bidding Procedures.

b.  **Bid Deposit**.  Each Bid must be accompanied by a 10% cash deposit of the proposed purchase price (the "Good Faith Deposit"), which shall be sent to counsel to the Debtors by wire transfer, which amount shall be deposited in an interest-bearing account.

c.  **Minimum Bid Amount**.  The value of each Bid must exceed the aggregate sum of the following:  (i) the Stalking Horse Bid; (ii) the Bid Protections; and (iii) $150,000 (all of which must be in the form of cash, and/or the assumption of administrative expense liabilities except to the extent of any secured debt that is being credit bid).  The Wink Stalking Horse Bidder will receive a "credit" equal to $650,000 when bidding at the Auction.

d.  **Good Faith Offer**.  Each Bid must constitute a good faith, bona fide offer to purchase the Wink Business Assets.

e.  **No Contingencies**.  A Bid must not be conditioned on any contingency, including, among others, on obtaining any of the following:  (i) financing, (ii) shareholder, board of directors or other approval, (iii) the outcome or completion of a due diligence review by the Acceptable Bidder; and/or (iv) any third party consents (other than as may be required for the Material Agreements).

f.  **Irrevocable**.  Each Bid must remain irrevocable for two (2) business days after the Sale Hearing (as defined below).

g.  **Joint Bids**.  The Debtors will be authorized to approve joint Bids in the Debtors' exercise of their reasonable good faith business judgment, following consultation with the Consultation Parties, on a case-by-case basis.

h.  **Adequate Assurance Information**.  Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the satisfaction of the Debtors, following consultation with the Consultation Parties, that such Acceptable Bidder (i) has the financial wherewithal and ability to consummate in the Sale of the Wink Business Assets and the assumption of the Debtors' liabilities as set forth in the Wink Agreement, including payment of any cure amount with respect to any contract that may be assigned with respect to the Sale.  The Bid shall also identify a contact person that counterparties to any lease or contract may contact to obtain additional Adequate Assurance Information.

i.  **No Fees**.  Except with respect to the Wink Stalking Horse Bidder, the Bids must not be subject to any break-up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

The Auction may be adjourned to a later date by the Debtors, in consultation with the Consultation Parties, by filing a notice of adjournment with the Court. No further notice of any such continuance will be required to be provided to any party.

**E.      Qualified Bids.**

Bids, or a combination of one or more Bids, fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."

Within two (2) days after the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and will notify the Acceptable Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction (as defined below). Any Bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors.

The Wink Stalking Horse Bidder shall be deemed to be a Qualified Bidder. The Wink Agreement submitted by the Wink Stalking Horse Bidder shall be deemed a Qualified Bid, qualifying the Wink Stalking Horse Bidder to participate in the Auction.

**F.      Bid Deadline.**

Qualified Bids must be received by (i) the Debtors and (ii) their counsel and investment banker **no later than the Bid Deadline of October 29, 2015 at 12:00 p.m. (prevailing Eastern Time)**. The Debtors, their counsel and/or their investment banker will share the Qualified Bids received with the Consultation Parties within one (1) business day following receipt thereof.

**G.      Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors shall evaluate Qualified Bids and, in consultation with their advisors and the Consultation Parties, identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid (the "Starting Bid"). Within 24 hours of such determination, the Debtors shall notify the Wink Stalking Horse Bidder and the other Qualified Bidders as to which Qualified Bid is the Starting Bid. The Debtors shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**H.      No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Wink Agreement will be deemed the Successful Bid (as defined herein) and the Debtors will pursue entry of an order by the Bankruptcy Court approving the Wink Agreement and authorizing the Sale of the Wink Business Assets to the Wink Stalking Horse Bidder at the Sale Hearing.

**I.      Auction.**

If one or more Qualified Bids is received by the Bid Deadline, then the Debtors shall conduct the Auction with respect to the Wink Business Assets. The Auction shall commence on November 2, 2015 at 10:00 a.m. (Eastern Time) at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, or such later time (after consultation with the Consultation Parties) or other place as the Debtors shall timely notify the Wink Stalking Horse Bidder and all other Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures")

a. the Auction will be conducted openly;

b. only the Qualified Bidders, including the Wink Stalking Horse Bidder, shall be entitled to bid at the Auction;

c. the Qualified Bidders, including the Wink Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

d. only such authorized representatives of each of the Qualified Bidders, the Wink Stalking Horse Bidder, the Committee, members of the Committee, Comerica, the Debtors, and each of their respective advisors shall be permitted to attend the Auction;

e. bidding at the Auction shall begin at the Starting Bid; subsequent Bids at the Auction, including any Bids by Wink Stalking Horse Bidder, shall be made in minimum increments in an amount to be determined by the Debtors, in consultation with the Consultation Parties, to be announced at the Auction;

f. each Qualified Bidder will be informed of the terms of the previous Bids and how the Debtors value that bid and what the next required overbid level is;

g. the bidding will be transcribed or videotaped to ensure an accurate recording of the bidding at the Auction;

h. each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale; and

i. absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider Bids made after the Auction is closed; and

j. the Auction shall be governed by such other Auction Procedures as may be announced by the Debtors after consultation with its advisors and the Consultation Parties from time to time on the record at the Auction; provided, however, that any such other Auction Procedures shall not be inconsistent with any order of the Bankruptcy Court or with the provisions of the Wink Agreement with respect to these Wink Bidding Procedures.

The Auction may be adjourned to a later date by the Debtors, in consultation with the Consultation Parties, by filing a notice of adjournment with the Court. No further notice of any such continuance will be required to be provided to any party.

**J.     Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, and in consultation with the Consultation Parties, shall identify the highest or otherwise best Qualified Bid that in the exercise of their fiduciary duties the Debtors in good faith believe is materially more beneficial to the Debtors than the Stalking Horse Bid (the "Successful Bid"), which will be determined by considering, among other things:

a.     the number, type and nature of any changes to the Wink Agreement as appropriate;

b.      the total expected consideration to be received by the Debtors;

c.      the likelihood of the bidder's ability to close a transaction and the timing thereof; and

d.      the expected net benefit to the estates.

The Qualified Bidder having submitted a Successful Bid will be deemed the "<u>Successful Bidder</u>". The Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtors will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Wink Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid, and (d) consummation of the Successful Bid will provide the highest or otherwise best value for the Wink Business Assets and is in the best interests of the Debtors' estates.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (1) such Qualified Bid is declared the Successful Bid at the Auction and (2) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and entry of the Sale Order approving such Successful Bid.


**K.      Sale Hearing.**

A hearing to consider approval of the Qualified Bid submitted by the Successful Bidder (or to approve the Wink Agreement if no Auction is held) (the "<u>Sale Hearing</u>") is presently scheduled to take place on November 6, 2015 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Martin Glenn, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004.

**The Sale Hearing may be adjourned to a later date by the Debtors, in consultation with the Consultation Parties, by filing a notice of adjournment or making an announcement at the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

**L.      Designation of Back-Up Bidder.**

If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Wink Sale Order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best Bid (the "<u>Back-Up Bidder</u>"), as determined by the Debtors after consultation with their advisors, and in consultation with the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (the "<u>Back-Up Bid</u>").

The Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four (24) hours advance notice, which notice will be filed with the Bankruptcy Court.

Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid shall remain open until the closing of the Successful Bid.

**M.      Break Up Fee and Expense Reimbursement.**

In the event that neither the Successful Bid nor the Back-Up Bid is made by the Wink Stalking Horse Bidder, the Debtors shall be obligated to pay to the Wink Stalking Horse Bidder from the proceeds of the purchase price for the Wink Business Assets, upon the closing of the Successful Bid or the Back-Up Bid (as applicable) and the payment of such purchase price, by wire transfer in immediately available funds to an account designated by the Wink Stalking Horse Bidder, the Break Up Fee and Expense Reimbursement, in each instance in accordance with the applicable provisions of the Wink Agreement.

**N.      Return of Good Faith Deposit.**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid for the Wink Business Assets.  If the Successful Bidder fails to consummate the Successful Bid (other than due to breach of the applicable asset purchase agreement by the Debtors), then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors.

The Good Faith Deposit of any unsuccessful Qualified Bidders will be returned within 3 (3) business days after consummation of the Sale of the Wink Business Assets.

**O.      Reservation of Rights.**

The Debtors reserve their rights to modify these Wink Bidding Procedures, in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process (subject to any restrictions set forth in the Wink Agreement) or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Wink Business Assets.

Notwithstanding anything herein or in the Wink Bidding Procedures Order to the contrary, nothing will in any way impair or enhance, alter or otherwise affect any and all rights that Comerica may have to "credit bid" pursuant to section 363(k) of the Bankruptcy Code or other applicable law; *provided, however*, the Committee's rights to challenge any "credit bid" by Comerica are expressly preserved.

**Exhibit 2 to Bidding Procedures Order**

**Form of Auction and Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------  x
                                                               :
In re                                                          :     Chapter 11
                                                               :
QUIRKY, INC., et al.¹                                          :
                                                               :     Case No. 15-12596 (MG)
                Debtors.                                       :
                                                               :     Jointly Administered
                                                               :
-------------------------------------------------------------  x
```

**NOTICE OF SALE BY AUCTION AND SALE**
**HEARING FOR ASSETS RELATED TO THE WINK BUSINESS**

　　　　**PLEASE TAKE NOTICE** that, on September 22, 2015, Quirky, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered cases (the "Chapter 11 Cases") filed a motion [Docket No. 17] (the "Wink Sale Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (a) authorizing and approving the bidding procedures with stalking horse bid protections in connection with the sale of assets related to the business of Wink, Inc., (b) approving the form and manner of notice of the Auction and Sale Hearing, (c) approving procedures for the assumption and assignment of Assumed Contracts and noticing of related cure amounts, and (d) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Sale Motion.  On October 8, 2015, the Bankruptcy Court entered an order (the "Wink Bidding Procedures Order") approving certain bidding procedures attached thereto as Exhibit 1 (the "Wink Bidding Procedures").

> **Copies of the Wink Sale Motion, Wink Bidding Procedures Order, and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Rust Omni Management, at www.quirkybankruptcy.com, or upon request by contacting Rust Omni Management, by telephone at (866) 989-6144, or by e-mail at quirky@omnimgt.com.**

　　　　**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Wink Business Assets (as defined in the Wink Bidding Procedures).  All interested bidders should carefully read the Wink Bidding Procedures and Wink Bidding Procedures Order.  To the extent there are any inconsistencies between this notice and the Wink Bidding Procedures, the latter shall govern in all respects.

　　　　**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive competing Qualified Bids within the requirements and time frame specified by the Wink Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Wink Business Assets on November 2, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel to the Debtors:  Cooley LLP, 1114 Avenue of the Americas, New, York, New York 10036.

---

¹　　　　The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692).  The Debtors' principal offices are located at 606 West 28ᵗʰ Street, Seventh Floor, New York, NY 10001.

PLEASE TAKE FURTHER NOTICE that the Debtors will seek approval of the sale of the Wink Business Assets at a hearing scheduled to commence on November 6, 2015 at 10:00 a.m. (prevailing Eastern Time) (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the Honorable Martin Glenn, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections to the proposed sale of the Wink Business Assets, if any, must:  (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and the *Interim Order Implementing Certain Notice and Case Management Procedures* [Docket No. 44] entered in these Chapter 11 Cases; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than October 29, 2015 at 4:00 p.m. (prevailing Eastern Time) (the "Sale Objection Deadline") by the following parties (the "Notice Parties") (provided that objections to the identity of the successful bidder (only if different than the Wink Stalking Horse Bidder (as defined in the Wink Bidding Procedures)) may be made on November 4, 2015 at 12:00 p.m. (Eastern Time):

| Debtors | Proposed Counsel to the Debtors |
|---|---|
| Quirky, Inc.<br>606 West 28th Street<br>New York, New York 10010<br>Attn:  Charles Kwalwasser, Esq.<br>        Ed Kremer | Cooley LLP<br>1114 Avenue of the Americas<br>New, York, New York 10036<br>Attn:  Jeffrey L. Cohen, Esq.<br>        Michael A. Klein, Esq. |
| **United States Trustee** | **Counsel to the Wink Stalking Horse Bidder** |
| Office of the United States Trustee for the Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn:  Paul Schwartzberg, Esq. | Dentons US LLP<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL 60606<br>Attn:  Robert E. Richards, Esq. |
| **Counsel to Comerica** | **Proposed Counsel to the Committee** |
| Sheppard, Mullin, Richter & Hampton LLP<br>Four Embarcadero Center<br>17th Floor<br>San Francisco, CA 94111<br>Attn:  William R. Wyatt, Esq. | Otterbourg P.C.<br>230 Park Avenue<br>New York, NY 10169<br>Attn: Melanie L. Cyganowski, Esq.<br>Kevin Zuzolo, Esq. |

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE OF THE WINK BUSINESS ASSETS ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE WINK BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO THE SUCCESSFUL BIDDER AND ANY CURE AMOUNTS RELATED THERETO.

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

> The proposed Order approving the Sale of the Wink Business Assets provides that the Successful Bidder will have no responsibility for claims, interests, liens or encumbrances, and that the Wink Business Assets will be sold free and clear of, any successor liability, including: (a) any debt, liability or other obligation of the Debtors of any kind or nature whatsoever of the Debtors or related to the Wink Business Assets other than as expressly set forth in the Wink Agreement or (b) any claims against the Debtors or any of their predecessors or affiliates.

Dated:    October ___, 2015
          New York, New York

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile:  (212) 479-6218
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit

*Proposed Counsel for Debtors and Debtors in Possession*

**Exhibit 3 to Wink Bidding Procedures Order**

**Form of the Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                :

In re                             :     Chapter 11
                                  :

QUIRKY, INC., *et al.*[1]           :
                                  :     Case No. 15-12596 (MG)
         Debtors.          :
                                  :     Jointly Administered
                                  :
---------------------------------------------------------------- x

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS RELATED TO THE WINK BUSINESS

       **PLEASE TAKE NOTICE** that, on September 22, 2015, Quirky, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered cases (the "Chapter 11 Cases") filed a motion [Docket No. 17] (the "Wink Sale Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (a) authorizing and approving the bidding procedures with stalking horse bid protections in connection with the sale (the "Sale") of the assets related to the Wink business, (b) approving the form and manner of notice of the Auction and Sale Hearing, (c) approving procedures for the assumption and assignment of Assumed Contracts and noticing of related cure amounts, and (d) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Sale Motion. On October 8, 2015, the Bankruptcy Court entered an order (the "Wink Bidding Procedures Order") approving certain bidding procedures attached thereto as Exhibit 1 (the "Wink Bidding Procedures").

> **Copies of the Wink Sale Motion, Wink Bidding Procedures Order, and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Rust Omni Management, at www.quirkybankruptcy.com, or upon request by contacting Rust Omni Management, by telephone at (866) 989-6144, or by e-mail at quirky@omnimgt.com.**

       **PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Wink Business Assets (as defined in the Wink Bidding Procedures). The Debtors have indicated on Schedule A attached hereto a list of the Debtors' executory contracts that the Debtors may be assumed and assigned to the Successful Bidder (each, a "Contract") along with the cure amounts that the Debtors believe must be paid to cure all prepetition defaults (in each instance, the "Cure Cost").

       **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the sale of the Wink Business Assets at a hearing scheduled to commence on November 6, 2015 at 10:00 a.m. (prevailing Eastern Time) (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the Honorable Martin Glenn, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10036.

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Quirky, Inc. (2873); Wink, Inc. (8826); and Undercurrent Acquisition, LLC (9692). The Debtors' principal offices are located at 606 West 28th Street, Seventh Floor, New York, NY 10001.

PLEASE TAKE FURTHER NOTICE that if you agree with the Cure Costs listed on Schedule A, you need not take any further action.

PLEASE TAKE FURTHER NOTICE that any party seeking to object to the validity of the Cure Costs (a "Cure Objection") as determined by the Debtors, or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Contracts in order to be assigned to the Successful Bidder, must file an objection, which must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and the *Interim Order Implementing Certain Notice and Case Management Procedures* [Docket No. 44] entered in these Chapter 11 Cases; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than October 29, 2015 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline") by the following parties (the "Notice Parties") (provided that objections to the identity of the successful bidder (only if different than the Wink Stalking Horse Bidder (as defined in the Wink Bidding Procedures)) may be made on November 4, 2015 at 12:00 p.m. (Eastern Time):

| Debtors | Proposed Counsel to the Debtors |
|---|---|
| Quirky, Inc.<br>606 West 28th Street<br>New York, New York 10010<br>Attn: Charles Kwalwasser, Esq.<br>      Ed Kremer | Cooley LLP<br>1114 Avenue of the Americas<br>New, York, New York 10036<br>Attn: Jeffrey L. Cohen, Esq.<br>      Michael A. Klein, Esq. |
| **United States Trustee** | **Counsel to the Wink Stalking Horse Bidder** |
| Office of the United States Trustee for the Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn: Paul Schwartzberg, Esq. | Dentons US LLP<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL 60606<br>Attn: Robert E. Richards, Esq. |
| **Counsel to Comerica** | **Proposed Counsel to the Committee** |
| Sheppard, Mullin, Richter & Hampton LLP<br>Four Embarcadero Center<br>17th Floor<br>San Francisco, CA 94111<br>Attn: William R. Wyatt, Esq. | Otterbourg P.C.<br>230 Park Avenue<br>New York, NY 10169<br>Attn: Melanie L. Cyganowski, Esq.<br>Kevin Zuzolo, Esq. |

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED CURE COST SHALL BE (A) FOREVER BARRED FROM OBJECTING TO THE CURE COSTS AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT OT THE CONTRACTS, AND THE DEBTORS AND THE SUCCESSFUL BIDDER SHALL BE ENTITLED TO RELY SOLELY UPON THE CURE COSTS LISTED ON EXHIBIT A, AND (B) FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING AGAINST THE DEBTORS OR THE SUCCESSFUL BIDDER THAT ANY ADDITIONAL AMOUNTS ARE DUE OR OTHER DEFAULTS EXIST OR ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER

**INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO THE SUCCESSFUL BIDDER AND ANY CURE AMOUNTS RELATED THERETO.**

**PLEASE TAKE FURTHER NOTICE** that the hearing with respect to the Cure Objections may be held (i) at the Sale Hearing, or (ii) on such other date as the Bankruptcy Court may designate. To the extent the Debtors and non-Debtor counterparty to a Contract are able to consensually resolve the Cure Objection prior to the Sale Hearing, the Debtors shall promptly provide notice to the Committee and the Successful Bidder of such resolution. To the extent the Debtors and non-Debtor counterparty to a Contract are unable to consensually resolve the Cure Objection prior to the Sale Hearing, then the amount to be paid with respect to the Cure Cost will be determined at the Sale Hearing or at such other date and time as may be fixed by the Bankruptcy Court. A Cure Cost Escrow is provided for in the Wink Agreement.

Dated:   October ___, 2015
      New York, New York

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile:  (212) 479-6218
Jeffrey L. Cohen
Michael A. Klein
Richelle Kalnit

*Proposed Counsel for Debtors and Debtors in Possession*

## Exhibit A to Assumption And Assignment Notice

### CONTRACTS

| Counterparty | Counterparty Address | Title/Description of Contract | Cure Cost |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |